```
          IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF OREGON PORTLAND DIVISION


PATSY JAY,

       Plaintiff,

v.                              Case No.:  3:23-cv-656

GRAND MANAGEMENT SERVICES, INC.,

EVERGREEN GARDENS LIMITED PARTNERSHIP,

JERRY MASCOLO, LEONDRA COLEMAN, and DAWN COCKRUM,

       Defendants.




                                      DEPOSITION OF

                                      KRISTIN SMITH

                                           TAKEN ON
                               THURSDAY, JULY 18, 2024
                                          9:09 A.M.


                                   OREGON LAW CENTER
                             490 NORTH SECOND STREET
                              COOS BAY, OREGON 97420
```

Page 2

```
 1                  APPEARANCES
 2
 3   Appearing on behalf of the Plaintiff:
 4   CARLY R. CRIPPS, ESQUIRE
 5   Oregon Law Center
 6   230 NE 2nd Avenue, Suite F
 7   Hillsboro, Oregon 97124
 8   (541) 726-4381
 9   (604) 726-4382 (Fax)
10   ccripps@oregonlawcenter.org
11
12   -and-
13
14   WILLIAM NIESE, ESQUIRE
15   NICOLE M. PRICHARD, ESQUIRE
16   Oregon Law Center
17   490 N. 2nd Street
18   Coos Bay, OR 97420
19   (541) 269-1226
20   npritchard@oregonlawcenter.org
21   bniese@oregonlawcenter.org
```

Page 3

```
 1             APPEARANCES CONTINUED
 2
 3   Appearing on behalf of the Defendant Evergreen
 4   Gardens Apartments:
 5   NATHAN B. MCCLINTOCK, ESQUIRE
 6   Corrigall & McClintock, LLP
 7   936 Central Avenue
 8   Coos Bay, Oregon 97420
 9   (541) 269-1123
10   nmcclintock@epuertot.com
11
12   Appearing on behalf of the Defendant Grand
13   Management Services, et al.:
14   HEIDI L. MANDT, ESQUIRE
15   Williams Kastner
16   1515 SW 5th Avenue, Suite 600
17   Portland, Oregon 97201
18   (503) 288-7967
19   (503) 222-7261 (Fax)
20   hmandt@williamskastner.com
```

Page 4

```
 1                INDEX OF EXAMINATION
 2                                                    Page
 3
 4   EXAMINATION BY MR. NIESE                            7
 5   EXAMINATION BY MS. MANDT                           68
```

Page 5

```
 1                     EXHIBITS
 2   Exhibit                                          Page
 3
 4    1      EMAIL                                      23
 5    2      NOTES                                      28
 6    3      PETITION FOR RESTRAINING ORDER             31
 7    4      EMAIL                                      32
 8    5      NOTICE OF INTENT TO EVICT                  35
 9    6      EMAIL                                      38
10    7      TENANT TO LANDLORD WRITTEN                 42
11           COMPLAINT
12    8      LETTER                                     42
13    9      NOTE                                       45
14   10      INCIDENT REPORT                            46
15   11      EMAIL                                      51
16   12      NOTICE OF LEASE VIOLATOIN                  55
17   13      EMAIL                                      64
```

(800) 528-3335   NAEGELI DEPOSITION & TRIAL Established 1980   NAEGELIUSA.COM

Page 6

1                DEPOSITION OF
2                KRISTIN SMITH
3                  TAKEN ON
4            THURSDAY, JULY 18, 2024
5                  9:09 A.M.
6
7        THE REPORTER:  We are on the record at
8  9:09 a.m.
9        Ms. Smith, will you please raise your
10 right hand.
11       Do you affirm under penalty of perjury
12 that the testimony you are about to give will be the
13 truth, the whole truth, and nothing but the truth?
14       THE DEPONENT:  I do.
15       THE REPORTER:  Thank 1ttorney please state
16 their name and whom they represent today?
17       MR. NIESE:  My name is William Niese.  The
18 last name is spelled N-i-e-s-e.  I represent Patsy
19 Jay.
20       MS. CRIPPS:  Carly Cripps.  I represent
21 Patsy Jay.
22       MS. PRITCHARD:  Nicole Pritchard.  I
23 represent Patsy Jay.
24       MR. MCCLINTOCK:  Nathan McClintock.  I
25 represent Evergreen.

Page 7

1        MS. MANDT:  Heidi Mandt on behalf of Grand
2  Management and all individual Grand Management
3  defendants.
4        THE REPORTER:  Thank you so much.
5  Counsel, please proceed.
6  KRISTIN SMITH, having been first duly sworn, was
7  examined, and testified as follows:
8  EXAMINATION
9  BY MR. NIESE:
10    Q.   Could you please state and spell your
11 name?
12    A.   Kristin Smith, K-r-i-s-t-i-n, S-m-i-t-h.
13    Q.   Thank you.  And have you been deposed
14 before?
15    A.   Yes.
16    Q.   Okay.  And when -- under what
17 circumstances?
18    A.   For work.  Work related.
19    Q.   Okay.  Can you elaborate on that?
20    A.   Two court cases.  One was in my early 20s.
21 It was a tenant that had a mold issue.  Didn't end
22 up going to trial.  And the second one was an HR
23 issue in 2019-ish.
24    Q.   Okay.
25    A.   And that did go to trial.

Page 8

1    Q.   Okay.  So, as I said, this is a
2  deposition.  Please answer clearly and out loud.  If
3  you need to take a break, you may do so, except
4  while the question is pending.  Have you taken any
5  drugs or medications today that would affect your
6  ability to answer questions completely and
7  truthfully?
8    A.   No.
9    Q.   Okay.  And what, if anything, have you
10 done to prepare for this deposition?
11    A.   I met with my attorney --
12    Q.   Okay.
13    A.   -- last night.
14    Q.   And have you reviewed any documents in
15 preparation for this deposition?
16    A.   I've looked over the file.
17    Q.   Oh, which -- which -- which file?
18    A.   Patsy Jay's --
19    Q.   And is -- was that --
20    A.   -- file pertaining to this matter.
21    Q.   Okay.  Have you provided copies of that
22 file to your attorney?
23    A.   Of course.
24    Q.   And could we get copies of those documents
25 of that file?

Page 9

1    A.   You already have it.
2         MR. MCCLINTOCK:  You already have.
3         MS. MANDT:  You already have.
4  BY MR. NIESE:
5    Q.   Okay.  Thank you.  Have you talked to
6  anyone aside from your attorney in preparation for
7  today's deposition?
8    A.   My staff.
9    Q.   Which -- which members of your staff?
10    A.   Jerry Mascolo.
11    Q.   Okay.  And anyone else?
12    A.   No.
13    Q.   Okay.  Thank you.  Who is your current
14 employer?
15    A.   Grand Management Services.
16    Q.   And what is your position there?
17    A.   Property manager/owner.
18    Q.   Okay.  How long have you been employed by
19 Grand Management?
20    A.   Almost 30 years.
21    Q.   Okay.
22    A.   Twenty-eight and a half or something.
23    Q.   Okay.  Do you know Jerry Mascolo?
24    A.   Yes.
25    Q.   In what capacity?

