IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PATSY JAY,

    Plaintiff,

vs.                                    Case No. 3:23-cv-656

GRAND MANAGEMENT SERVICES, INC., EVERGREEN GARDENS LIMITED PARTNERSHIP JERRY MASCOLO, LEONDRA COLEMAN, and DAWN COCKRUM,

    Defendants.

DEPOSITION OF

LEONDRA COLEMAN

TAKEN ON

FRIDAY, JULY 19, 2024

8:57 A.M.

WILLIAMS KASTNER

1515 SOUTHWEST FIFTH AVENUE, SUITE 600

PORTLAND, OREGON 97201

Page 2

| | |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | Appearing on behalf of the Plaintiff: |
| 4 | EDWARD JOHNSON, ESQUIRE |
| 5 | Oregon Law Center |
| 6 | 522 Southwest 5th Avenue, Suite 812 |
| 7 | Portland, Oregon 97204 |
| 8 | (800) 672-4919 |
| 9 | (503) 295-0676 (Fax) |
| 10 | ejohnson@oregonlawcenter.org |
| 11 | -and- |
| 12 | CARLY CRIPPS, ESQUIRE |
| 13 | Oregon Law Center |
| 14 | 230 Northeast 2nd Avenue, Suite F |
| 15 | Hillsboro, Oregon 97124 |
| 16 | (503) 726-4381 |
| 17 | (503) 726-4382 (Fax) |
| 18 | ccripps@oregonlawcenter.org |

Page 3

1  APPEARANCES CONTINUED
2
3  Appearing on behalf of Grand Management Services,
4  Inc., Jerry Mascolo, Leondra Coleman, and Dawn
5  Cockrum:
6  HEIDI L. MANDT, ESQUIRE
7  Williams Kastner
8  1515 Southwest 5th Avenue, Suite 600
9  Portland, Oregon 97201
10 (503) 228-7967
11 (503) 222-7261 (Fax)
12 hmandt@williamskastner.com
13
14 Appearing on behalf of Evergreen Gardens Limited
15 Partnership:
16 NATHAN MCCLINTOCK, ESQUIRE
17 Corrigall & McClintock, LLP
18 936 Central Avenue
19 Coos Bay, Oregon 97420
20 (541) 269-1123
21 nmcclintock@epuerto.com

Page 4

EXAMINATION INDEX

|   |                              | Page |
|---|------------------------------|------|
| 3 | EXAMINATION BY MR. JOHNSON   | 7    |

Page 5

EXHIBIT INDEX

| | | Page |
|---|---|---|
| 3  | 015 INCIDENT REPORT | 35 |
| 5  | 016 TILLAMOOK POLICE REPORT | 50 |
| 7  | 017 WRITTEN COMPLAINT | 56 |
| 9  | 018 WRITTEN COMPLAINT | 62 |
| 11 | 019 NOTICE OF INTENT TO EVICT | 68 |
| 13 | 020 PHOTO | 78 |
| 15 | 021 COAST PRINTING AND STATIONERY DOCUMENT | 82 |
| 17 | 022 COURTESY LETTER PRE EVICTION WARNING | 85 |
| 19 | 023 TENANT NOTES | 86 |
| 21 | 024 TENANT NOTES | 92 |
| 23 | 025 WRITTEN LETTER | 100 |
| 25 | 026 RESIGNATION EMAIL | 101 |

Page 14

 1    Q.   And was it like a video thing that you
 2  could do online or?
 3    A.   Yes, it was online.  But yes, there were
 4  videos, but it was a lot of questions,
 5  questionnaires, reading up on things, answering the
 6  questions afterwards.  But there were a lot of
 7  videos.  Yes.
 8    Q.   And do you remember if this course covered
 9  the topic of sexual harassment?
10    A.   Yes.
11    Q.   And what do you remember about your
12  training on sexual harassment?
13    A.   Well, honestly, it's been a while, but for
14  the sexual harassment specifically, a lot of it is
15  reporting to supervisors, documentation, and
16  specific like abusers wouldn't be able to be in
17  contact with a victim if there was an ongoing like
18  criminal investigation.  But other than that, from
19  my standpoint, there wasn't much for me to do.
20    Q.   Okay.  Any -- do you recall anything else
21  about what you learned about sexual harassment in
22  those trainings?
23    A.   Currently, no.
24    Q.   Okay.
25    A.   No.

Page 15

 1    Q.   When you're -- what -- what was your job
 2  at GMS?
 3    A.   I was property -- well, I was like on site
 4  manager.  So basically, I was the manager that lived
 5  on the property.  Helped manage the grounds, I
 6  guess, like upkeep the grounds.  And then I had my
 7  office portion of the job, which was recertification
 8  for all the tenants, filing complaints, maintenance
 9  work orders every day.  Yeah.
10    Q.   Okay.  So you -- you were doing
11  recertification because there was some kind of
12  federal subsidy in these projects?
13    A.   Yes.  That was attached to the -- to the
14  job I had.  Yes.
15    Q.   Okay.
16    A.   Yeah.
17    Q.   And did -- how many projects did you
18  manage when you were at GMS?
19    A.   How many projects?
20    Q.   I mean how many --
21    A.   The properties?
22    Q.   -- properties?  Yeah.
23    A.   Yeah.  Two.
24    Q.   Okay.
25    A.   Two properties.