Page 14

```
 1  eviction notice based on noise complaints or noise?
 2       A.   If it was repetitive, then yes.
 3       Q.   Would it require police involvement before
 4  Grand Management would issue that notice of
 5  eviction?
 6       A.   A notice of eviction?  It would definitely
 7  have to be documented.  I don't know that it would
 8  require police action.
 9       Q.   Okay.  Does Grand Management have a policy
10  regarding physical relationships between employees
11  and tenants?
12       A.   Yes.
13       Q.   And is that policy in writing?
14       A.   Yes.
15       Q.   Does Grand Management have a written
16  policy regarding its response to violence between
17  tenants?
18       A.   I -- I'm not sure if it's written.
19       Q.   Okay.
20       A.   We certainly have to take action.
21       Q.   So what would Grand Management's policy be
22  if you had reason to believe that tenant A attacked
23  tenant B?
24            MS. MANDT:  Object -- object to the form.
25  You can answer.
```

Page 15

```
 1            THE DEPONENT:  I mean, again, that's a
 2  very broad statement.  I -- I have personally been
 3  attacked and we tried to do an eviction for
 4  substantial harm with 24-hour notice, and that was
 5  not allowed.  You actually have to hit someone.  And
 6  the -- the judge informed me that it has to be an
 7  actual assault.  So we may give a 14/30, that's what
 8  we call it.  It's a notice of intent to evict if it
 9  was repetitive.  I don't know if that answers your
10  question.  It's very broad, your -- your question.
11  BY MR. NIESE:
12       Q.   Okay.  Well, let me see if I can narrow it
13  down.  What would your policy be if a tenant called
14  you and said my neighbor punched me in the face?
15            MS. MANDT:  Well, I'm going to object to
16  the form.  It's an improper hypothetical.  You can
17  answer the question if you can.
18            THE DEPONENT:  Well, we would investigate
19  and hopefully, there would be a police record and
20  they would be issued a notice of intent to evict.
21  That's the most stringent notice that we're allowed
22  to give under the Rural Development Rules and
23  Regulations, and it does allow a cure period.
24  BY MR. NIESE:
25       Q.   Okay.  So that would be a 3014?
```

Page 16

```
 1       A.   Yes.
 2       Q.   What would your investigation entail?
 3       A.   Interviewing both parties and reviewing
 4  police records and any witnesses and the site
 5  manager, if -- if she had record or was a witness or
 6  had documents.
 7       Q.   What would you do if there was no police
 8  involvement in the call?
 9       A.   I mean, we would do the best we can, but
10  if we found, through our investigation, that it
11  actually happened that there was witnesses, then we
12  would issue the 14/30.  That's all we can do.
13       Q.   Okay.  So you -- if there were --
14       A.   If it was physical, though, if it was
15  physical, we would certainly attempt the 24-hour
16  notice of substantial harm.
17       Q.   Okay.  What if there were no witnesses?
18            MS. MANDT:  Object to the form.
19  BY MR. NIESE:
20       Q.   What would -- what would your policy be if
21  tenant A said tenant B punched me in the face, but
22  you could locate no witnesses?
23       A.   Well, is there damages?  Can you see a
24  bruise on the tenant?  I mean, there would have to
25  be some evidence.
```

Page 17

```
 1       Q.   Okay.
 2       A.   But we would do what we could.  You know,
 3  that's what we always try to do.
 4       Q.   Okay.
 5       A.   We do the best we can.
 6       Q.   Does Grand Management have a written
 7  policy for when one tenant sexually assaults or
 8  sexually harasses another tenant?
 9            MS. MANDT:  Object to the form.
10            THE DEPONENT:  We have a lease agreement
11  that states tenant duties and reasons for
12  termination, and that is one of them, yes.  You
13  cannot sexually harass --
14  BY MR. NIESE:
15       Q.   Is -- is that --
16       A.   -- another tenant.
17       Q.   Is that the entirety of your sexual
18  harassment, sexual assault policy, is that --
19       A.   We also --
20       Q.   -- is the -- is the rental agreement?
21       A.   For tenants?  I mean, there is --
22       Q.   Yes, for tenants.
23       A.   -- there is a Rural Development handbook.
24       Q.   Again, that's not my question.  My
25  question is does Grand Management have a written
```

Page 18

```
 1  policy, outside of the rental agreement, dealing
 2  with an issue when one tenant sexually assaults or
 3  sexually harasses another tenant?
 4          MS. MANDT:  Object to the form.
 5          THE DEPONENT:  We have a tenant
 6  eligibility criteria.  We have a selection plan.  We
 7  have a lease.  We have every document in the world.
 8  I don't know what that would be under.  We have an
 9  employee handbook.  There's no handbook on how to
10  deal with tenants, per se.  There's not a written
11  handbook of how to deal with every situation.
12          I mean, there's a operations manual, but
13  it doesn't go over, you know, stuff like this.  We
14  default to Oregon law and our lease agreement and
15  our rules, and those do state that you cannot
16  sexually harass.  We're also trained in fair housing
17  every year.
18  BY MR. NIESE:
19      Q.  Okay.
20      A.  So we do the best we can, but Rural
21  Development requires a cure period.
22      Q.  Is there a policy for how employees should
23  handle complaints of sexual harassment or sexual
24  assault?
25          MS. MANDT:  Object to form.
```

Page 19

```
 1          THE DEPONENT:  Yes.
 2  BY MR. NIESE:
 3      Q.  Okay.  And that's a written policy?
 4      A.  I'm not sure if it's written or not.
 5      Q.  Okay.  As the owner of Grand Management,
 6  do you have a responsibility to keep your tenants
 7  safe, even if the police don't intervene?
 8          MS. MANDT:  Object to form.
 9          THE DEPONENT:  Yes.
10  BY MR. NIESE:
11      Q.  What is Grand Management's policy when a
12  tenant reports being sexually assaulted or harassed
13  in their home?  Is that the same as you -- as -- the
14  same as you previously described?
15          MS. MANDT:  Object to form.
16          THE DEPONENT:  In their home?  Okay.  Can
17  you give me a little more detail on what that would
18  entail?  The --
19  BY MR. NIESE:
20      Q.  Someone is sexually assaulted or harassed
21  in their home --
22      A.  Okay.
23      Q.  -- that they're renting from you.
24      A.  To my knowledge, that wasn't the
25  situation.
```