Page 16

 1    Q.   Which -- and which were those?
 2    A.   Evergreen and Golden Eagle.
 3    Q.   Okay.  And did they have the same kind of
 4  federal subsidy?
 5    A.   They both, yes, they did.
 6    Q.   Okay.
 7    A.   Uh-huh.
 8    Q.   And do you remember what that was?
 9    A.   No.  It was just like the Rural
10  Development funding.  Yeah.  I don't know specific.
11  There were two different kinds.
12    Q.   And that's through the Department of
13  Agriculture?
14    A.   Yes, exactly.
15    Q.   Okay.  And do you recall if there were any
16  rules around those RD properties that limited your
17  ability to evict tenants?
18    A.   Yes.  Yeah.
19    Q.   What -- what do you remember about that?
20    A.   Well, I mean, it doesn't necessarily
21  prevent me from evicting them.  They all still have
22  the same guidelines, so I guess the answer would be
23  no.  No, there isn't anything specific from the RD
24  to the regular renting tenants that they get special
25  rules or something.

Page 17

 1  No, that doesn't pertain to evictions
 2  unless, like they lie or something on their
 3  applications for their rental amount because they do
 4  have to do a packet.  I mean, if they falsify
 5  something on that, then eventually they could get
 6  evicted.  Yes.
 7    Q.   Okay.  So let me unpack that a little bit.
 8  So I -- I gather what you're saying is that like if
 9  somebody lies about their income, they could be
10  evicted for that?
11    A.   Yes.  Exactly, which the people that don't
12  have income required.  Well, I guess certainly they
13  still do.  No, they all follow the same rules.
14    Q.   Okay.  And -- but to the extent, you know,
15  is it -- was there anything about these rural
16  development regulations that limited the kinds of
17  evictions you could give someone compared to just
18  market rate landlord tenant law?
19         MS. MANDT:  Object to form.
20         THE DEPONENT:  Yes.  You might have to
21  reword that one more time.
22  BY MR. JOHNSON:
23    Q.   That's probably a terrible question.
24    A.   That's a long question.
25    Q.   Yeah.

Page 26

1  Properties, tillamookproperties@gmail.com.
2      Q.   Okay.  And did you just have one at a
3  time?
4      A.   When I first started, it was the
5  goldeneagle2 and evergreengardens.  They had their
6  own emails separate.
7      Q.   Okay.
8      A.   And then we merged those two together,
9  which was tillamookproperties and it was just
10 tillamookproperties for the remainder of my
11 employment.
12     Q.   Okay.  Do you still have those emails?
13     A.   No.  No.
14     Q.   You haven't had access to that since,
15 right?
16     A.   I don't have access to them.  They may --
17 might still exist, yes.
18     Q.   Okay.
19          THE REPORTER:  Just wait for him to finish
20 his question before you answer.
21          THE DEPONENT:  Okay.
22          MR. JOHNSON:  Yeah.
23          THE REPORTER:  Thank you.
24 BY MR. JOHNSON:
25     Q.   Sorry.

Page 27

1      A.   No, it's okay.  You're good.
2      Q.   My -- my bad too.
3      A.   You don't need to apologize.
4      Q.   I mean, it's how normal people talk, but
5  --
6      A.   It's okay.  You're fine.
7      Q.   -- Court Reporter.
8           When you started -- do you remember when
9  you started at GMS?
10     A.   When I started employment?  No, not
11 really.
12     Q.   Is it --
13     A.   I know the season.  It's the wildfire
14 season because that's --
15     Q.   Yeah.  Was it possibly September 15th,
16 2020?  Like I saw that somewhere.
17     A.   Actually, yeah.  Give or take around
18 there.  Yeah.
19     Q.   And you were there for just over a year?
20     A.   Yeah, a little bit over a year.
21     Q.   Okay.  When you started at GMS, did anyone
22 provide you with information about like, what was
23 going on at the properties?
24          MS. MANDT:  Object to form.  What was
25 going on at the properties?  What does that mean?

Page 28

1           MR. JOHNSON:  Well, I don't really know
2  what it means.
3  BY MR. JOHNSON:
4      Q.   So did -- like when you -- when you were
5  onboarded, when you started, did somebody like sit
6  down with you and talk to you about ongoing issues
7  at the property?
8           MS. MANDT:  Object to form.
9           THE DEPONENT:  I can still answer that?
10          MS. MANDT:  Yeah, you can.
11          THE DEPONENT:  Yes.  Yes.
12 BY MR. JOHNSON:
13     Q.   And do you remember who that was?
14     A.   My supervisors, Jerry and Maria.
15     Q.   Okay.  And did they tell you about like
16 any ongoing disputes between tenants?
17     A.   No, because there weren't any ongoing
18 disputes.
19     Q.   Okay.  Did they tell you about any
20 previous complaints that tenants had made about one
21 another before you started?
22          MS. MANDT:  Object to form.
23          THE DEPONENT:  No.
24 BY MR. JOHNSON:
25     Q.   Did anyone inform you when you started

Page 29

1  that a couple of women had gotten restraining orders
2  against John McKnight?
3      A.   No.
4      Q.   Did anyone inform you that John McKnight
5  had been accused of sexual assault by someone who
6  had your job before you?
7      A.   No.
8      Q.   Did Jerry or Dawn say anything about Patsy
9  Jay when you started?
10     A.   No.  No.
11     Q.   Okay.
12     A.   No.
13     Q.   I -- I just --
14     A.   No.
15     Q.   So when you were working at Grand
16 Management, was John McKnight an employee there?
17     A.   No.
18     Q.   Okay.  Do you know if he was ever an
19 employee?
20     A.   Yes.  He was like maintenance.
21     Q.   Do you remember when that ended?
22     A.   Probably like -- I don't know.  No, I
23 don't know.
24          MS. MANDT:  Don't guess if you don't know.
25          THE DEPONENT:  Yeah.  I don't know.