Page 20

```
 1          MS. MANDT:  Well -- well, that's not the
 2  question.
 3          THE DEPONENT:  Okay.
 4          MS. MANDT:  Listen to his question and
 5  answer his question.
 6          THE DEPONENT:  Well, normally, the person
 7  would call the police, I would assume, if they were
 8  sexually assaulted in their home by a relative or
 9  friend or whoever their guest was.  So yes, we would
10  certainly take action if it was a tenant.  I --
11  you're not even explaining if it was another tenant.
12          MS. MANDT:  We're going to take a break.
13          MR. NIESE:  Sure.
14          THE REPORTER:  Okay.  We're off the record
15  at 9:22 a.m.
16          (WHEREUPON, a recess was taken.)
17          THE REPORTER:  We are back on the record
18  at 9:27 a.m.
19  BY MR. NIESE:
20      Q.  Did you rent a unit to Patsy Jay?
21      A.  Yes.
22      Q.  When did you begin renting that unit to
23  Ms. Jay?
24      A.  I would have to look for the date.  It's
25  approximately 24 years ago.
```

Page 21

```
 1      Q.  Okay.  Do you recall which unit she was
 2  renting or is renting?
 3      A.  Look on the file here.
 4          MS. MANDT:  No.  If you don't remember --
 5          THE DEPONENT:  Oh.  I don't remember --
 6  BY MR. NIESE:
 7      Q.  Okay.
 8      A.  -- off the top of my head --
 9      Q.  Okay.
10      A.  -- without looking.
11      Q.  Sure.  Has she lived --
12      A.  I want to say --
13      Q.  Has she lived in that unit through the
14  duration of her tenancy --
15      A.  I would have to see if she ever
16  transferred, but she's lived on the complex --
17      Q.  Okay.
18      A.  -- for the duration, yes.
19      Q.  Okay.  And are you aware that Ms. Jay
20  relies on a wheelchair and a walker for support?
21      A.  I don't know.  I've never met her in
22  person.  I just talked to her on the phone.
23      Q.  Okay.  Are you aware of -- of any of Ms.
24  Jay's disabilities?
25      A.  No.
```

Page 34

1   A.   When I prepped for today, I prepped for
2  Patsy Jay.
3   Q.   Okay.
4   A.   I did not prep for Cindy Fargher, or I
5  would have been more up on her dates of employ for
6  you.
7   Q.   Okay.  This email states that the so-
8  called consensual incident was sexual assault,
9  correct?
10  A.   I would have to read it.
11  Q.   Well, I -- I can give you a couple -- I
12 can give you a minute to read it.
13  A.   Okay.  She claims it was sexual assault.
14 Again, we didn't know any of this was going on --
15       MS. MANDT:  It's okay.
16       THE DEPONENT:  -- until after the fact.
17       MS. MANDT:  Answer only his question,
18 please.
19 BY MR. NIESE:
20  Q.   But it also mentions a gun incident,
21 correct?
22       MS. MANDT:  Object to the form.
23 BY MR. NIESE:
24  Q.   Does the email state, "It is pointless to
25 me to write anything about my personal concerns, as

Page 35

1  they haven't been acknowledged or addressed at all
2  since the gun incident and sexual assault has
3  occurred in February"?
4   A.   It states that, yes.
5   Q.   Okay.
6   A.   But that is --
7        MS. MANDT:  You answered his question.
8  BY MR. NIESE:
9   Q.   Okay.  Is it correct that Grand Management
10 issued a notice of intent to evict John McKnight on
11 or about March 7th, 2019?
12  A.   I would have to review, but yes --
13  Q.   Okay.
14  A.   -- we've tried several times to evict John
15 McKnight.
16       (WHEREUPON, a discussion was held off the
17 record.)
18       MR. NIESE:  Introduce this into evidence.
19       (WHEREUPON, Exhibit 5 was marked for
20 identification.)
21 BY MR. NIESE:
22  Q.   Give you a moment to review.
23  A.   Okay.
24  Q.   Okay.  So was this notice issued as a
25 result of Mr. McKnight's actions against Ms.

Page 36

1  Fargher?
2   A.   It was issued as a result of the actions
3  listed on page 3 of 4, starting with, "during the
4  last 60 days."  It lists out the reasons why we
5  issued this notice.
6   Q.   It mentions waving around of a gun; is
7  that correct?
8   A.   Yes.
9   Q.   Why was the sexual assault not mentioned
10 in this notice?
11       MS. MANDT:  Object to form.
12       THE DEPONENT:  I didn't write the notice.
13 I can't answer that.  I can tell you we went to
14 court on that sexual assault issue with a bunch of
15 witnesses, so I did not appear, but Richard Nored
16 did, and Jerry Mascolo did.  So you're -- you're
17 deposing them next week, so you could ask them about
18 that.
19  Q.   In what capacity did they go to court?
20 What -- what case was that?
21  A.   On the Cindy Fargher issue.
22  Q.   Was that for --
23  A.   For the restraining order --
24  Q.   Okay.
25  A.   -- type issue, yeah.

Page 37

1   Q.   Why did you issue a curable notice rather
2  than a 24 hour outrageous conduct notice, given the
3  gun issue?
4   A.   Because you can't evict just for waving a
5  gun or threatening to hurt someone or kill someone
6  or to punch someone.  It has to be, you did it.  And
7  I know that because I've been in this business 30
8  years and I've tried.  You have to issue a 14/30,
9  that is the RD regulations.  There must be a cure
10 period in subsidized housing, unless there is
11 substantial harm.  Like I said, an assault or a rape
12 or physical action.  It has to have taken place.
13  Q.   Okay.
14  A.   So we did what we could.
15  Q.   Okay.  On or about March 15th, 2019, did
16 you receive an email concerning another restraining
17 order entered against Mr. McKnight?
18  A.   I would have to look at the document.
19       MR. NIESE:  Yes.  I'm sorry.  I'm going to
20 need to take a short break.
21       THE REPORTER:  We are off the record at
22 10:00 a.m.
23       (WHEREUPON, a recess was taken.)
24       THE REPORTER:  We are back on the record
25 at 10:05.

**Page 46**

1          MS. MANDT: Object to the form. We'd only
2    be speculating.
3    BY MR. NIESE:
4         Q.   Again, without --
5              MR. NIESE: I would like to enter this
6    into -- into evidence, thank you.
7              (WHEREUPON, Exhibit 10 was marked for
8    identification.)
9    BY MR. NIESE:
10        Q.   Without discussing the contents of this
11   document, do you recognize what this document is?
12        A.   Yes.
13        Q.   And what is this document?
14        A.   It is an incident report.
15        Q.   Okay. Do you normally look at incident
16   reports when they come in?
17        A.   Yes.
18        Q.   Did you see this incident report?
19        A.   Yes.
20        Q.   Okay. So once you read a report stating
21   that Mr. McKnight, "Turned around, out of anger,
22   unzipped his pants, turned towards Patsy and started
23   walking towards her with his penis in his hand
24   saying, 'Come on, if you don't do it, someone else
25   will,'" what action did you take?