LEONDRA COLEMAN                                 July 19, 2024                                  38 to 41
76216

Page 38

1  office hours or if I have to go to another apartment
2  complex, it'll be filed the next morning.
3       Q.   Okay.
4       A.   Yes.
5       Q.   And like, what kind of incidents warrant
6  an incident report?
7       A.   What kind?  Any incident, and especially
8  incidents that revolve like the police and stuff.
9  Like, well, I wouldn't say any incident.  I mean, it
10 tells you right here, type of incident injury,
11 property damage, police.  I mean there isn't other.
12 So I mean, I guess it would be anything very
13 important.
14      Q.   Okay.  So you wrote on -- in here, "No
15 injury sustained."  Do you mean no physical injury?
16      A.   Yes.  Yes.
17      Q.   Okay.  What do you remember about Ruth
18 Fulks, if -- if anything?
19      A.   She's just another tenant.
20      Q.   Okay.  So she lived on the property?
21      A.   Yes.  Uh-huh.
22      Q.   All right.  Was she with Patsy Jay when
23 Patsy came to you to talk -- to tell you about this?
24      A.   No.  She was not with me.  No.  Patsy came
25 to talk to me about this a few days later after I

Page 39

1  had called her and asked her to come to my office to
2  talk about it.
3       Q.   Okay.
4       A.   This is when the police came to my door.
5  That's when they notified me that this happened.
6       Q.   Oh, okay.  I understand.  So it says,
7  "Reported by Ruth Fulks and Patsy Jay."  But you --
8  you filled this out after --
9       A.   That's -- this is reported to the police.
10      Q.   Let me -- I'm sorry, let me back up and
11 finish that question.  So you -- you filled out this
12 report based on your conversation with the police?
13      A.   Yes.  That's what the incident report is
14 for.
15      Q.   Okay.  I just didn't understand because I
16 thought --
17      A.   Yeah.
18      Q.   It says up top, "Reported by Ruth Fulks
19 and Patsy Jay."  So I thought you were talking to
20 them about this.
21      A.   Oh, no.  This is my altercation with the
22 police involving the tenants.
23      Q.   Yeah.
24      A.   That's why the incident report is made
25 because there was a police altercation involving my

Page 40

1  tenants.
2       Q.   Yeah.
3       A.   So I have to go in description on why --
4       Q.   Okay.
5       A.   -- that happened.
6       Q.   So you were having an interaction with the
7  police about that and this is what this is?
8       A.   Yes.
9       Q.   Okay.
10      A.   Uh-huh.
11      Q.   All right.  That makes more sense now.  I
12 had a bunch of questions that you just answered.
13 Thank you.
14      A.   Yeah, no worries.
15      Q.   Do you remember when you talked with --
16 was it Officer Saddler?  Does that ring a bell?
17      A.   Yes.
18      Q.   Do you remember when that was?  Was it on
19 the 12th?
20      A.   It was on Sunday, the 11th.
21      Q.   Yeah.
22      A.   The date that's first on the incident
23 report.
24      Q.   And where was that conversation?
25      A.   At the apartment complex at my front door.

Page 41

1       Q.   Okay.
2       A.   Yeah.  Well, actually inside my unit.
3       Q.   Okay.  And after you talked to Officer
4  Saddler, did you talk to other residents about this
5  incident?
6       A.   I talked to Patsy and I talked to John
7  McKnight and I talked to Ruth Fulks about it, yes.
8       Q.   Okay.
9       A.   The people that are on the incident
10 report.
11      Q.   Did you talk to Carolyn Degon?
12      A.   No, I did not talk to Carolyn Degon about
13 this.  That would --
14      Q.   Did you talk to Shirley Rose?
15      A.   No.
16      Q.   Do you remember Officer Saddler telling
17 you that other women had been -- had made
18 allegations about John McKnight?
19      A.   That's --
20           MS. MANDT:  Object to form.
21           THE DEPONENT:  Yeah.  Could you actually
22 reword that one more time?  Sorry.
23 BY MR. JOHNSON:
24      Q.   Well, I'm just looking at page -- the
25 first page of this exhibit.  It says, "John began to

Page 42

1  brag about how he manipulates the other women in the
2  complex." And then in parentheses, "Carolyn Degon,
3  Shirley Rose."
4      A.   Yes.  This is me repeating what they're
5  telling me.  So when it says, "John began to brag,"
6  that's somebody telling me that John began to brag.
7  I'm just repeating what was said.
8      Q.   By Officer Saddler?
9      A.   Yes.  That's him repeating what he was
10 told by Patsy and Ruth.
11     Q.   Okay.
12     A.   That there's no one actually -- there's no
13 one actually saying that they saw him do that, other
14 than Patsy and Ruth.
15     Q.   Okay.
16     A.   So they're just repeating to the police
17 officer and he's repeating to me.
18     Q.   Got it.  So after you learned this, you
19 did not follow up with Carolyn Degon or Shirley
20 Rose?
21     A.   No.
22     Q.   Okay.  Did you ever get complaints from
23 Carolyn Degon or Shirley Rose about John McKnight?
24     A.   Carolyn Degon, yes.  But not Shirley Rose.
25     Q.   Is she the person that you were referring