**Page 47**

1         A.   We investigated and issued a 14/30 to John
2    McKnight.
3         Q.   Okay. When the incident report tells you
4    that, "Patsy became frightened. Told John to find
5    someone else and get out. Still scared, Patsy
6    yelled 'get out' while crying," did that change your
7    opinion to maybe issue a 24-hour notice?
8              MS. MANDT: Object to form.
9              THE DEPONENT: Cannot issue a 24-hour
10   notice unless an action of physical assault has
11   taken place. I know this because I have tried many
12   times in my career. You have to issue a cure
13   period, and that's what I did.
14   BY MR. NIESE:
15        Q.   Were you aware that another restraining
16   order was filed against Mr. McKnight on July 16th,
17   2021?
18        A.   Yes.
19        Q.   What, if anything, did you do when you
20   found out about that restraining order being filed?
21             MS. MANDT: Object to form.
22             THE DEPONENT: We investigated and so did
23   the police.
24   BY MR. NIESE:
25        Q.   Okay. What -- what did your investigation

**Page 48**

1    entail? How did you investigate?
2         A.   We -- we interviewed witnesses, as did the
3    police, and several of the witnesses said that this
4    was a made up story, that Patsy Jay had told this
5    person that the story had been made up.
6         Q.   Okay. So you were aware that there were
7    three separate restraining orders obtained by three
8    separate women in three years against Mr. McKnight?
9         A.   I was aware of two.
10        Q.   Okay.
11        A.   One being an employee that had a
12   relationship and that was not granted, and then this
13   one. I don't know about any other one.
14        Q.   Did it concern you at all that you were
15   renting a unit -- a unit to someone with so many
16   restraining orders issued in such a short amount of
17   time?
18             MS. MANDT: Object to form.
19             THE DEPONENT: They weren't issued. The
20   first one was denied, and then this one was issued,
21   but there was no prosecution because of the
22   investigation showed that it may not happen -- may
23   not have happened because of the witnesses.
24   BY MR. NIESE:
25        Q.   Okay.

**Page 49**

1         A.   So the police --
2         Q.   Let me -- let me rephrase.
3         A.   Sure.
4         Q.   Did it concern you that you were renting a
5    unit to someone with so many restraining orders
6    filed against them in such a short amount of time?
7              MS. MANDT: Object to form.
8              THE DEPONENT: First restraining order was
9    not issued, so there had been none before this, to
10   my knowledge. So it concerned me that my
11   investigation, as well as the police support that we
12   received -- you know, we -- we were working with
13   police, their investigation also showed that there
14   was witnesses saying that this incident was made up
15   by Patsy Jay, and they'd end up prosecuting. So we
16   did what we could, which was issue the 14/30. That
17   was what we could do under our lease.
18   BY MR. NIESE:
19        Q.   Were you aware that Mr. McKnight was
20   arrested for violating the restraining order against
21   Ms. Jay?
22        A.   Yes.
23        Q.   And what, if anything, did you do when you
24   found out?
25             MS. MANDT: Object to form.

Page 50

```
 1        THE DEPONENT:  I mean, he had not re-
 2   offended.  I mean, the restraining order was
 3   something that I put on him, so I don't know what
 4   the right answer is here.
 5   BY MR. NIESE:
 6        Q.   Did you file a restraining order against
 7   Mr. McKnight?
 8        A.   No.  I said it wasn't ours, so it --
 9        Q.   Oh, okay.
10        A.   -- wasn't a violation of the 14/30.  I
11   mean, he lived right there.  He -- do you
12   understand?  His door was -- that's why he moved
13   out.  He couldn't not violate the restraining order.
14   He lived right there.  He lived within --
15        Q.   Okay.
16        A.   -- 500 feet of her unit.
17        Q.   So you did not consider a violation of his
18   restraining order a violation of his rental
19   agreement?
20        A.   He lived within the parameters of the
21   restraining order.  That is why --
22        Q.   Okay.
23        A.   -- he ended up moving out.
24        Q.   That wasn't the question.  The question
25   was did you consider this repeat violation -- did
```

Page 51

```
 1   you consider his violation of the restraining order
 2   a violation of his rental agreement?
 3        A.   I guess not.  There was no way for him to
 4   avoid not being within 500 feet of her door.  His
 5   door was within 500 feet of her.
 6        Q.   Okay.
 7             (WHEREUPON, Exhibit 11 was marked for
 8   identification.)
 9   BY MR. NIESE:
10        Q.   Is this an email to you from Jerry
11   Mascolo?
12        A.   Looks like it, yes.
13        Q.   It says, "Fuel for the case.  Looks like
14   they never pressed charges against him, so I would
15   say there is not treat then."
16        A.   I don't know what that means.
17        Q.   That wasn't my question.
18        A.   It was bad English, but I don't know what
19   that means.
20        Q.   Do you -- so you don't -- you don't -- you
21   don't know what this was about?
22        A.   That was a mistake.
23             MS. MANDT:  Just stop.  You're talking
24   over one another.  Wait for him to ask his question
25   before you answer.
```

Page 52

```
 1   BY MR. NIESE:
 2        Q.   Was this email in response to any
 3   questions that you had asked him?
 4        A.   I don't remember.
 5        Q.   Did your response to Mr. McKnight's
 6   actions, the restraining orders, the arrests, the
 7   allegations, did your response to those abide by
 8   Grand Management's written policies?
 9        A.   We abide by federal and state law in the
10   lease agreement, so yes.  In that regard, yes.
11        Q.   Do your tenants sign a written rental
12   agreement?
13        A.   Yes.
14        Q.   Is that a month to month or fixed term?
15        A.   Fixed term.
16        Q.   How long is --
17        A.   One year.
18        Q.   One year?  Okay.  Does that agreement
19   allow tenants to have potted plants on their
20   porches?
21        A.   Yes.
22        Q.   How many?
23        A.   I believe six.
24        Q.   Okay.  I'm sorry, did you say at least
25   six?
```

Page 53

```
 1        A.   I -- I believe six.
 2        Q.   Oh, you believe six.  Okay.  Thank you.
 3   And how was that number determined?
 4        A.   We -- we just made that policy.  We didn't
 5   want tenants -- you know, they can get out of
 6   control with potted plants, and it can look
 7   unsightly.  So we just wanted to put a number out
 8   there so people can abide by it --
 9        Q.   Okay.
10        A.   -- so we chose six.
11        Q.   Okay.  Are lawn chairs permitted on
12   porches and in yards under your rental agreement?
13        A.   If it's outside furniture and it does not
14   interfere with the pathway, then -- then yes, but
15   not inside things.
16        Q.   Okay.  But how about upholstered chairs or
17   other types of chairs?
18        A.   No.
19        Q.   Why not?
20        A.   It looks unsightly.  We want to have good
21   curb appeal.  That's part of our management.
22        Q.   What is -- what is curb appeal?
23        A.   Looking pleasant to the outsider.
24        Q.   Okay.  Are walkers or wheelchairs
25   permitted on the porch?
```

Page 54

1   A.  They're not usually allowed to leave them
2   there to impede the common pathway for other
3   tenants.
4   Q.  Okay.  What if they're not impeding the
5   pathway and they're just on the porch; is that okay?
6
7   A.  That is fine, but -- yes, that's allowed.
8   Q.  Okay.  Did you issue Patsy Jay an eviction
9   notice on or about August 20th, 2021?
10  A.  I personally did not, no.
11  Q.  Are you aware of her being issued an
12  eviction notice --
13  A.  I am aware of a document that someone else
14  wrote, Dawn Cockrum.
15  Q.  Okay.  Did that notice list having a
16  walker on her porch as a reason for its issuance?
17  A.  I don't know if it was on the porch or in
18  the planted area with gravel, but yes, it was left
19  in an area that was against the rules.
20  Q.  Okay.  Did Grand Management receive a
21  request for reasonable accommodation for Ms. Jay?
22  A.  I believe after that was issued, yes, we
23  received it --
24  Q.  Do you --
25  A.  -- and we granted it.