Page 43

1  to in 7A or is that a different person?
2      A.   Actually, it is Carolyn Degon now I think
3  about it.  Yes, it is her.
4      Q.   Okay.
5      A.   And she does not live in 7A.  She lives in
6  7C.
7      Q.   Okay.  What did you do after you got this
8  report from Officer Saddler?
9      A.   Oh, I reported instantly to my -- my
10 supervisors.
11     Q.   And your -- was Maria your supervisor at
12 that time?
13     A.   It was Maria and Jerry.
14     Q.   Okay.
15     A.   They were like co-supervisors together.
16 Yeah.
17     Q.   Do you remember how you reported it to
18 them?
19     A.   Through my office, landline phone I
20 called.
21     Q.   Okay.
22     A.   And faxed this in.
23     Q.   Okay.  So on the second page of that
24 exhibit -- let's see here.  On the second page of
25 this exhibit, it says, "Management went to Patsy's

Page 44

1  unit to rekey her front door."  Was that -- why was
2  that?
3      A.   Because Patsy requested, and Grand
4  Management thought it was appropriate to have her
5  front door rekeyed because -- because John had a key
6  to her unit is what Patsy had said.
7      Q.   Okay.  And do you know how he got a key to
8  her unit?
9      A.   He gave -- she gave him a key.
10     Q.   Because he walked her dog?
11     A.   Yes.
12     Q.   Okay.
13     A.   I'm pretty sure John dog sitted (sic) for
14 her, not just watched her -- like, not just walk the
15 dog, but dog sitted.
16     Q.   When she was gone?
17     A.   Yes.
18     Q.   Okay.  Did you have any conversations with
19 Maria Mant?
20     A.   Is that her name?
21     A.   Maria Moldt.
22     Q.   Moldt?
23     A.   Yeah.  Sorry.
24     Q.   The name was familiar.
25     A.   Yeah.

Page 45

1      Q.   Did you have any conversations with Maria
2  Moldt or Jerry Mascolo about what to do in response
3  to this incident?
4      A.   Yes.  Yes, I did.
5      Q.   What do you remember about those?
6      A.   The conversations we were had was just to
7  communicate as clear as possible with Grand
8  Management to notify them what was going on, filing
9  everything that they can, rekey Patsy's unit, and
10 that they weren't able to do anything.  And specific
11 was that we were not able to move forward with any
12 sort of process with John without some type of
13 police report or like charges being pressed against
14 John.
15     Q.   Okay.
16     A.   Like, some type of order, safety order
17 something.
18     Q.   And who -- who was -- who was making that
19 decision?
20     A.   Jerry is the one that specifically told me
21 that.
22     Q.   Did -- did Jerry, as part of this
23 conversation, mention that other women had gotten
24 restraining orders against John McKnight in the
25 past?

Page 46

```
 1            MS. MANDT:  Asked and answered.
 2            THE DEPONENT:  I answered.
 3   BY MR. JOHNSON:
 4       Q.   Well, I think what I asked before was that
 5   when you started at the job --
 6       A.   Uh-huh.
 7       Q.   -- did anybody tell you that.  And you
 8   said no.  But when this happened in July of 2021,
 9   did anyone mention that other women had gotten
10   restraining orders against John McKnight?
11       A.   I had already known by then.
12       Q.   Okay.  How did you find that out?
13       A.   Me going through my tenants' files.
14       Q.   Okay.
15       A.   Yes.
16       Q.   Like AppFolio?
17       A.   Yes.  And just their paper files as well.
18       Q.   Okay.  So when this -- when you had this
19   conversation with Maria Moldt and Jerry Mascolo, did
20   it -- did it factor into what you did the fact that
21   this -- that there had been multiple women who had
22   accused John McKnight of sexual harassment?
23       A.   No.  No.  They're all separate.  No.  I --
24   I can't mix things, no.
25       Q.   Did anybody talk about giving him a 24-
```

Page 47

```
 1   hour notice?
 2       A.   Yes.
 3       Q.   Who -- do you remember what was said about
 4   that?
 5       A.   We talked about giving him a notice
 6   depending if everything worked out.  Like if we got
 7   the paperwork and things followed through --
 8       Q.   A 24-hour notice?
 9       A.   -- and Patsy followed through.  And
10   specific not a 24-hour notice unless the paperwork.
11   So I would have to have like -- I don't know, like a
12   police report saying that there's proof or
13   something, and I cannot give that.  My supervisor
14   has to do it.
15       Q.   Okay.  Did he get any eviction notice as a
16   result of this incident report?
17       A.   He got a 14/30, which is like a repair
18   notice.  So he --
19       Q.   Do you remember -- do you remember when
20   that was?
21       A.   I don't know the date.  No, sir.
22       Q.   Okay.  Do you remember Deborah Greaves?
23       A.   Yes.
24       Q.   Do you know anything about her
25   relationship with John McKnight?
```

Page 48

```
 1       A.   Yes.  I guess they --
 2       Q.   Was there anything other than neighbors
 3   that comes to mind?
 4       A.   Friends.
 5       Q.   Yeah.
 6       A.   Or acquaintances, I guess.
 7       Q.   Do you know if they were in a romantic
 8   relationship?
 9       A.   No.
10       Q.   You don't know?
11       A.   I don't know if anyone -- yeah.
12       Q.   Okay.  I think that was asked and
13   answered.  How did you learn that Deborah Greaves
14   had information about this incident?
15       A.   She came to me about it.  She came to me
16   letting me know that Patsy had told her, or confided
17   in her that this was all a hox.  That she made it up
18   to get back at John for not wanting to be in a
19   romantic relationship with Patsy.  That's how I know
20   that Deborah knows something.
21       Q.   Okay.  And do you know if Deborah Greaves
22   had spoken to John McKnight about this incident
23   before?
24       A.   Yes, I do know that.
25       Q.   What do you remember about that?
```