Page 55

1   Q.  -- do you recall when that was -- okay.
2   A.  No.
3   Q.  Okay.  And you did grant the request you
4   said, correct?
5   A.  Yes.
6   Q.  Okay.  And are you aware that Ms. Jay
7   filed a HUD complaint against Grand Management on or
8   about August 30th, 2022?
9   A.  Yes.
10  Q.  On or about March 28th, 2023, did Grand
11  Management issue Ms. Jay a notice of lease violation
12  warning?
13  A.  I would have to look --
14  Q.  Okay.
15  A.  -- at the document.  I -- I didn't issue
16  it to her.
17      MR. NIESE:  Okay.  I have it.  I just need
18  to make some copies.  Let me take a quick break.
19      THE REPORTER:  We are off the record at
20  10:36.
21      (WHEREUPON, a recess was taken.)
22      THE REPORTER:  We are back on at 10:41.
23      MR. NIESE:  Okay.  Thank you.
24      (WHEREUPON, Exhibit 12 was marked for
25  identification.)

Page 56

1   BY MR. NIESE:
2   Q.  So do you recognize -- without talking
3   about the substance of the document, do you
4   recognize what this document is?
5   A.  It looks like a lease violation --
6   Q.  Okay.
7   A.  -- for not turning in all of her recert
8   paperwork needed to complete her tenant
9   recertification.
10  Q.  Okay.  And was that information on her
11  life insurance policy?  Is that what was requested?
12  A.  I'm not sure.  I do know that she
13  submitted it, like, the next day.
14  Q.  Okay.
15  A.  So it was cured.
16  Q.  Okay.
17  A.  But she's supposed to only have 14 days.
18      MS. MANDT:  Just --
19      THE DEPONENT:  Oh, okay.
20  BY MR. NIESE:
21  Q.  If you could look on the second page?
22  Thank you.
23  A.  Okay.
24  Q.  Does that refresh your memory?  Is that --
25  can you -- can you state that --

Page 57

1   A.  Oh, yeah.  It says Colonial Life Insurance
2   Policy.
3   Q.  Okay.
4   A.  Yeah.
5   Q.  Okay.  Thank you. Is that life insurance
6   policy information necessary to recertify her?
7   A.  It appears so, yes.
8   Q.  Okay.  Before -- let me -- let me
9   rephrase.  Had Ms. Jay ever been given a notice
10  based on not submitting her life insurance policy?
11  A.  I don't know.
12  Q.  Do -- do -- okay.  Do you know a Sharon
13  Elrod?
14  A.  She was a manager there --
15  Q.  Okay.
16  A.  -- after Cindy.
17  Q.  Are you aware that Ms. Elrod informed Ms.
18  Jay that her life insurance information was not
19  required?
20  A.  If it's whole life, it is required.  I
21  don't know if it's whole or -- or part, but we need
22  that information for the file.
23  Q.  But are you aware that Ms. Elrod informed
24  Ms. Jay that it wasn't?
25  A.  No.

Page 66

1  Q.  So would he tell someone that a
2  restraining order would be an automatic 24-hour
3  eviction without you giving him that order?
4  A.  Absolutely not.  Absolutely not.
5  Q.  He wouldn't tell them that?
6  A.  He would not.
7  Q.  Okay.
8  A.  And it sounds like you're deposing him, so
9  you can ask him directly, but that was not something
10 that we would say.
11 Q.  Did you ever issue a notice to Mr.
12 McKnight regarding termination of employment?
13 A.  We never used him again.  He wasn't really
14 an employee.  We -- he fixed a couple things on the
15 property when we were in between handymen at Cindy's
16 request, apparently, because he was her boyfriend.
17 We didn't know that at the time.  But -- but no, we
18 didn't use him again.
19 Q.  Okay.  This email states that every
20 resident here is in danger.  Do you agree with that
21 assessment?
22 A.  No.
23 Q.  Why not?
24 A.  She's a --
25 Q.  Who's she?

Page 67

1  A.  She -- Cindy, sounds like a -- a person --
2  you know, she obviously broke up with this man and
3  they had a -- a situation.  Again, I'm not going to
4  speculate what happened in their sexual life, but
5  she's clearly mad and wants him out of there, so
6  this is her opinion.  But again, she was in the
7  wrong.
8  Q.  Did you respond to this email?
9  A.  I don't believe so.
10 Q.  Okay.
11 A.  It wasn't to me.
12 Q.  Did you talk to Sharon about this email?
13 A.  I don't remember.  It was a long time ago.
14 Probably, but I don't remember.
15 Q.  Probably?
16 A.  I don't remember.
17 Q.  Okay.
18     MR. NIESE:  Okay.  Another short break,
19 please.
20     THE REPORTER:  We are off the record at
21 10:56.
22     (WHEREUPON, a recess was taken.)
23     THE REPORTER:  Back on at 10:56.
24     MR. NIESE:  No further questions.
25     MR. MCCLINTOCK:  I have no questions at

Page 68

1  this time.
2     MS. MANDT:  All right.
3  EXAMINATION
4  BY MS. MANDT:
5  Q.  Ms. Smith, how long has Grand Management
6  Services been in existence?
7  A.  Since about 1994.
8  Q.  How many units does Grand Management
9  manage?
10 A.  Currently, almost 1,300.
11 Q.  And are those located, excuse me,
12 throughout the state of Oregon?
13 A.  Yes, in 15 counties.
14 Q.  How many of those units are RD or low-
15 income units?
16 A.  About half, so about 650.
17 Q.  And Evergreen Gardens, is that a RD, Rural
18 Development Program, living situation?
19 A.  Yes.
20 Q.  So can you -- what does the -- basically,
21 what is the Rural Development Program?
22 A.  It's a program through USDA Rural
23 Development under the Department of Agriculture that
24 provides subsidy to low-income tenants.
25 Q.  Is it basically Section 8 housing?