Page 49

```
 1       A.   Debbie told me that she talked with John.
 2   She told me that she felt for him because she knew
 3   how Patsy could get and that she didn't think it was
 4   right what Patsy was doing.
 5       Q.   Okay.  And did you record this
 6   conversation with Deborah Greaves?
 7       A.   I did record a -- yes, I did.  Not this
 8   whole conversation, but a portion of it, yes.
 9       Q.   Okay.  And did you record any other
10   conversations?
11       A.   No.  That's the only conversation I've
12   ever recorded.
13       Q.   How come you recorded that one and not
14   like others when you were talking to people about
15   this?
16       A.   Because this pertained to like a legal
17   issue.  This was after the police report and stuff
18   had already been made, and I wanted to be safe.
19       Q.   Okay.  And did you relay this -- the
20   substance of this conversation to Officer Saddler?
21       A.   Yes.
22       Q.   And did you relay any other conversations
23   that you'd had with Patsy or John or anybody else to
24   Officer Saddler or --
25       A.   Yes.
```

Page 66

1  letter from, or this complaint from Mr. McKnight,
2  did you issue an eviction notice to Ms. Jay?
3      A.   Sorry, what was the question again?
4      Q.   Shortly after you got the August 14th,
5  2021 complaint from Mr. McKnight --
6      A.   Uh-huh.
7      Q.   -- did you issue an eviction notice to Ms.
8  Jay?
9           MS. MANDT:  Object to form.
10          THE DEPONENT:  She got probably a 14/30,
11 not an eviction notice.
12 BY MR. JOHNSON:
13     Q.   So why are you saying that's not an
14 eviction notice?
15     A.   Well, because a 14/30 -- eviction notice
16 is like a notice stating that you are evicted and
17 you have to vacate between this timeframe.  And a
18 14/30 is a -- a notice to fix the problem.  Your
19 attempt to not get evicted.  If you don't fix the
20 problem, or I guess you'd say the problem keeps
21 happening, then you will get evicted and you'll have
22 a whole different notice and everything before the
23 eviction is actually there or done.
24     Q.   Okay.  What do you remember about the
25 reason for that 14/30 notice that you gave Ms. Jay?

Page 67

1      A.   The reason --
2           MS. MANDT:  Well, I'm going to object to
3  form because it misstates her testimony.  She said
4  probably.  She did not say she did.
5           THE DEPONENT:  What was the question
6  again?
7  BY MR. JOHNSON:
8      Q.   So, do you remember if you ever gave Ms.
9  Jay a 14/30 notice?
10     A.   Yes.
11     Q.   And do you remember what the reason for
12 that notice was?
13     A.   Multiple reasons.  But one of the reasons
14 was that she didn't stop watching John through the
15 window with binoculars.
16     Q.   Okay.  What are -- what do you recall
17 about the other reasons for giving that notice?
18     A.   Well, the other reasons would have been
19 her also not following through with her commitment
20 to keep her front patio up to the lease standards.
21 And then there would have also been sending letters
22 to the other -- the other tenants, the -- the
23 disturbing of other tenant's peace regarding the
24 situation.
25     Q.   Okay.  Do you remember anything else about

Page 68

1  that?
2      A.   About the --
3      Q.   About the --
4      A.   -- the letter?
5      Q.   The 14/30 notice.  Yeah.
6      A.   She ended up fixing all the things, so
7  that's what I remember.
8      Q.   Okay.
9      A.   All the requirements.
10          MR. JOHNSON:  We at 19?
11          (WHEREUPON, Exhibit 19 was marked for
12 identification.)
13          THE REPORTER:  Correct.
14          MR. JOHNSON:  Oh, sorry.
15          THE REPORTER:  No problem.
16          MR. JOHNSON:  You get paper cuts a lot?
17          THE REPORTER:  Actually, no.
18 BY MR. JOHNSON:
19     Q.   I'm going to show you an exhibit that's
20 been marked Number 19.
21     A.   Okay.
22     Q.   Is this the document that you were
23 referring to as the 14/30?
24     A.   No.  The 14/30 states it's a 14/30.
25     Q.   Do you recognize this document?

Page 69

1      A.   Yes.  I do know this.
2      Q.   What is this?
3      A.   This is the intent to evict notice.  This
4  is what you get after you get a 14/30 when the
5  problems have continued, the problems that are
6  listed on your 14/30.
7      Q.   So this is an eviction notice?
8      A.   No.  There will be one more before this
9  that actually states the eviction has been put in
10 process.
11     Q.   Okay.  So -- but this document is called
12 Notice of Intent to Evict?
13     A.   Yes.  This means that if you don't follow
14 through with actually fixing the cures here on the
15 -- the second to last page, that the eviction will
16 be put in, like to the courthouse.
17     Q.   So Ms. Jay got some -- a 14/30 notice
18 prior to getting this?
19     A.   Yes.  Yes.
20     Q.   Okay.  Did you issue this --
21     A.   No.
22     Q.   -- this notice to Ms. Jay?
23     A.   Yes.
24     Q.   Did you write it?
25     A.   Me and Don.