Page 69

1  A.  It is not.  Section 8 is through HUD --
2  Q.  Okay.
3  A.  -- so it's a different division.
4  Q.  Okay.
5  A.  But it is similar.
6  Q.  But it's similar?  Okay.  And so specific
7  to Evergreen Gardens, what are the requirements to
8  apply and obtain housing at that apartment complex?
9  A.  You have to be 62 years of age or older or
10 disabled, handicapped, regardless of age.  And you
11 have to meet income parameters.
12 Q.  Okay.  And you -- and so each tenant,
13 whether it's Ms. Jay, Mr. McKnight, or anyone else,
14 has to apply to reside there; is that correct?
15 A.  Yes.
16 Q.  Okay.  And is that just simply filling out
17 a one-page application?
18 A.  It's several pages, but yes, they fill out
19 an application.
20 Q.  And is that information required by RD?
21 A.  Yes.
22 Q.  Okay.  And you talked about a couple of
23 different things that I want to clarify.  You talked
24 about the recertification process, and you talked
25 about the one-year lease agreement.  How do those

Page 70

1  things correspond with one another?
2     A.  When they move in and sign a lease, the
3  recertification date is at least annually on that
4  anniversary date.  Now, sometimes that date changes.
5  If they have a change in income, whether it's up or
6  down, or a change in household size, and they
7  recertify internally then that can change their
8  annual recertification date, but it's at least once
9  a year.
10    Q.  Okay.  So if I represent to you that when
11 Ms. -- Ms. Jay moved in in May of 2021, okay?
12 Assuming that there was no change in her status,
13 when would the recertification information have been
14 provided to her?
15    A.  Well, the recertification date would be
16 5/1 --
17    Q.  Okay.
18    A.  -- but she would be provided with the
19 information on 3/1, and she would have 14 days to
20 fill out the packet --
21    Q.  Okay.
22    A.  -- and return it to the office.
23    Q.  And this is done every year?
24    A.  Every year.
25    Q.  Okay.

Page 71

1     A.  And it's not '21, it's 2001, I believe.
2     Q.  I'm sorry, 2001.
3     A.  She's lived there a long time.
4     Q.  Okay.  And so if she received the
5  certification packet in early 2023, she had 14 days
6  to respond, correct?
7     A.  Yes.
8     Q.  And if she did not respond within those 14
9  days, what would occur?
10    A.  She would get the violation notice that
11 she received, and there's also a 60-day notice of
12 recertification and a 30 day.  Those 60 days and 30
13 days are standard forms.  They're in the RD
14 handbook, they're required.  It basically states if
15 you don't get the information in, your rent is going
16 to go to market.
17    Q.  Okay.  So if she had not completed that
18 recertification packet by May 1 of 2023, what would
19 have occurred?
20    A.  She would have lost her subsidy.
21    Q.  Okay.
22    A.  So she would have gone to market.
23    Q.  Does that mean she'd be evicted or that
24 she would pay a higher rent?
25    A.  We would -- we would terminate her, but

Page 72

1  she would have to pay the full amount of rent, the
2  note -- the note rate rent for the unit.
3     Q.  Okay.  So pulling numbers out of the air,
4  it's a $1,500 unit, but because of her subsidy,
5  she's paying 300 bucks.  She would have to pay that
6  additional $1,200?
7     A.  Right, but it's not $1,500.
8     Q.  No, no, no.  I understand.
9     A.  It's less than that, but yeah.
10    Q.  I understand, but --
11    A.  Yes.
12    Q.  And would that have been for the entire
13 time that she lived there?
14    A.  Until we terminate.  She has to comply
15 with the program still, so she would be terminated,
16 but --
17    Q.  Okay.  And so would this have been the
18 process that would have occurred in 2022, 2023?
19    A.  Yes.
20    Q.  Did it occur in 2024?
21    A.  Yes.
22    Q.  Okay.
23    A.  It has to.
24    Q.  And does everyone's -- and this is a
25 process that every single tenant that is under the

Page 73

1  RD subsidy goes through every single year?
2     A.  Yes.
3     Q.  Okay.  So in -- in a given year, how many
4  30-day, 60-day notices does Grand Management send to
5  its residents?
6     A.  Hundreds.
7     Q.  Okay.
8     A.  We're required to do it.
9     Q.  And if Grand Management doesn't send those
10 notices, is there a -- but is there some form of a
11 violation of -- of the RD program on your behalf?
12    A.  Yes.
13    Q.  Okay.
14    A.  It would be written up.
15    Q.  Okay.  And so for all of the various units
16 that are RD that you manage, this same process is
17 going on for every single tenant?
18    A.  Yes.
19    Q.  Anything special about Ms. Jay getting a
20 notice in March of 2023 that she had not provided
21 the information that was requested?
22    A.  No.  You need to provide that.  It's a
23 requirement.
24    Q.  Okay.  Any reason to think that Ms. Jay
25 was not aware that she needed to provide that

Page 74

```
 1  information based on the fact that she had lived at
 2  Evergreen Garden since 2001?
 3       A.   She should have been very aware of it.
 4       Q.   Okay.  Who handled the recertification
 5  process from Grand Management?
 6       A.   Depends on what year you're speaking of.
 7       Q.   Okay.  Let's talk about 2023.  Who would
 8  have been in charge of it?
 9       A.   Jerry Mascolo.
10       Q.   Okay.  And with respect to, you were asked
11  some names, Dawn Cockrum, who is that?
12       A.   She was an employee that worked in the
13  same department as Jerry, right under him, and she
14  was compliance specialist.
15       Q.   Okay.  And Leondra Coleman?
16       A.   She was a site manager for Evergreen
17  Gardens.
18       Q.   How long was she employed?
19       A.   I would have to look.  I'm not sure.
20       Q.   Okay.  With respect to the complaint, the
21  HUD complaint, that was filed by Ms. Jay with
22  respect to Grand Management, is there any
23  relationship between that complaint and the issuance
24  of the 30-day notice?
25       A.   No.
```

Page 75

```
 1       Q.   Do you have a recollection of why or what
 2  Ms. Jay's allegations were that she raised in the
 3  HUD complaint?
 4       A.   Yes.
 5       Q.   And what were those?
 6       A.   Well, it pertained to this issue, so it
 7  pertained to the incident that happened with John
 8  McKnight --
 9       Q.   Okay.
10       A.   -- and she felt that was sexual
11  harassment.
12       Q.   And Mr. McKnight -- this incident with Mr.
13  McKnight occurred in the year, calendar year of
14  2021?
15       A.   Yes.
16       Q.   Okay.  Mr. McKnight was evicted, or he --
17  he was not evicted.  He left Evergreen Gardens in
18  2021?
19       A.   Yes.
20       Q.   Okay.  And after he left Evergreen Gardens
21  in 2021, Ms. Jay would have gone through the
22  recertification process in early 2022?
23       A.   Yes.
24       Q.   At any point in time, was there any
25  verification of any physical contact between Ms. Jay
```