Page 70

1  Q.  So you consulted with Dawn Cockrum about
2  this?
3  A.  Yes.  Dawn Cockrum.  Yes.  Yes.
4  Q.  Anyone else?
5  A.  Jerry Mascolo would have also been in on
6  this as well, like consulted.
7  Q.  Okay.
8  A.  Yeah.  For verbiage.
9  Q.  And do you remember if there was a
10 particular person who made the decision to issue
11 this notice?
12 A.  In specific, it would have been Dawn and
13 Jerry.  That's a joint decision.  Yeah.
14 Q.  Okay.  Were you aware at the time that
15 this notice was issued that Ms. Jay is a person with
16 disabilities?
17 A.  Wait, ask -- sorry, what was that again?
18 Q.  Were you aware at the time that this
19 notice was issued that Ms. Jay was a person with
20 disabilities?
21 A.  Yes.
22 Q.  How did you know that?
23 A.  Because she was my tenant and I could see
24 that she was in a wheelchair.
25 Q.  Okay.  At the bottom of page 281, which I

Page 71

1  guess is the third page of this, there's a
2  description of May 13, 2021, management posted a
3  notice.  Is that the 14/30 that you were referring
4  to?
5  A.  No.  No.  That would just be a regular --
6  that would just be like a regular notice.  It would
7  not be called a 14/30.  That's just me letting you
8  know that there's a problem you have to fix.  That
9  hasn't even gone down to the -- the three strikes
10 rule kind of thing.
11 Q.  So this notice that you're referring to on
12 May 13th was not any kind of eviction notice?  It
13 was just like a here's the rules, you're breaking
14 them?
15 A.  Yes, exactly.  Yes.
16 Q.  Okay.  Like a warning?
17 A.  Yes.  Exactly, a warning.
18 Q.  Okay.  Do you remember what she had on her
19 front porch back in May?
20 A.  Yeah.  That would have been the chair.
21 The -- it's like a push chair.  It's not a
22 wheelchair, but you push it while you walk.
23 Q.  Okay.
24 A.  Like assisted chair, you would call.
25 Q.  Did she tell you why she kept it on her

Page 72

1  front porch?
2  A.  She kept it on her front porch because she
3  didn't have space in her unit for it.
4  Q.  Okay.  And did she need it to get around
5  as a walker?
6  A.  I couldn't tell you that.  I don't know
7  her physical condition.
8  Q.  Okay.
9  A.  But no.
10 Q.  What do you mean?
11 A.  I would assume not, no.
12 Q.  You would assume she didn't need it?
13 A.  No.
14 Q.  Okay.
15 A.  Or that she couldn't use it because it's a
16 walker and she was in a motorized chair.
17 Q.  Oh.
18 A.  And had complained to me various times
19 that she could not use her legs.
20 Q.  Okay.  So you never saw her using a
21 walker?
22 A.  I've never seen her walk before.
23 Q.  Okay.  But it was her walker?
24 A.  Yes.  I would assume so.  And she said so.
25 Yes, it's her walker.

Page 73

1  Q.  Okay.
2  A.  Yeah.
3  Q.  So I'm going to walk through some of these
4  dated incidents.  So the next one is July 30th,
5  2021.  Do you see that?
6  A.  Okay.  Yeah.
7  Q.  Do you remember -- so do you remember this
8  incident?
9  A.  Yes.  I do remember -- I remember Patsy
10 coming to me regarding this incident.  Yes.
11 Q.  So you weren't there?
12 A.  I was not there, no.
13 Q.  Okay.  And did you write the part that's
14 bold and underlined -- underlined there?
15 A.  I did not specifically write that, no.
16 Q.  Do you know who did?
17 A.  Yes.  Dawn.
18 Q.  Okay.  So did you know at this time that
19 Patsy Jay had a restraining order that said Mr.
20 McKnight had to stay 500 feet away from her?
21 A.  I did know that, yes.
22 Q.  Okay.  Was it your understanding that she
23 also had to stay 500 feet away from him pursuant to
24 this order?
25 A.  Yes.

Page 74

```
 1     Q.   So she could violate the order if she came
 2  within 500 feet of him?
 3     A.   Yes.  Yes.
 4     Q.   Okay.  Did you tell Ms. Jay that she
 5  needed to stay out of the community room if Mr.
 6  McKnight was in there?
 7     A.   I personally did not state that.  The
 8  order did right here.
 9     Q.   Okay.
10     A.   Yeah.
11     Q.   At the top of the next page, there's an
12  incident from August 11th, 2021 involving Ms. Jay's
13  caretaker.  Do you remember that?
14     A.   Oh, yes.  I remember that.  Yeah.
15     Q.   What do you recall about that incident?
16     A.   I -- I think her name was Rebecca.
17  Patsy's caretaker, came to my office.  She was
18  banging on the door.  I let her in.  She was just
19  really mean, yelling at me, calling me names, saying
20  I wasn't doing my job.  And that the process wasn't
21  moving fast enough for Patsy to feel safe.
22     Q.   And did you write this part of the
23  eviction notice?
24     A.   Which part?
25     Q.   Just the entry under August 11th, 2021.
```