Page 76

```
 1  and Mr. McKnight in 2021?
 2       A.   Physical contact?
 3       Q.   Yes.
 4       A.   No.
 5       Q.   Okay.  And I want to -- you mentioned it
 6  several times, and I want to give you the
 7  opportunity to talk about it.  What -- I mean, you
 8  oversaw this -- this particular housing unit at some
 9  point in time, correct?
10       A.   Yes.
11       Q.   How many times were you the -- the -- the
12  portfolio manager for Evergreen Gardens?
13       A.   Many times in my career, but most
14  recently, like, 2017 to 2019.
15       Q.   Okay.  And throughout the time of your
16  operating -- well, before I get to that, what is the
17  demographic makeup between men and women at
18  Evergreen Gardens?
19       A.   I would have to look specifically, but
20  there's way more women than men.  There's only a
21  couple of men at the -- at the -- the -- I don't --
22  I don't want to say a couple and, you know, have it
23  be five or six.
24       Q.   Right.
25       A.   But anyways, there's a fewer percentage of
```

Page 77

```
 1  males --
 2       Q.   Okay.
 3       A.   -- than women.
 4       Q.   And prior to the reported incident by Ms.
 5  Jay in 2021, were you aware of tenants making
 6  complaints against her?
 7       A.   Against Patsy?
 8       Q.   Yes.
 9       A.   Yes.
10       Q.   Okay.  And what type of complaints do you
11  have a recollection of?
12       A.   She hit a tenant in the laundry room once.
13       Q.   Okay.  And what was the result of that?
14       A.   I'm -- I'm not a hundred percent sure.
15  There was a -- a legal case, and she did receive a
16  14/30, but it was cured.
17       Q.   Okay.  And when you say that, does that
18  mean that -- that she, essentially, didn't hit
19  anybody else in 14 days?
20       A.   Correct.
21       Q.   After that --
22       A.   It never happened again.
23       Q.   Okay.  So if she had hit somebody within
24  those 14 days, what would have occurred?
25       A.   She would have been terminated, evicted.
```

Page 78

1   Q.   Okay.  What other type of complaints do
2  you recall receiving about Ms. Jay during the time
3  that she's lived there?  Just in general?  It
4  doesn't have to be specifics.
5   A.   I'm not sure, but she's kind of a busybody
6  and she gets involved in a lot of different things,
7  but those were the major things.  It was the fight
8  in the laundry room and then this John McKnight
9  situation.
10   Q.   Do you recall her being accused of
11 stealing somebody's cell phone?
12   A.   Maybe.
13   Q.   Okay.
14   A.   I'd have to look back.
15   Q.   Okay.
16   A.   But yeah, she's a busybody in the complex,
17 so there's been other issues.  Fights with other
18 tenants.  Just verbal fight, you know, not physical
19 fights.
20   Q.   So she has not only filed complaints
21 against other tenants other than just Mr. McKnight,
22 but she's also had complaints filed against her?
23   A.   Yes.
24   Q.   And are you aware of prior to 2021, what
25 Ms. Jay's relationship was like with Mr. McKnight?

Page 79

1   A.   They were best friends, and he walked her
2  dog twice a day.
3   Q.   Okay.  And what -- what else gives you the
4  impression that they were best friends?
5   A.   I have about 35 little notes between them
6  saying, I love you, you're my best friend, I'm so
7  glad you're in my life, you're so sweet.
8   Q.   Okay.
9   A.   You know.
10   Q.   And you mentioned that when Cindy Fargher
11 filed for a protective order, there was a court case
12 --
13   A.   Yes.
14   Q.   -- where there was a court hearing.
15   A.   Yes.
16   Q.   Did you attend that court hearing?
17   A.   No, but several members of my staff did.
18   Q.   Okay.  And did Ms. -- to the best of your
19 knowledge, did Ms. Jay attend that court hearing?
20   A.   Yes, along with several tenants.  I don't
21 know how many.  Ten maybe.
22   Q.   Okay.
23   A.   Quite a few.
24   Q.   And is it your understanding that Ms.
25 Jay's presence at that court hearing was to support

Page 80

1  Mr. McKnight?
2   A.   Yes, it was.
3   Q.   Okay.  Did she also present herself in
4  response to any other -- well, strike that.  You may
5  not know the -- I'll ask you a different question.
6        And so -- and do you know if any of your
7  staff testified at that hearing on the protective
8  order?
9   A.   We did.
10   Q.   Who specifically, do you know?
11   A.   My father, Richard Nored, and Michelle
12 Gibbons, I believe.  And I thought Jerry Mascolo
13 went as well.
14   Q.   And Michelle Gibbons is who?
15   A.   She, at the time, was a regional manager.
16 I don't think at the time of this, but at the time
17 of the Cindy Fargher thing.
18   Q.   Okay.  And -- and it's your understanding
19 that no protective order was issued based on the
20 presentation that was made at that court hearing?
21   A.   That's correct.
22   Q.   Was Ms. Fargher terminated from her
23 employment?
24   A.   I don't believe so.  I think she quit.
25   Q.   Okay.  Based on your experience in serving

Page 81

1  as the portfolio manager at Grand -- at Evergreen
2  Gardens, is there a lot of complaints going on
3  between the tenants?
4   A.   Well, when he -- when he was there, there
5  was a lot of back and forth.
6   Q.   Okay.
7   A.   He said/she said type.
8   Q.   And did that occur with the other male
9  residents of Evergreen?
10   A.   I mean, he's the one that kind of sticks
11 out in my mind.  There wasn't -- I don't remember
12 another name off the top of my head --
13   Q.   Okay.
14   A.   -- at this complex.
15   Q.   At any point in time that Mr. McKnight was
16 a resident at Evergreen Gardens, did you ever verify
17 that there had been physical contact between Mr.
18 McKnight and any other resident?
19   A.   No.
20   Q.   And if that had occurred, if you had been
21 able to verify that, either through your own
22 investigation or the police investigation, what
23 would have occurred?
24   A.   I would have issued the only more
25 stringent eviction notice that I could, which is a

Page 82

1  24-hour notice of substantial harm.
2      Q.   Okay.  Are you aware, and I apologize if I
3  asked you this, but did Ms. Coleman -- do you know
4  how long she was the property manager or the onsite
5  manager for Evergreen?
6      A.   I don't know exactly.  I think it was less
7  than a year.
8      Q.   Do you know if she ever had a personal
9  relationship with Mr. McKnight?
10     A.   Not to my knowledge.
11     Q.   Did her leaving her employment at
12 Evergreen -- or with Grand Management have anything
13 to do with Mr. McKnight?
14     A.   I don't believe so, no.
15     Q.   Okay.  Let's go back.  I want to ask you
16 some questions about this very first email you were
17 handed on the Temera Porter matter.
18          MR. MCCLINTOCK:  What exhibit?
19          MS. MANDT:  I think it's Exhibit 1.
20          THE DEPONENT:  Okay.  Let me find it here.
21 Okay.
22 BY MS. MANDT:
23     Q.   Do you know -- so there's mention in here
24 about a court date.  Do you know what court date is
25 referred to?