Page 75

```
 1     A.   The entire thing?  Between me and Dawn, it
 2  was both of us.
 3     Q.   Okay.  But the only people that were
 4  present for this were you and -- I'm sorry, what was
 5  the caregiver's name?
 6     A.   Rebecca.
 7     Q.   Rebecca.  Is that right?
 8     A.   Yes.
 9     Q.   Okay.
10     A.   Were just, me and Rebecca were together
11  for this.  Yeah.
12     Q.   Okay.  And it -- so did Rebecca say to you
13  that you were not following up on John's daily
14  harassment?
15     A.   She said that to me.
16     Q.   Okay.
17     A.   Yes.
18     Q.   Okay.  And prior to this, were you aware
19  that Patsy Jay was saying that John was harassing
20  her every day?
21     A.   Yes, but I told Patsy that she -- she
22  knows there's a process for me to do anything.  I
23  can't do anything just verbal.  I have to have a --
24  I have to have a written complaint from -- from
25  Patsy to start anything.
```

Page 76

```
 1     Q.   Okay.
 2     A.   That's for every single encounter that
 3  somebody's doing wrong.  I need a written complaint
 4  first because word of mouth means that I can't do
 5  anything with that.
 6     Q.   Okay.  But -- but Patsy Jay got an
 7  eviction notice for this, right?
 8          MS. MANDT:  Object to form.
 9          THE DEPONENT:  No.  Patsy Jay got an
10  eviction notice for her caretaker verbally harassing
11  me in my office, alongside the other issues.
12  BY MR. JOHNSON:
13     Q.   Okay.  Did you follow up on this
14  allegation that the -- that Rebecca is making about
15  John's daily harassment?
16     A.   What do you mean follow up on the
17  allegation?
18     Q.   Like did you ask her to put it in writing
19  or?
20     A.   I asked him to put in written complaints
21  for anything that they need to tell about John.
22     Q.   Okay.
23     A.   It needs to be a complaint.
24     Q.   Okay.
25     A.   It needs to be them filing that he did
```

Page 77

```
 1  something wrong.
 2     Q.   Okay.  And did you get a report about the
 3  finger gun gesture?
 4     A.   For the finger gun incident?  Did I get a
 5  report for that?  Yes, I did.  I'm sure I got a
 6  written report, yes.
 7     Q.   Okay.  Do you know if you got other
 8  reports from Jay or -- or from Patsy or Rebecca
 9  about John harassing her after she'd gotten the
10  restraining order?
11     A.   No.  No.
12     Q.   The next one, I think we've covered August
13  16th.  Did -- was it -- was it Mr. McKnight who
14  complained about Patsy Jay and the binoculars?
15     A.   Yes.  It was -- yes, it was.  And then
16  Monte -- Monte Dunn, who was the guy from the other
17  letter had stated that he witnessed Patsy watching
18  John.
19     Q.   Okay.  Other than Patsy watching John,
20  were there any allegations that she was looking at
21  anybody else with binoculars?
22     A.   No.  She was only looking at John.
23     Q.   Okay.
24     A.   Yeah.  I didn't get a written complaint
25  regarding anything else.
```

Page 78

1   Q.   Okay.  This -- and then the next thing is
2 the walker on the front patio.  Did you -- you
3 personally saw the walker?
4   A.   Yes.
5   Q.   Okay.
6   A.   Various times.
7   Q.   And did you take this?
8        Let's go ahead and mark this.  Oh, that's
9 going to go over here.  Sorry.  You get the one with
10 the sticker.
11            (WHEREUPON, Exhibit 20 was marked for
12 identification.)
13            THE DEPONENT:  Thank you.
14            THE REPORTER:  Mm-hmm.
15 BY MR. JOHNSON:
16   Q.   Did you take that picture?
17   A.   Yes.
18   Q.   This is the -- why is this a lease
19 violation?
20   A.   Because the walker is on her patio
21 section, and we cannot have anything that is not up
22 to six live plants or patio furniture.  It has to be
23 specifically patio furniture that is allowed on the
24 front porch.  It keeps the property more appealing.
25 And then also it's a fire hazard to have extra

Page 79

1 things by your windows and doors in the front of the
2 unit in case like fire department or something
3 needed to access quickly.
4   Q.   And was this the only day that you saw the
5 walker out there?
6   A.   No.
7   Q.   Was it always out there?
8   A.   The beginning of my employment, yes.  It
9 was always outside.  And then started trickling down
10 on things.  This chair used to be on the other side
11 of her patio.
12   Q.   Okay.
13   A.   Over here.
14   Q.   And you -- but the August 16th --
15   A.   August 16th pertains to this picture.
16   Q.   August 17th.  Yeah.  And that was right
17 after Ms. Jay's caregiver had complained to you
18 about not dealing with the daily harassment?
19            MS. MANDT:  Object to form.
20            THE DEPONENT:  No.
21 BY MR. JOHNSON:
22   Q.   But it -- there's just six days apart,
23 right?
24   A.   Yes, but this like I had said, had been
25 previously on the other side of the yard.  So Patsy

Page 80

1 had knowledge that it wasn't supposed to be there,
2 so she moved it on the other side so it could be
3 more concealed by the giant bush out front, which
4 she knows is still breaking the -- the cure to her
5 conditions.
6   Q.   So what did you see on August 17th that
7 was different than the preceding days when you --
8 did you always do a walkthrough of the property
9 every day?
10   A.   Yes.  Every morning.
11   Q.   Okay.
12   A.   Yes.  This chair was on the other side of
13 her patio.
14   Q.   And that was not a lease violation?
15   A.   No, it was.  This isn't the first time
16 she's gotten a notice regarding this being outside.
17 So she's aware that she's breaking it and now she's
18 moving it back and forth, which she knows it just
19 shouldn't be outside in the first place.  This is
20 her second time, actually, honestly, this would be
21 her fourth time being told about this chair because
22 I have verbally told her twice that this cannot be
23 outside.
24   Q.   Okay.
25   A.   Prior to anything with John McKnight.