Page 83

1      A.   Not really, but I know that she wanted her
2  deposit back.  That was the deal that we had
3  negotiated.  She wanted me to hand her the deposit,
4  and state law gives me 31 days.
5      Q.   Okay.
6      A.   And so I had agreed to it, apparently, if
7  she -- apparently she -- I mean, I don't know.  The
8  -- this indicates that we had a deal that I was
9  going to hand it over if she returned keys.
10     Q.   Was there any quid pro quo that if she
11 didn't testify at a protective order hearing, you
12 would give her money, or --
13     A.   No.
14     Q.   -- pay her off or --
15     A.   No.
16     Q.   -- anything along those lines?
17     A.   No.
18     Q.   Okay.  Do you know if she -- did -- had
19 she filed an action against Grand Management to get
20 her deposit back?
21     A.   No.  We gave it back to her.  It's just we
22 didn't hand it to her that day because she didn't
23 turn in the keys like she was supposed to.
24     Q.   So when she talks about in this last
25 communication, "So either I go back and make another

Page 84

1  court date, or we wait.  I want my deposit today.
2  I've completed everything you requested.  Now the
3  ball is in your court."  What court date is she
4  referring to?
5      A.   Nothing to do with us.  I think it must --
6  I don't know if she had something against John
7  herself.
8      Q.   Okay.
9      A.   If that was -- I don't -- I -- I don't
10 know, but it wasn't us.
11     Q.   Okay.
12     A.   To my knowledge.
13     Q.   Did you have other communications with Ms.
14 Porter, other than what is referred to in this
15 email?
16     A.   Not to my knowledge.  I didn't even really
17 remember that.
18     Q.   It refers to -- there's a -- where it says
19 subject line, forward video.  Do you know what that
20 refers to?
21     A.   No.
22     Q.   It says on this first page, it says 7110
23 at the bottom, about halfway through, it says, "I
24 was railroaded by Patsy Jay, and Muriel (phonetic),
25 Cindy and John.  They have talked to everyone that

Page 85

1  lives there about me getting evicted, and again,
2  it's all lies.  You accused" -- and then it talks
3  about, "You accused me of going door to door,
4  claiming my innocent."  Do you know what that refers
5  to?
6      A.   I don't remember.
7      Q.   Okay.  Have you had any communication with
8  Ms. Porter since October of 2018 when she left
9  Evergreen Gardens?
10     A.   Not to my knowledge.
11     Q.   If GMS took an action against a tenant
12 outside of the RD guidelines, what would occur?
13 Well, how would -- how -- look, let me ask you this.
14 How -- how does RD evaluate your management of these
15 approved properties?
16     A.   Oh, they -- they conduct supervisory
17 visits.
18     Q.   How often do those occur?
19     A.   At least every three years, sometimes more
20 often.
21     Q.   Okay.  To each site?
22     A.   Yes.
23     Q.   Okay.  So Evergreen Gardens, it may be
24 once a year -- or I mean, once every three years,
25 but another property -- and then there's another

Page 86

1  property, and so on and so forth?
2       A.   Yes.
3       Q.   Okay.  And do you know -- do you meet with
4  those auditors when they come to the property?
5       A.   Yes.
6       Q.   Okay.  Do you know what they do when they
7  are on site evaluating?
8       A.   Yes.
9       Q.   What do they do?
10      A.   They look through a sample percentage of
11 the tenant files, and they also conduct a physical
12 inspection of the units.
13      Q.   Okay.  Has Grand Management ever been
14 sanctioned in any way following one of those audits?
15
16      A.   No.
17      Q.   And as far as you know, in 2021 through
18 the present, you are in good standing with RD?
19      A.   Yes.
20      Q.   That's all I have.  Thank you.
21           THE REPORTER:  We are off the record at
22 11:17 a.m.
23           (WHEREUPON, a recess was taken.)
24           THE REPORTER:  We are back on the record
25 at 11:19.

Page 87

1            MR. NIESE:  We have no redirect.
2            MS. MANDT:  Okay.
3            MR. NIESE:  Yep.  So we're done --
4            MS. MANDT:  We're done.
5            THE REPORTER:  While we're still on the
6  record, sorry, Attorney Niese, will you be ordering
7  original -- excuse me, I can't -- an original of
8  today's transcript?
9            MR. NIESE:  Yes.
10           UNIDENTIFIED SPEAKER:  Yes.
11           THE REPORTER:  And then Attorney
12 McClintock, will you be ordering a copy today?
13           MR. MCCLINTOCK:  I'll take one.
14           THE REPORTER:  Okay.  And then Attorney
15 Mandt?
16           MS. MANDT:  Yes.
17           THE REPORTER:  Thank you all for your help
18 with that.  We are off the record at 11:20 a.m.
19           (WHEREUPON, the deposition of KRISTIN
20 SMITH was concluded at 11:20 a.m.)
21
22
23
24
25

Page 88

1                    CERTIFICATE
2
3       I, Valerie Barna, do hereby certify that I
4  reported all proceedings adduced in the foregoing
5  matter and that the foregoing transcript pages
6  constitutes a full, true and accurate record of said
7  proceedings to the best of my ability.
8
9       I further certify that I am neither related to
10 counsel or any party to the proceedings nor have any
11 interest in the outcome of the proceedings.
12
13      IN WITNESS HEREOF, I have hereunto set my hand
14 this 7th day of August, 2024.
15
16
17
18                    _____
19
20                              Valerie Barna
21
22
23
24
25

Page 89

1                  CORRECTION SHEET
2  Deposition of: Kristin Smith    Date: 07/18/2024
3  Regarding: PATSY JAY vs GRAND MANAGEMENT SERVICES
4  Reporter:  Valerie Barna
5  _____
6  Please make all corrections, changes or clarifications
7  to your testimony on this sheet, showing page and line
8  number.  If there are no changes, write "none" across
9  the page.  Sign this sheet and the line provided.
10 Page   Line   Reason for Change
11 ____   ____   _____
12 ____   ____   _____
13 ____   ____   _____
14 ____   ____   _____
15 ____   ____   _____
16 ____   ____   _____
17 ____   ____   _____
18 ____   ____   _____
19 ____   ____   _____
20 ____   ____   _____
21 ____   ____   _____
22 ____   ____   _____
23
24              Signature: _____
25                              Kristin Smith

```
                                                          Page 90
 1                      DECLARATION
 2    Deposition of: Kristin Smith    Date: 07/18/2024
 3    Regarding: PATSY JAY vs GRAND MANAGEMENT SERVICES
 4    Reporter:  Valerie Barna
 5    _____
 6
 7    I declare under panalty of perjury the following to be
 8    true:
 9
10    I have read my deposition and the same is true and
11    accurate save and except for any corrections as made
12    by me on the Correction Sheet herein.
13
14    Signed at _____, _____
15    on the _____ day of _____, 20_____.
16
17
18
19
20
21
22
23
24            Signature: _____
25                           Kristin Smith
```