Page 81

1   Q.   Did -- after -- after getting this
2 eviction notice, did Ms. Jay ask for a reasonable
3 accommodation for her disability?
4   A.   For the chair in specific?
5   Q.   I mean, do you remember any request for
6 reasonable accommodation about this eviction notice?
7   A.   For the chair -- for the chair.
8   Q.   For the chair?
9   A.   Yes.
10   Q.   And did -- what did you do with that
11 request?
12   A.   I have to fax that in to my supervisor and
13 then they handle that.  They just give me the
14 results and then I print it and post it.
15   Q.   Do you remember the results?
16   A.   I do not specifically remember the
17 results, no.
18   Q.   But it wasn't your job to grant or deny
19 reasonable accommodations?
20   A.   No, it was not my job to do that.
21   Q.   Was it Jerry Moscalo's?
22   A.   It was Dawn's job, but she would have to
23 consult with Jerry.
24   Q.   Okay.
25   A.   But it was Dawn -- Dawn Cockrum's job for

Page 110

1  of your deposition that you would text your
2  supervisors about work stuff from your cell phone.
3  Was that like a daily -- is that -- was that one of
4  the main ways you communicated with them?
5      A.   Yeah, for like pictures, texting,
6  pictures, "Oh, is this okay?"  What's on people's
7  yards.
8      Q.   Okay.
9      A.   Yeah.
10     Q.   And did Jerry text with you?
11     A.   Yes, he did.
12     Q.   And Dawn?
13     A.   No.  Dawn, no, no.  It was Maria Moldt and
14  Jerry Mascolo --
15     Q.   Okay.
16     A.   -- that texted.  Yeah.
17     Q.   Okay.  And so did you text to them about
18  the -- about the Patsy and John incident?
19     A.   No.  No.  It's more of -- it's things that
20  you need a quick response to.  Like if somebody has
21  an extra flower pot or a flower pot that just looks
22  a little too big, you'd send a picture, "Hey, is
23  this okay?"  Anything that pertains to like -- I
24  don't know, like specific tenant, like their
25  personal stuff or like things about their unit and

Page 111

1  size -- no, that all has to be done in AppFolio.
2  It's just like for the grounds, like the property
3  wise, like a pipe burst or the lawn's not cut right.
4  Things like that.
5           MR. JOHNSON:  Okay.  I don't think we have
6  anything further.
7           THE DEPONENT:  Yeah, cool beans.
8           MR. JOHNSON:  Get on with your Friday.
9  Sorry.  I'm sure you would have rather been anywhere
10 else besides here.
11          THE DEPONENT:  No worries, guys.  I'm
12 sorry we all have to be here.
13          MR. JOHNSON:  We can go off the record.
14 You don't have any --
15          MS. MANDT:  Well, hold on.
16          Nate, do you have anything?
17          MR. MCCLINTOCK:  No, I do not.
18          MS. MANDT:  I have nothing.
19          MR. JOHNSON:  Let's go off the record.
20          THE REPORTER:  Mr. Johnson, are you
21 ordering the original transcript?
22          MR. JOHNSON:  Yeah.
23          THE REPORTER:  Okay.
24          Ms. Mandt, are you ordering a copy of the
25 transcript?

Page 112

1           MS. MANDT:  Sure.
2           THE REPORTER:  Cripps, are you ordering a
3  copy?  Are you --
4           MS. CRIPPS:  We'll get the same one.
5           MS. MANDT:  Okay.
6           You're done.  I'll walk you out.
7           THE REPORTER:  We're off record at 11:04
8  a.m.
9           (WHEREUPON, the deposition of LEONDRA
10 COLEMAN was concluded at 11:04 a.m.)

Page 113

1                    CERTIFICATE
2
3       I, Rowan Folske, do hereby certify that I
4  reported all proceedings adduced in the foregoing
5  matter and that the foregoing transcript pages
6  constitutes a full, true and accurate record of said
7  proceedings to the best of my ability.
8
9       I further certify that I am neither related to
10 counsel or any party to the proceedings nor have any
11 interest in the outcome of the proceedings.
12
13      IN WITNESS HEREOF, I have hereunto set my hand
14 this 5th day of August, 2024.
15
16
17
18 Rowan Folske

Page 114

```
1                    CORRECTION SHEET
2    Deposition of: Leondra Coleman    Date: 07/19/2024
3    Regarding: PATSY JAY vs GRAND MANAGEMENT SERVICES
4    Reporter:  Rowan Folske
5    _____
6    Please make all corrections, changes or clarifications
7    to your testimony on this sheet, showing page and line
8    number.  If there are no changes, write "none" across
9    the page.  Sign this sheet and the line provided.
10   Page  Line  Reason for Change
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23
24              Signature: _____
25                       Leondra Coleman
```

Page 115

```
1                    DECLARATION
2    Deposition of: Leondra Coleman    Date: 07/19/2024
3    Regarding: PATSY JAY vs GRAND MANAGEMENT SERVICES
4    Reporter:  Rowan Folske
5    _____
6
7    I declare under panalty of perjury the following to be
8    true:
9
10   I have read my deposition and the same is true and
11   accurate save and except for any corrections as made
12   by me on the Correction Sheet herein.
13
14   Signed at _____, _____
15   on the _____ day of _____, 20____.
16
17
18
19
20
21
22
23
24              Signature: _____
25                       Leondra Coleman
```