Jamie Trinkle, OSB #192463
Carly Cripps, OSB #223860
Edward Johnson, OSB #965737
Nicole Pritchard, OSB #164635
**Oregon Law Center**
230 NE Second Ave., Suite F
Hillsboro, OR 97124
Tel: (503) 640-4115
Fax: (503) 640-9634
jtrinkle@oregonlawcenter.org
ccripps@oregonlawcenter.org
ejohnson@oregonlawcenter.org
npritchard@oregonlawcenter.org

*Attorneys for Plaintiff Patsy Jay*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **PATSY JAY,** | Case No.: 3:23-cv-656-SI |
| Petitioner, | |
| v. | **PLAINTIFF'S RESPONSE TO DEFENDANTS GRAND MANAGEMENT SERVICES, INC., JERRY MASCOLO, LEONDRA COLEMAN, AND DAWN COCKRUM'S MOTION FOR SUMMARY JUDGMENT** |
| **GRAND MANAGEMENT SERVICES, INC., EVERGREEN GARDENS LIMITED PARTNERSHIP, JERRY MASCOLO, LEONDRA COLEMAN,** *and* **DAWN COCKRUM,** | |
| Defendants. | |

1 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

**Table of Contents**

I.    Introduction and Failure to Confer ........................................................ 5

II.   Summary Judgment Standard .............................................................. 5

III.  Statement of Facts ............................................................................ 6

IV.   Defendants Are Not Entitled to Summary Judgment on Plaintiff's Disability
Discrimination Claim ............................................................................. 15

V.    Defendants Are Not Entitled to Summary Judgment on Plaintiff's Hostile Sexual Living
Environment Claim ................................................................................ 19

    A.   Defendants Move Against a Claim Not Made by Plaintiff .............................. 19

    B.   Plaintiff was Subject to a Severe and Pervasive Sexually Hostile Environment............. 19

    C.   Defendants are Liable for All of the Harassment that Plaintiff Endured, Including the July
12, 2021, Incident ................................................................................. 21

         1.  The Legal Standard for Defendants' Liability ..................................... 21

         2.  Defendants Knew About the Harassment by Mr. McKnight and Failed to Act to End it.24

         3. Defendants Had the Authority to End Mr. McKnight's Harassment. ............................. 28

VI.   Defendants are not Entitled to Summary Judgment on Plaintiff's 42 U.S.C. § 3617 Claim.
29

    A.   Legal Standard for Evaluating a 42 U.S.C. § 3617 Claim. ................................. 30

    B.   Plaintiff has Presented Evidence that Defendants Violated 42 U.S.C. § 3617. ................ 31

VII.  Defendants Are Not Entitled to Summary Judgment on Plaintiff's Negligence Claim.... 32

VIII. Dismissal of the Individual Defendants is Not Warranted.................................... 35

    A.   Dismissal of Dawn Cockrum is Not Warranted .......................................... 35

    B.   Dismissal of Jerry Mascolo is Not Warranted .......................................... 36

    C.   Dismissal of Leondra Coleman is Not Warranted ........................................ 36

IX.   Genuine Disputes of Material Fact Exist with Respect to Plaintiff's Claim for Punitive
Damages.......................................................................................... 37

X.    Conclusion .................................................................................. 38

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

## Cases

*Adams v. United States,* No. 3:19-cv-00804-AC, 2022 U.S. Dist. LEXIS 87586 at *42 (D. Or. May 16, 2022)…………………………………………...………………………………35

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) ..............................................6

*Andujar v. Hewitt*, No. 02-2223, 2002 U.S. Dist. LEXIS 14294 at *10 (S.D.N.Y. Aug. 2, 2002)..35

*BMW of N. Am. v. Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589, 1595 (1996) ................................ 37

*Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000)…………………………………20

*Butler v. Sundo Capital, LLC*, 559 F. Supp. 3d 452, 462 (W.D. Pa. 2021)…………………………37

*Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001)…………………6

*DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006)..16

*El v. People's Emergency Ctr.*, 315 F. Supp. 3d 837, 844 (E.D. Pa. 2018) .................................. 37

*Elliott v. QF Circa 37, LLC,* No. 16-cv-0288-BAS-AGS, 2018 U.S. Dist. LEXIS 98668 (S.D. Cal June 12, 2018)……………………………………………………………………………16

*Ellison v. Brady*, 924 F.2d 872, 878-79 (9th Cir. 1991)……………………………………………20

*Fahnbulleh v. GFZ Realty, LLC*, 795 F. Supp. 2d 360, 364 n.1 (D. Md. 2011)……………….....23

*Fair Hous. Ctr. of Wash. v. Breier-Scheetz Props., LLC*, 743 F. App'x 116, 118 (9th Cir. 2018)…37

*Fair Hous. v. Combs*, 285 F.3d 899, 907 (9th Cir. 2002)............................................................. 37

*Fielder v. Sterling Park Homeowners Ass'n*, 914 F. Supp. 2d 1222, 1227 (W.D. Wash. 2012)….23

*Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997)…………………….24

*Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006)…………………………………………...23

*Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 648 (9th Cir. 2021)………………………………20

*Fuhrer v. Gearhart By The Sea, Inc.*, 306 Ore. 434, 438, 760 P.2d 874 (1988)…………………33

*Fuller v. Idaho Department of Corrections*, 865 F.3d 1154, (9th Cir. 2017)…………………….26

*Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997)…………………………………20

*Gibson v. Cmty. Dev. Partners*, 2022 U.S. Dist. LEXIS 189828 (D. Or. Oct. 18, 2022)……...…24

*Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1157 (9th Cir. 2003)…………………………………...16

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)…………………………………………20

*Hicks v. Makaha Valley Plantation Homeowners Ass'n*, 2015 U.S. Dist. LEXIS 85101 at *30-31 (D. Haw. June 30, 2015)……………………………………………………..…..…23

*Honce v. Vigil*, 1 F.3d 1085, 1089-90 (10th Cir. 1993) .............................................................. 19

*James W. v. City & Cnty. of San Francisco*, No. 21-CV-02370-EMC, 2022 U.S. Dist. LEXIS 89012, at *44-45 (N.D. Cal. May 17, 2022)……………………………………………23, 30

*Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3rd Cir. 1997)…………………………31

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-6 (1999)....................................................... 37

*Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000)……………………20

*Lazarus v. Ouansafi*, No. 21-00247-HG-RT, 2023 U.S. Dist. LEXIS 178293, at *7, (D. Haw. October 3, 2023)……………………………………………………………..……23

*Mariano v. Villa*, No. 5:16-CV-03467-EJD, 2017 U.S. Dist. LEXIS 95116, at *6-7. (N.D. Cal. June 20, 2017)……………………………………………………………..………31

*Miller v. Tabor W. Inv. Co., Ltd. Liab. Co.,* 223 Or App 700 (2008)……………………………33

*Nevels v. W. World Ins. Co.*, 359 F. Supp. 2d 1110, 1119 (W.D. Wash. 2004)……………………30

*Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)……………………5

*Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004)………………………………31

*Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005)…………………………………31

3 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

*Quigley v. Winter*, 598 F.3d 938, 946 (8th Cir. 2010)…………………………………………26
*Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1290 (E.D. Cal. 2013)…………………..……19, 20
*San Pedro Hotel Co., Inc. v. City of Los Angeles*, 159 F.3d 470, 477 (9th Cir. 1998)…………...30
*Scutt v. Doris*, No. 20-00333 JMS-WRP, 2021 U.S. Dist. LEXIS 10708, at *16 (D. Haw. Jan. 20, 2021) ....................................................................................................................... 19
*Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007)........................................ 6
*Southeastern Community College v. Davis*, 442 U.S. 397, 410, 412 (1979)…………..………16
*Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)……………………………26
*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 578 U.S. 519, 530-31 (2015)………………………………………………………………………………...20
*Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972)……………………………30
*United States v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997)…….17
*United States v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994)……………………….…30
*Wetzel v. Glen St. Andrews Living Community, LLC,* 901 F.3d 856, 865 (7th Cir. 2018)……..…22
*Zetwick v. Cnty. Of Yolo*, 850 F.3d 436, 445 (9th Cir. 2017)……………………………………26

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

## I.    Introduction and Failure to Confer

Plaintiff is an elderly woman with disabilities who was sexually assaulted in her apartment by a neighbor who Defendants knew was a danger to the women tenants in the complex. Defendants failed to take steps reasonably calculated to prevent this assault and end the sexual harassment despite having clear authority to do so. This brief is plaintiff's response to Defendants Grand Management Services, Inc. ("GMS"), Jerry Mascolo, Dawn Cockrum, and Leondra Coleman's (collectively "Defendants") motion for summary judgment filed on November 12, 2024. Plaintiff has put forth facts as to each element of each claim that would allow a jury to find in her favor. At a minimum, genuine disputes of material fact exist as to each element of each claim. Additionally, Defendants failed to confer on this motion as required by LR 7.1. For that reason, and all of the reasons below, Defendants' motion for summary judgment should be denied in its entirety.

## II.    Summary Judgment Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of any genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts

**OREGON LAW CENTER**
230 NE 2ⁿᵈ Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

showing that there is a genuine issue for trial.'" *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978,

984 (9th Cir. 2007), (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and

draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters,*

*Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Accordingly, the Court must analyze Defendants'

motion based on the facts set out below, not on Defendants' statement of facts, which does the

opposite of the applicable legal standard: cherry-picking facts, misstating others, ignoring

disputed facts and drawing incorrect inferences in Defendants' favor.

## III.    Statement of Facts

Evergreen Garden Apartments ("Evergreen Gardens") is financed through the U.S.

Department of Agriculture Rural Development ("USDA RD") multifamily housing program and

subject to the Fair Housing Act ("FHA") (ECF 9, ¶ 11). The property is owned by Evergreen

Gardens LP and managed by GMS (ECF 1, ¶¶6,7). The individual Defendants are current or

former employees of GMS, as described in their Motion for Summary Judgment (ECF 27, ¶3-4).

Plaintiff Patsy Jay has been a tenant of Evergreen Gardens for over twenty-five years

(Deposition of Patsy Jay, 10:11[1]). Ms. Jay is a person with a disability (ECF 1, ¶¶13, 14; ECF 27,

fn. 1). Defendants were aware of Ms. Jay's disabilities (Deposition of Kristin Smith, 54:20-25[2];

Jay Dep., 83:22-84:2; Declaration of Patsy Jay, ¶¶3, 12).

### A.  McKnight's Assault of Plaintiff

Ms. Jay was sexually assaulted by another tenant and former employee of Defendants,

John McKnight, in her apartment on July 12, 2021 (Jay Dep., 22:21-25). On that date, McKnight

---

[1] Attached as Exhibit 1 to the Declaration of Jamie Trinkle.

[2] Attached as Exhibit 2 to the Declaration of Jamie Trinkle.

6 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

entered Ms. Jay's apartment to return her dog, whom he had taken on a walk (*Id*., 23:1-3). This was a regular occurrence, as Ms. Jay and McKnight, prior to this day, had a friendly relationship (*Id*., 17:21-18:4). When he was in Ms. Jay's apartment, McKnight made an extremely rude and crass remark about another tenant's daughter (*Id*., 23:9-13). Plaintiff told McKnight to leave, and then he turned on her, pulled his penis out of his pants and held his hand on the back of Ms. Jay's head, forcing her face within inches of his penis (Jay Decl., ¶6; *see also* ECF 28-6). As he forced her face closer to his genitals, he said, "either you do it or someone else will" (Exhibit 3, at 2, entry dated July 12, 2021). McKnight had a gun on his waist at the time (Jay Dep., 28:3-4). Ms. Jay screamed, and McKnight then left her apartment (*Id*., 30:21-24; 33:1).

Defendant Leondra Coleman, property manager of Evergreen Gardens at the time, was notified of the assault by Tillamook Police later that day (Deposition of Leondra Coleman, 39:3-22[3]). Ms. Coleman informed the police, "[t]here has been many written reports about John harassing some of the women that live in the apartments[, including]… reports of John looking through windows and following them home. Some have reported being followed at the store too." (Exhibit 5, at 5 ¶3). On July 12, 2021, Ms. Coleman notified the other Defendants of the assault, and that Ms. Jay was seeking a restraining order against McKnight (Coleman Dep., 43:9-10). On July 15, 2021, Ms. Jay reported to Defendants that she was sexually assaulted by McKnight in her apartment, in the form of a formal written complaint (ECF 28-6).

On July 16, 2021, Ms. Jay obtained a restraining order under the Elderly Persons and Persons with Disabilities Abuse Prevention Act ("EPPDAPA") against McKnight and provided a copy to Defendants (ECF 9, ¶21; ECF 28-7; Jay Dep., 46:19-21). To obtain the restraining order,

---

[3] Attached as Exhibit 4 to the Declaration of Jamie Trinkle.

7 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Ms. Jay proved by a preponderance of evidence that she had been abused[4] by McKnight and was in immediate and present danger of further abuse from McKnight. ORS 124.010(1)(a), (2).[5]

Defendants claim that, at some point, they issued a curable 30-day/14-day ("30/14") termination notice[6] to McKnight after Ms. Jay reported that she was sexually assaulted by him. (Deposition of Jerry Mascolo, 31:6-14[7]). Defendants have not provided this termination notice to Plaintiff and neither Plaintiff nor her counsel have ever seen it. (Declaration of Jamie Trinkle, ¶2). It is undisputed that Defendants never issued a 24-hour termination notice and that he eventually moved out of his own accord in November 2021. (Coleman Dep., 99:12-100:4; 101:3-21; Ex. 3, at 1, Nov. 4, 2021 entry; Mascolo Dep., 31:6-21). In the months after her assault, McKnight constantly threatened Ms. Jay and made her feel unsafe in her home. (Jay Decl., ¶9).

GMS' lease states that the landlord "may immediately terminate the lease and take possession after twenty-four (24) hours written notice" if a tenant "threatens to immediately inflict personal injury or actually inflicts substantial personal injury" upon GMS, its employees or other tenants or if a tenant commits an "act outrageous in the extreme" (ECF 28-11, at 4 §

---

[4] The definition of abuse under ORS 124.005 includes: "Willful infliction of physical pain or injury" ORS 124.005(d), and "Sexual contact with a nonconsenting elderly person or person with a disability…" ORS 124.005(h). To obtain an EPPDAPA protective order, the petitioner must show that they are in immediate and present danger of further abuse from the abuser. ORS 124.101(1)(a).

[5] On October 14, 2021, Ms. Jay's restraining order against McKnight was upheld after a contested hearing. (Exhibit 12)

[6] Under ORS 90.392, a landlord may issue a "for-cause" termination notice if the tenant commits a "material violation" of the lease or the tenant duties described in ORS 90.325. ORS 90.392(2). The termination notice requires the tenant to move in 30 days, if the tenant fails to cure the violation within 14 days. ORS 90.325(4)(a), (3)(c). If the tenant fixes the issue but commits substantially the same "material violation" within 6 months of the notice, the landlord may issue a new 10-day notice, requiring the tenant to vacate within 10 days and without the opportunity to cure. ORS 90.392(5).

[7] Attached as Exhibit 6 to the Declaration of Jamie Trinkle.

8 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(3)(C)(1)). The lease clarifies that the landlord's standard of proof is "the civil standard, providing proof by a preponderance of the evidence" (*Id.*, at 5 ¶1). The lease further states that, "Verbal abuse (including yelling or swearing), mental abuse, or physical abuse towards the resident Manager [or]…other tenants…is expressly prohibited and will lead to the termination of tenancy immediately upon the first occurrence" (*Id.*, at 5 § (H)).

On August 20, 2021, GMS issued a 30/14 termination notice to Ms. Jay (ECF 9, ¶28; ECF 28-9). This was the first termination notice Ms. Jay had ever received in her tenancy (*see* Jay Decl., ¶12). The notice threatened Ms. Jay with eviction because Ms. Jay allegedly: had a walker on her front patio; followed McKnight with her phone and threatened to call the police on him in the community room; invaded other tenants' privacy (McKnight's) by watching them with binoculars; and Ms. Jay's caregiver had demanded Defendants act based on the restraining order and respond to Ms. Jay's complaints of ongoing harassment by McKnight (ECF 28-9).

Ms. Jay provided Defendants with a written objection to the termination notice on August 27, 2021 (ECF 9, ¶30; ECF 28-10). In that letter, she described McKnight's assault again:

> [Ms. Coleman] describing what John did to me as 'private indecency' is entirely minimizing the offense. That man aggressively trapped me in my wheelchair, his legs hard against my knees making it impossible to scoot down to avoid his smelly private part held as he tried to force it into my mouth, thrusting forcefully.

(ECF 28-10, 6-7). In August 2021, Mr. Mascolo called Ms. Jay with a warning against improper behavior and accused Ms. Jay of pounding on the door of Ms. Coleman's private residence and occupying a significant amount of her office time (ECF 9, ¶32, admitting ECF 1, ¶32).

On August 31, 2021, McKnight was arrested by Tillamook Police for violating Ms. Jay's restraining order (ECF 28-8). Defendants were aware of this violation and arrest but took no action against McKnight (Ex. 3, at 1-2, entries dated July 12, 2021 to Nov. 4, 2021).

9 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

**B.  Prior Complaints Against McKnight**

At the time of McKnight's assault of Ms. Jay, Defendants were aware of many other women tenants' serious complaints about McKnight (ECF 9, ¶18). Defendants logged these complaints in and had access to refer to them at all times in their management software database, AppFolio. (*see* Ex. 3; *see infra*).

John McKnight moved into Evergreen Gardens on or about May 1, 2018 (Exhibit 7, at 1 § 3). McKnight was employed by Defendants to do maintenance work, but Defendants chose to stop asking him to do that work at some point (Smith Dep., 10:13-22, 25:6-10). In the three years preceding the sexual assault of Ms. Jay by McKnight, Defendants received complaints from ten different female tenants about harassing, aggressive, threatening, and erratic behavior by McKnight (*see infra,* Ex. 3). In 2019, they also received a report of sexual assault from their own employee (Exhibit 8). Two women got restraining orders against John McKnight, and Defendants were aware of those orders (*See Id.;* infra; Ex. 3, at 3, 21).

o **Female Tenant #1**: On September 12, 2018, tenant Temera Porter filed for a Stalking Protective Order against McKnight, which stated, "I believe that he is a danger to most of the people living there," and "I have called the owner (Richard) about his stalking and to change my locks…the owners refuse to change my locks" (Exhibit 9, at 4). After an *ex parte* hearing, the court granted Ms. Porter's protective order against McKnight on September 13, 2018 (*Id.*, at 15-19). The next month, on October 1, 2018, GMS issued a 14-day Status of Eviction Notice to Ms. Porter, stating she had not corrected issues from a previous notice (Exhibit 10).

o **Female On-Site Manager, Cindy Fargher**: In December 2018, the On-Site Property Manager at Evergreen Gardens at the time, Cindy Fargher, made a written complaint to GMS that McKnight "flipped out" on her (Ex. 3, at 5). That complaint included the language, "I am now

10 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

extremely uncomfortable using him as my maintenance man" (*Id.*). A month later, on January 21, 2019, Ms. Fargher submitted to GMS a written complaint about McKnight yelling at her in a way that made her fear for her safety while he was making unjustified complaints about another tenant (*Id.*, at 8).

o **Female Tenant #2**: The following month, on February 26, 2019, tenant "JT", submitted a written complaint to GMS, stating "I fear for my life," in reference to McKnight, and that he had approached neighborhood children with his gun visible (Ex. 3, at 9-11).

o **Female Tenant #3**: On February 27, 2019, tenant "MF", submitted a written complaint to GMS regarding McKnight, stating that he threatened her by standing in front of her kitchen window and lifting his shirt to show his gun (Ex. 3, at 12).

o **Female On-Site Manager, Cindy Fargher**: On March 5, 2019, Ms. Fargher submitted a written report to GMS stating that she was sexually assaulted by McKnight on February 17, 2019, and that during that attack he waved his gun in her face and left bite marks on her body (Ex. 3, at 14). The next day, Ms. Fargher emailed Ms. Smith and Mr. Mascolo directly, notifying them that she was seeking a restraining order against McKnight because she was afraid for her life, and requested that GMS evict McKnight (*Id.*, at 14-16); she wrote: "His behavior makes me very afraid. He won't listen to 'No' no matter how many times I say it," and "my highest concern is my safety" (*Id.,* at 16). She filed a Family Abuse Prevention Act restraining order 19PO02348 against McKnight on March 13, 2019 (Exhibit 11, 1-9), and it was granted the next day (*Id.*, 10-18; Ex. 8, 12-17). Inexplicably, Defendants did not issue McKnight a 24-hour eviction notice for this incident; instead, McKnight was issued a 30/14 (Exhibit 12, at 1-4) which Defendants claim that he "remedied" (*Id.*, at 5-6) and he was allowed to stay on the property.

11 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

o **<u>Female tenant #4</u>**: On March 10, 2019, female tenant "JH" made a written complaint to GMS about McKnight coming to her door drunk on the night of March 9, 2019 (Ex. 3, at 18-20).

o **<u>Female tenants #5 & #6</u>**: On April 24, 2019, the following AppFolio note was entered by Ms. Fargher in McKnight's file:

> [JH] is terrified of him, even going as far as putting a No Trespassing sign in her window, thinking she may have to move. [Female tenants RF and SP] have expressed their fear of him. He is walking around talking to people and clearly upsetting them. This seems a violation of the 14/30. (Ex. 3, at 23)

o **<u>Female tenant #7</u>**: On May 22, 2019, female tenant "DG" submitted a written complaint to GMS about McKnight (Ex. 3, at 24-25). She wrote: "It's pretty sad that we have to be worried about some creepy man living around us, I should be able to be safe, and feel safe in my house, and around my house when I'm outside. Please I'm asking you to please ask this man to leave" (*Id.*, at 24).

o **<u>Female tenant #8</u>**: On May 23, 2019, female tenant "EK" submitted a written complaint to GMS regarding McKnight touching her: "John rubbed the upper part of my arm telling me he was so sorry. I was very uncomfortable but let it pass" (Ex. 3, at 26).

o **<u>Female tenant #9</u>**: On May 25, 2019, female tenant "CD" submitted a written complaint to GMS regarding fearing McKnight and feeling unsafe (Ex. 3, at 30-32). CD made six additional reports to GMS on: September 23, 2019 (McKnight got too close to her) (*Id.*, 36); October 7, 2019 ("footprints in bark under my kitchen window" "I believe it's John McKnight," ongoing harassment, his gun, "watching me, stalking me, and trying to intimidate me, and takes advantage of my deafness") (*Id.*, 39-40); October 8, 2019 (regarding making a police report "documenting someone looking in my window") (*Id.*, 42-43); November 5, 2019 (McKnight watched her while she waited for the bus, signed by another female tenant who witnessed

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

McKnight watching CD) (*Id.*, 44-45); November 13, 2019 (McKnight watched her while she waited for the bus, "This is the second incident in 6 days. The police came to my apartment.") (*Id.*, 44); and, February 10, 2021 (McKnight watched CD from his bedroom window; "These are his intimidate tactics that he's been doing to me since May 2019. He wants me to know he's watching me-he's very overt-again-and I'm very worried his behavior is going to escalate and he'll begin stalking me on the complex and elsewhere again.") (*Id.*, 65).

o **Cindy Fargher**: On May 25, 2019, Ms. Fargher emailed GMS management, including Defendant Mascolo:

> It is pointless to me to write anything about my personal concerns as they haven't been acknowledged or addressed at all since the gun incident and sexual assault occurred in February. The 'previous' is still 'Now' and as word is getting out that a predator lives on property, the tenants are afraid for their safety as they should be and they have a right for their concerns to be addressed. The gun incident alone should have been enough to evict anyone. Legally, the police have no authority to pull their gun out of their holster in public unless they are threatened. The complaint from 9A dated 3/10/19 happened the evening of the same day (afternoon) he received the 14/30 (verified). He violated it right out the gate.

(Ex. 3, at 75).

o **Female tenant #10**: On October 7, 2019, female tenant "LW" submitted a written complaint to GMS regarding McKnight pounding on her wall after she had gone to bed (Ex. 3, at 37-38). She wrote: "This means that he was watching my apartment and the lights on and off. He knew exactly when I turned off my T.V. and my lights. I consider this to be an escalation in his repeated attempts to harass me, intimidate me and to continue his stalking behaviors." (*Id.*, 38)

o **On-site manager Angela Zuehl**: On October 25, 2019, Cindy Fargher's replacement and new GMS employee and Evergreen Gardens on-site property manager Angela Zuehl entered the following AppFolio note in McKnight's file: "After a few weeks of watching and receiving complaints that John is walking in the bark in front of units and witnessing it myself. I posted a

13 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

non-compliance today"[8] (Ex. 3, at 41). On May 18, 2020, Ms. Zuehl entered another AppFolio

note in McKnight's file:

> On Friday the 15th, I was leaving evergreen and came around the corner by the raised flower beds and he was hiding behind the bushes and taking pictures of other tenants while they were walking to their apartments. I did roll my window down and tell him "you can not be taking pictures of people like that", waited a few minutes and then left.

(*Id.*, at 46).

o On June 18, 2020, GMS Owner Kristin Smith wrote a letter to McKnight regarding his May

2020 and June 13, 2020 complaints about a female tenant. (Ex. 3, at 80). Ms. Smith wrote:

> She admits cussing at you and says that she shouldn't have done that…however she went on to explain that you video tape her while she was walking her dog and that makes her feel uncomfortable...We allow residents to have...security cameras near their door or in their units, but videotaping other residents on your phone makes people uncomfortable. I am sure you can understand how that might make a person feel....I understand that you are trying to document people breaking rules, however, you have not been asked or appointed to document other residents in that way, so I would respectfully ask that you keep any video documentation to a blink camera or other cameras within the confines of your unit or door area...I am sorry for any problems this has caused you and I hope you have a peaceful rest of your summer. Thank you for your time. Very truly yours, Kristin Smith (*Id.*).

o **Female tenant #9**: On February 24, 2021, female tenant CD submitted her eighth written

complaint to GMS regarding their handling of her and other female tenants' complaints about

McKnight. She wrote, in part:

> [GMS] has a professional, legal and moral responsibility to provide tenants of Evergreen Gardens with a safe and comfortable environment in which to live. McKnight's malicious intimidation and harassment of myself and other tenants in the two years I've lived at Evergreen is classified as abuse. Management cannot change his sick mind, but I believe they do have the legal authority to set strict guidelines or parameters McKnight must follow-or be evicted. His abuse of tenants is a misjustice to people who do not deserve it. I have been targeted by McKnight for 21 months-I have been subjected to being stalked, intimidated by malicious means, and harassed-I have been under an enormous amount of stress and anxiety for 21 months. If you've

---

[8] If it exists, Defendants did not provide Plaintiff with a copy of this notice. (Trinkle Decl., ¶¶2, 14).

14 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

> never experienced this, it would be beyond your comprehension. It is imperative mgmt realize more seriously that complaints are so much more than McKnight's actions-it's the fear and the anxiety and helpless feeling that a really unstable mind is behind what he does. He doesn't hide it-he's very overt. The many complaints against McKnight would, surely, stand up in court if necessary, and prove he is a menace to the peace of this complex. The more he gets by with, the more he'll do.

(Ex. 3, at 68-69).

Defendants did not inform Ms. Fargher's successor, Leondra Coleman, about any complaints about McKnight, including his threats and violent sexual assault of Ms. Fargher (Coleman Dep., 28:25-29:7). After McKnight's sexual assault of Ms. Jay, Ms. Coleman looked back at McKnight's file finding five to seven previous complaints, and about five to seven complaints from her time there, for a total of ten to fourteen complaints about McKnight's behavior (*Id.,* 52:20-53:24). Dawn Cockrum, GMS's own Senior Compliance Specialist at the time of Plaintiff's assault (Deposition of Dawn Cockrum, 10:23-11:1[9]), who was in charge of reviewing violation notices and ensuring that GMS was complying with federal and state guidelines (*Id.*, 11:12-18), was not informed of prior incidents of McKnight's assault of Ms. Porter and Ms. Fargher (*Id.*, 29:22-30:10, 40:1-8). Defendants consistently classified McKnight's harassment as "he said/she said" and classified Ms. Jay's assault as the same (*See* Smith Dep. 58:16-19; Cockrum Dep. 25:13-26:1; Coleman Dep. 54:4-18).

## IV.    Defendants Are Not Entitled to Summary Judgment on Plaintiff's Disability Discrimination Claim

The Fair Housing Act, 42 U.S.C. § 3604 et seq., makes it unlawful to "discriminate against any person in the terms, conditions or privileges of …rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of a handicap of that

---

[9] Attached as Exhibit 13 to the Declaration of Jamie Trinkle.

15 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

person." 42 U.S.C. § 3604(f)(2). Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B); 24 C.F.R. § 100.204(a). The U.S. Department of Housing and Urban Development ("HUD") defines an accommodation as "reasonable" if "it is feasible and practical under the circumstances." 24 C.F.R. § 100.204. An accommodation is "reasonable" if it does not impose a "'fundamental alteration in the nature of the program' or 'undue financial and administrative burdens.'" *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1157 (9th Cir. 2003), (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 412 (1979). To state a claim under the FHA for discrimination based on failure to reasonably accommodate, a plaintiff must demonstrate that (1) she suffers from a "handicap" as defined by 42 U.S.C. § 3602(h); (2) Defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap "may be necessary" to afford plaintiff an equal opportunity to use and enjoy the dwelling; (4) the accommodation is reasonable; and (5) Defendants refused to make such accommodation. *DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006).

Additionally, a plaintiff "need not use the magic words of reasonable accommodation or the Fair Housing Act to trigger a defendant's duty to provide an accommodation so long as the plaintiff's request contains sufficient information to place a defendant on notice that the request is one for a reasonable accommodation." *Elliott v. QF Circa 37, LLC*, No. 16-CV-0288-BAS-AGS, 2018 U.S. Dist. LEXIS 98668, 7 (S.D. Cal. June 12, 2018) (internal quotations omitted). To meet the "may be necessary" standard, a plaintiff "must show that, but for the

16 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

accommodation, they likely will be denied an equal opportunity to enjoy the housing of their

choice." *U.S. v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997).

On the first prong, it is undisputed that Ms. Jay has a "handicap" as defined by 42 U.S.C.

§3602(h) (ECF 27, fn. 1). Ms. Jay has arthritis in her spine (Jay Dep., 6:23-7:4). Ms. Jay's

handicap has substantially limited her life activities by necessitating the use of a wheelchair or

walker for her to get from place to place (*Id.*, 7:11-24).

On the second prong, it is undisputed that Defendants knew of Ms. Jay's handicap. GMS

received a reasonable accommodation request from Ms. Jay in 2018 to move to an ADA

accessible unit (Exhibit 14) and granted that request on February 12, 2019. (*See* Exhibit 15, at 1,

16). Ms. Coleman knew Ms. Jay used a wheelchair and had seen Ms. Jay's walker on her porch

since the beginning of her employment. (Coleman Dep., 79:4-11).

On the third prong, accommodating Ms. Jay's handicap was necessary to afford Ms. Jay

equal use and enjoyment of her home. Being able to move in and out of her unit and around her

porch comfortably without falling and potentially injuring herself enabled her to use and enjoy

the dwelling. Ms. Jay needed her walker on her porch to have an equal opportunity to enjoy that

area of her apartment (Jay Dep., 71:23-72:4; 75:23-76:3, 83:14-17).

On the fourth prong, the accommodation Ms. Jay needed was reasonable. Ms. Jay used

her walker as her "porch chair" (Jay Dep., 72:23-73:4). It was neither a fundamental alteration

nor an undue burden on Defendants to allow Ms. Jay to keep her walker on her porch.

Defendants do not dispute any of the prongs above. Instead, they argue that they granted

Ms. Jay's reasonable accommodation (ECF 27, at 12). That argument is not supported by the

facts. It is undisputed that Defendants issued a notice of allowable front porch items to Ms. Jay

on May 13, 2021 (Coleman Dep., 71:11-22; Jay Dep., 71:7-15; ECF 27, at 12; ECF 28-9, at 3).

17 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In response to the notice, Ms. Jay moved her walker onto the gravel area beside her porch. (Jay Dep., 72:5-10, 75:10-20). Defendants issued a termination notice to Ms. Jay on August 20, 2021, for having a walker on her "front patio", among other issues related to McKnight (ECF 28-9, at 4). Defendants issued that notice based on the walker being in the gravel area beside her porch. (Jay Dep., 76:9-77:3; Coleman Dep., 78:1-79:15, 79:22-80:23). Defendants received Ms. Jay's written request for a reasonable accommodation dated August 25, 2021 (ECF 28-10; Smith Dep., 54:20; Coleman Dep. 81:5-81:14). It is disputed amongst Defendants whether they considered Ms. Jay's letter to be a reasonable accommodation request (Cockrum Dep., 25:6-11; Smith Dep., 54:20-55:5), and it is disputed by the parties whether Defendants responded to that request (Jay Decl., ¶12; Coleman Dep., 81:15-17).

Ms. Jay made a verbal request to keep her walker on her porch before the termination notice was issued (Jay Decl., ¶12). Defendants never responded and never issued a Notice of Cure to Ms. Jay regarding placement of her walker nor any other issue raised in the August 17, 2021 notice. (Jay Decl., ¶12; Jay Dep., 83:14-84:10). If they did grant Ms. Jay's request, she never knew it and Defendants did not follow GMS' own lease requirements:

> Reasonable accommodation requests will be evaluated within 14 days of receipt from tenant or applicant by central office personnel. A decision will be made to either accept or deny the accommodation within 14 days. The decision will be made **in writing and delivered to tenant/applicant via first class mail**.

(Exhibit 16, at 12, ¶4[10]) (emphasis added).

By issuing the termination notice citing her walker as a material lease violation for which she could be evicted and by failing to respond in writing to her request for an accommodation,

---

[10] Exhibit 16 includes the entirety of Ms. Jay's 2021 lease. Defendants provided only the last 13 pages of this lease as Exhibit K of their Motion for Summary Judgment (Trinkle Decl., ¶18; *see* ECF 28-11).

18 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

Defendants denied or effectively denied Ms. Jay's reasonable accommodation. Ms. Jay continues

to keep her walker in her bedroom and off her porch to this day (Jay Dep., 72:15-23).

There is sufficient evidence for the trier of fact to find for Ms. Jay on this claim. For the

foregoing reasons, Defendant's motion for summary judgment as to Plaintiff's First Claim for

Relief should be denied.

## V. Defendants Are Not Entitled to Summary Judgment on Plaintiff's Hostile Sexual Living Environment Claim

### A. Defendants Move Against a Claim Not Made by Plaintiff

Defendants fail to move against plaintiff's hostile **sexual** environment claim, and instead

analyze a claim for hostile **disability** environment, a claim Plaintiff did not make. (ECF 27, 14-

17). Plaintiff's complaint, however, clearly asserts a claim for "a hostile sexual environment."

(ECF 1, ¶52). Summary judgment on this claim should accordingly be denied. Had Defendants

complied with the conferral requirement of LR 7.1, this mistake could have been easily avoided.

### B. Plaintiff was Subject to a Severe and Pervasive Sexually Hostile Environment

The FHA prohibits discrimination based on sex in the provision of housing. To prevail in

a hostile living environment sexual harassment claim, plaintiff "must establish that she was

subjected to (1) unwelcomed (2) sexual harassment that was (3) sufficiently severe or pervasive

so as to interfere with or deprive the plaintiff of her right to use or enjoy her home." *Salisbury v.*

*Hickman*, 974 F. Supp. 2d 1282, 1290 (E.D. Cal. 2013); citing *Honce v. Vigil*, 1 F.3d 1085, 1089-

90 (10th Cir. 1993).

Harassment that is "severe or pervasive enough to 'alter the conditions of the housing

arrangement'" constitutes a hostile living environment. *Scutt v. Doris*, No. 20-00333 JMS-WRP,

2021 U.S. Dist. LEXIS 10708, at *16 (D. Haw. Jan. 20, 2021), quoting *Honce*, 1 F.3d at 1090.

19 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This analysis contains both subjective and objective elements. *Salisbury*, 974 F. Supp. 2d at 1290, citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Subjectively, Ms. Jay is a 79-year-old woman who uses a wheelchair, making her particularly vulnerable to harassment. (Jay Decl., ¶3). When assessing the objective severity of harassment faced by a female plaintiff, the facts are viewed from the perspective of a reasonable woman. *Ellison v. Brady*, 924 F.2d 872, 878-79 (9th Cir. 1991) (Title VII case[11]). The required "severity or seriousness of the harassing conduct varies inversely with the pervasiveness of the conduct." *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000). Simply put, "the more severe the harassment, the less need to show a repetitive series of incidents." *Id.* Single incidents of harassment, if sufficiently severe, can create a hostile environment. *Id.* at 925-27.

Critically, for the purposes of this motion, whether an incident is "severe" should be left to a factfinder, not disposed of on summary judgment. *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 648 (9th Cir. 2021). As detailed above, Plaintiff has put forth evidence that the July 12, 2021, incident was severe and unwelcome sexual harassment. McKnight was in Ms. Jay's home while he was armed with a gun. He told Ms. Jay that another tenant's daughter had large breasts and said that he "would moo like a cow" when he saw her. (Jay Dep., 23:6-13). She objected to this sexually crude comment (*Id.*, 23:14-16, 27:6-17). He then unzipped his pants, removed his penis and approached Ms. Jay's face with his penis in his hand (*Id.*, 27:21- 28:20, 30:3-12). He

---

[11]     The Ninth Circuit generally applies Title VII employment discrimination analysis when examining Title VIII FHA discrimination claims. *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997). Title VII and the FHA have been described as "functional equivalent[s]" to be "given like construction and application." *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000); see also *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 578 U.S. 519, 530-31 (2015) (comparing section 3604(a) of the FHA to Title VII); *Bloch*, 587 F.3d at 779 (noting that section 3604(b) mirrors Title VII).

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

kicked her feet off her wheelchair footrest, put his foot on the footrest, grabbed her hair with his

hand (*Id.*, 28:22-29:21) and tried to force his penis into her mouth (*Id.*, 85:14-86:4; Jay Decl.,

¶6). His penis came within inches of her face before Ms. Jay screamed and Mr. McKnight

backed up, zipped his pants and left her apartment. (Jay Dep., 30:15-22, 32:15-25). This incident

was so frightening that Ms. Jay vomited in her lap. (ECF 28-6, 2.; Jay Decl., ¶6).

Over the next four months, because Defendants failed to evict him, McKnight was

allowed free reign to continue his pattern of harassment exacerbating the hostility of Ms. Jay's

living environment, by carrying his gun, making threatening gun gestures toward her, creeping

outside her apartment and making verbal threats. (Jay Decl., ¶11; Jay Dep., 40:12-41:19, 47:18-

49:1). Ms. Jay reported these incidents to Defendants. (*Id.*, 49:2-50:17). Defendants declined to

act to end the harassment, instead advising Ms. Jay to "ignore it." (Coleman Dep., 58:17-59:15).

Understandably, and as Ms. Jay has testified (Jay Decl., ¶¶10-12), this seriously interfered with

(in fact, ruined) her ability to enjoy her home and made her feel constantly physically and

sexually unsafe in the apartment complex for four months, until McKnight moved out on his own

volition. This evidence is more than sufficient for a jury to find that Ms. Jay endured sexual

harassment that was both severe and pervasive.

### C. Defendants are Liable for All of the Harassment that Plaintiff Endured, Including the July 12, 2021, Assault

#### 1. The Legal Standard for Defendants' Liability

HUD issued a regulation in 2016 defining housing providers' liability when one tenant

harasses another and confirming that it mirrors the Title VII test. Landlords and landlord agents

are directly liable for

> failing to take prompt action to correct and end a discriminatory housing practice by a
> third-party, where the person knew or should have known of the discriminatory conduct

21 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party.

24 C.F.R. § 100.7(a)(1)(iii) (hereinafter "HUD Regulations"). The HUD Regulations and relevant caselaw establish that Ms. Jay must prove three elements to establish a housing provider's liability for a third party's harassment: (1) the third-party created a hostile environment for her; (2) the housing provider knew or should have known about the conduct creating the hostile environment; and (3) the housing provider failed to take prompt action to correct and end the harassment while having the power to do so. *Id.*

Having "the power to do so" does not mean that the landlord has "absolute control" over a harassing tenant. As the Seventh Circuit found in a tenant-against-tenant harassment case,

> Control in the absolute sense, however, is not required for liability. Liability attaches because [a defendant] has 'an arsenal of incentives and sanctions ... that can be applied to affect conduct' but fails to use them. [Landlord] brushes aside the many tools for remedying harassment that it has pursuant to the Agreement. For example, the Agreement allows [landlord] to evict any tenant who 'engages in acts or omissions that constitute a direct threat to the health and safety of other individuals' or who 'engage[s] in any activity that [landlord] determines unreasonably interferes with the peaceful use and enjoyment of the community by other tenants.' . . . With respect to the common areas, [landlord] could have suspended privileges for tenants who failed to abide by the anti-harassment policies, instead of taking a blame-the-victim approach.

*Wetzel v. Glen St. Andrews Living Community, LLC,* 901 F.3d 856, 865 (7th Cir. 2018) (internal citations omitted).

Courts in the Ninth Circuit, including this court, have applied this standard in analyzing both harassment by co-workers or customers in employment cases and in tenant-against-tenant harassment in housing cases.

Federal District Courts within the Ninth Circuit have interpreted the Fair Housing Act to permit a hostile housing environment claim. A hostile housing environment

22 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

claim can stem from the discriminatory conduct of other tenants. Such a claim arises when a plaintiff can establish that they were subject to harassment that was sufficiently severe or pervasive so as to interfere with or deprive them of their right to use or enjoy their home. It is necessary that the landlord knew or should have known of the harassment but failed to take appropriate action.

*Lazarus v. Ouansafi*, No. 21-00247-HG-RT, 2023 U.S. Dist. LEXIS 178293, at *7, (D. Haw. October 3, 2023) citing, *Hicks v. Makaha Valley Plantation Homeowners Ass'n*, 2015 U.S. Dist. LEXIS 85101 at *30-31 (D. Haw. June 30, 2015) and *Fielder v. Sterling Park Homeowners Ass'n*, 914 F. Supp. 2d 1222, 1227 (W.D. Wash. 2012). In *Johnson v. Brenneke*, 2022 U.S. Dist. LEXIS 61098 (D. Or. Feb. 23, 2022), this court noted that while the issue was not settled, "the Ninth Circuit has applied Title VII discrimination analyses when examining FHA claims" and thus adopted the HUD Regulations' negligence liability standard elements for the purpose of analyzing a motion for summary judgment. *Id.,* at *13-14. In *Johnson,* the court specifically noted that a landlord's liability for harassment of a tenant by a third party, hinges on "the extent of the [landlord's] control or any other legal responsibility the [landlord] may have with respect to the conduct of such third-party." *Id*., quoting 24 C.F.R. § 100.7; s*ee James W. v. City & Cnty. of San Francisco*, No. 21-CV-02370-EMC, 2022 U.S. Dist. LEXIS 89012, at *44-45 (N.D. Cal. May 17, 2022) (stating that liability arises from the landlord's "'negligence and ratification' of the harassment through its failure to take appropriate and reasonable responsive action" (quoting *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006)); *Fahnbulleh v. GFZ Realty, LLC*, 795 F. Supp. 2d 360, 364 n.1 (D. Md. 2011)(Title VII's standard for harassment by a customer attaches "where the employer either ratifies or acquiesces in the harassment by not taking immediate

23 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

and/or corrective actions when it knew or should have known of the conduct." (quoting

*Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997))[12].

### 2. Defendants Knew About the Harassment by Mr. McKnight and Failed to Act to End it.

There is no real dispute that Defendants knew about McKnight's harassment of many

other women on the property for years before Ms. Jay was assaulted in her apartment. (See *supra*

at III. B., 10-15). Among the many complaints made by a variety of women, McKnight's violent

threats and sexual assault on Cindy Fargher stands out. Ms. Fargher was the on-site manager at

the complex, an employee of Defendant GMS. On February 17, 2019, McKnight waved a gun in

her face, and later that night he sexually assaulted Ms. Fargher. (Ex. 3, 14-16; Ex. 11, 2-5). On

March 6, 2019, he threatened her. (*Id.*). On March 13, 2019, Ms. Fargher filed a restraining order

against McKnight where she described the violent nonconsensual sexual assault and McKnight's

threats made at gunpoint. (Ex. 11, 1-9). The next date, Ms. Fargher's restraining order was

---

[12] This court also indirectly addressed this issue in *Gibson v. Cmty. Dev. Partners,* 2022 U.S. Dist. LEXIS 189828 (D. Or. Oct. 18, 2022), where an unrepresented plaintiff alleged a variety of claims including tenant-on-tenant harassment. The court dismissed her complaint, with leave to amend, due to pleading insufficiencies. *Id.* at 27. However, the court recognized that a landlord's "failure to act may constitute discrimination." *Id.* at 13. It appears that neither the defendant nor the *pro se* plaintiff in that case raised the proper standard above as found in Title VII and the HUD Regulations.

   Even if the discriminatory treatment or disparate impact tests applied here, plaintiff has, at a minimum, produced evidence that puts at issue whether defendants' motivations were based on sex and whether their failure to end McKnight's harassment had a disparate impact on women living in the complex who might be subject to ongoing sexual harassment. One example of the different treatment is found in defendants' eviction practices. GMS Owner Kristin Smith testified that GMS evicts tenants for repeat noise violations without the need for any police involvement (Smith Dep., 13:11-14:8), but when McKnight engaged in much more serious and threatening repeated sexual harassment, they declined to evict him even after the police were involved and Ms. Jay obtained a restraining order. The evidence supports both discriminatory treatment and disparate impact based upon sex here.

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97124
Ph: 503-640-4115/Fax: 503-640-9634

granted (Ex. 11, 10-18), and she filed an incident report with GMS regarding her sexual assault

by McKnight and the restraining order. (Ex. 8).

Despite being on notice of these incidents (Ex. 8; s*ee also* Exhibit 17: "Is there a reason

he wasn't terminated? Any person who waves a gun in the manager's face and threatens them

should be terminated and evicted."), rather than evicting McKnight pursuant to a clearly

available and applicable 24-hour notice, McKnight was allowed to stay on the property (Ex. 3, 1;

Ex. 12, 5-6) and Ms. Fargher was forced to flee. Defendants Smith and Mascolo downplay these

violent incidents and blame Ms. Fargher (in part for violating her employment agreement by

having an intimate relationship with a tenant) rather than McKnight for his violent threats and

assault on her. (Smith Dep., 29:13-30:4, Mascolo Dep., 18:21-19:3). Mascolo refers to McKnight

in his deposition as "an alright guy" and "a good tenant," despite his knowledge of the many

complaints of harassment and multiple assaults of women. (*Id*., 18:11-17). Notably, Smith and

Mascolo didn't even bother to tell Dawn Cockrum (one of the people responsible for evaluating

Ms. Jay's complaints in 2021) or Leondra Coleman (the person who took Ms. Fargher's job and

could have been in harm's way herself) about the sexual assault and gun-related threats by

McKnight. (Coleman Dep., 28:25-29:7; Cockrum testified that she normally checked a tenant's

file to see the history of complaints in deciding what to do about a new complaint, but in this

case said she had never heard of Cindy Fargher (or Temera Porter), (Cockrum Dep., 22:2-6;

29:22-30:10, 42:19-22).

Defendants' failure to evict McKnight based on their knowledge of his earlier harassment

directed at other individuals, including Ms. Fargher, is relevant in analyzing Ms. Jay's hostile

living environment claims. In 2008, the Supreme Court ruled that "me too" evidence is

admissible for this purpose; its relevance "depends on many factors, including how closely

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). The Eighth Circuit cited *Mendelsohn* in a hostile living environment case to determine that it was not error to admit testimony from three other tenants who the landlord had harassed, although the plaintiff did not know the women or about their experiences. *Quigley,* 598 F.3d at 951. Accordingly, in *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154 (9th Cir. 2017), the Ninth Circuit held that the employer's knowledge of previous harassment complaints against plaintiff's attacker was "probative of [the employer's] general attitude of disrespect toward its female employees." 865 F.3d at 1162 n.8 (quoting *Zetwick v. Cnty. Of Yolo*, 850 F.3d 436, 445 (9th Cir. 2017)). Thus, when the plaintiff learned that her employer knew her perpetrator's history, "she reasonably could have believed that [her employer] would continue to support [her abuser] at the expense of its female employees." *Id.*

For the purposes of this motion, the court must assume that Defendants knew about many previous complaints against McKnight. This knowledge is directly relevant to plaintiff's theory of the case: it indicates Defendants' disinterest in protecting her and other women tenants from McKnight. Ms. Coleman, the on-site manager at the time Ms. Jay was attacked, testified that she knew that multiple other women had accused McKnight of sexual harassment but that this did not play a role in what action Defendants took against McKnight regarding Ms. Jay's allegation. (Coleman Dep., 46:7-24). Not only did Defendants refuse to address Ms. Jay's complaints against McKnight, but they had a history of supporting this man at the expense of their women tenants; this quite reasonably made Ms. Jay feel even more unsafe in her home. (Jay Decl., ¶¶10-12). Also, had Defendants evicted Mr. McKnight, as they could have and should have, based on the prior complaints of ten women tenants and Ms. Fargher, plaintiff would never have suffered *any* sexual harassment by him.

26 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Further fact disputes exist about what, if any, action Defendants took against McKnight for his assault on Ms. Jay. While some individual Defendants testified at deposition that he was issued a 30-day curable notice for this action[13], this eviction notice has not been produced to plaintiff despite repeated requests and is not attached to Defendants' motion. (Trinkle Decl., ¶2). Neither plaintiff nor her counsel have ever seen this notice. (*Id.*; Jay Decl., ¶13.) If such a notice exists, Defendants should be estopped from introducing it now, as plaintiff would be significantly prejudiced by not being able to analyze it and ask deponents about the notice. Also, even if such a notice was issued to McKnight, this action was wholly insufficient and ineffective in stopping the harassment which continued over the months following the July 12, 2021 assault in plaintiff's home. Dawn Cockrum does not recall giving McKnight even a curable eviction notice, and testified that her only recollection of the July 12, 2021, incident was that Ms. Jay said that McKnight "grabbed his crotch" and said something sexually offensive. (Cockrum Dep., 36:9-18). Ms. Cockrum went on to state, "I just basically made the decision on, you know, we believe both parties. They're both saying this. And nothing happened." (*Id.*, 36:14-37:12). What is undisputed is that McKnight was *never* evicted by Defendants. Rather, he gave his own 30-day notice and moved out of his own volition in November 2021 (Ex. 3, at 1), four months after his violent assault on Ms. Jay. (*See Id.*, at 1-2; Coleman Dep., 101:18-21; Ex. 12, at 5-6).

//

//

---

[13]    Defendant Mascolo told HUD in a letter that this notice was served on McKnight on July 22, 2021 and that McKnight committed a repeat violation of it when he was arrested for violating Ms. Jay's restraining order against him, but there is no evidence that Defendants did anything to evict McKnight, even after the repeat violation referenced by defendant Mascolo (Ex. 36 to Mascolo Dep.)

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

### 3. Defendants Had the Authority to End Mr. McKnight's Harassment.

Defendants had clear authority to take effective action calculated to end the harassment and they failed to do so. Specifically, despite Defendants' obvious misstatements or misunderstanding regarding Oregon law, federal law, and their own lease agreement, they had unambiguous authority to issue McKnight a 24-hour termination notice. Had a 24-hour notice been issued after McKnight's assault on Ms. Fargher, Ms. Jay would not have suffered *any* harassment, and had it been issued after his assault on Ms. Jay, she would not have continued to live in an extremely hostile environment for four months following the assault.

ORS 90.396 allows all Oregon landlords to terminate a residential tenancy with 24-hours' notice in any of the following circumstances:

> The tenant…seriously threatens to inflict substantial personal injury, or inflicts any substantial personal injury, upon a person on the premises other than the tenant;
>
> The tenant…recklessly endangers a person on the premises other than the tenant by creating a serious risk of substantial personal injury;
>
> The tenant…commits any act that is outrageous in the extreme, on the premises or in the immediate vicinity of the premises. For purposes of this paragraph, an act is outrageous in the extreme if the act is not described in paragraphs (a) to (e) of this subsection, but is similar in degree and is one that a reasonable person in that community would consider to be so offensive as to warrant termination of the tenancy within 24 hours, considering the seriousness of the act or the risk to others.

ORS 90.396(1)(a), (b) and (f). All of these subsections are clearly applicable to McKnight's sexually predatory attacks on Ms. Fargher in 2019 and Ms. Jay in 2021.

In addition to Defendants' misunderstanding of Oregon law, they ignore the equally unambiguous authority that they have given themselves in their own rental agreement with McKnight and their other tenants:

> Landlord may immediately terminate the lease and take possession after twenty-four (24) hours written notice if…(1) Tenant…threatens to immediately inflict

28 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

personal injury or actually inflicts substantial personal injury upon the Landlord or the Landlord's employees or any other Tenant or any neighbor living in the immediate vicinity…(4) Tenant…commits any act that is outrageous in the extreme. With regard to 'acts outrageous in the extreme'…an act can be proven to be 'outrageous in the extreme' even if it is one that does not violate a criminal statute…the Landlord's standard of proof in an action for possession under this subsection remains the civil standard, providing proof by a preponderance of the evidence. If a good faith effort by a Landlord to terminate a tenancy pursuant to subsection (24B) of this section…fails by decision of the court, the Landlord may not be found in violation of any state statute or local ordinance requiring the Landlord to remove the Tenant…as long as the Landlord continues to make a good faith effort to terminate the tenancy"

(Ex. 16. at 12 §7.5(B), 21§(3)(C). McKnight's lease had identical language (Ex. 7, at 7 §24(B)).

Defendants' lease agreement also states that:

Verbal abuse (including yelling or swearing), mental abuse, or physical abuse towards the resident Manager, Landlord agency or personnel, maintenance personnel, other Tenants, neighbors, guests, or other persons is expressly prohibited and will lead to the termination of tenancy immediately upon the first occurrence.

(Ex. 16, at 22 (H)).

In sum, and despite their incorrect and unsupported musings to the contrary, Defendants had broad and unambiguous authority to evict McKnight with 24-hours' notice and without a right to remedy dating back *at least* to his violent sexual assault and gun threats against on-site manager Cindy Fargher in 2019. Defendants failed on multiple occasions to even attempt to evict McKnight, the harassment continued, and Ms. Jay was unnecessarily forced, as a direct result of Defendants' inexplicable inaction, to endure McKnight's sexual attack and to live in serious fear of him for four months following that incident. Defendants are liable.

**VI.    Defendants are not Entitled to Summary Judgment on Plaintiff's 42 U.S.C. § 3617 Claim.**

In addition to Defendants' failure to take prompt remedial action reasonably calculated to end McKnight's harassment, they separately took retaliatory actions *against* Ms. Jay, attempting

29 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

to evict her and even accusing her of harassing McKnight (ECF 28-9). This significantly interfered with Ms. Jay's ability to assert her right to live in a safe environment and reasonably indicated to Ms. Jay that Defendants were not serious about protecting her from future attacks by McKnight. It is important to note, before analyzing Ms. Jay's § 3617 claim, that Defendants' retaliatory actions against Ms. Jay *also* exacerbated her fear and the severity and pervasiveness of her hostile living environment claim. The HUD Guidance explicitly states that: "For purposes of determining liability …, prompt action to correct and end the discriminatory housing practice may not include any action that penalizes or harms the aggrieved person, such as eviction of the aggrieved person." 24 C.F.R. § 100.7(a)(2)(2024).

## A. Legal Standard for Evaluating a 42 U.S.C. § 3617 Claim.

42 U.S.C. § 3617, commonly referred to as the FHA's "retaliation" provision, states:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of [the Fair Housing Act].

42 U.S.C. § 3617. In order to prove a claim under Section 3617, a plaintiff must show that: "(1) the tenant engaged in a protected activity, (2) an adverse housing consequence causally linked to that activity, and (3) resulting damage." *James W.,* 2022 U.S. Dist. LEXIS 89012, at *44-45, citing *San Pedro Hotel Co., Inc. v. City of Los Angeles*, 159 F.3d 470, 477 (9th Cir. 1998).

Under Section 3617, "'interfere with' has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *U.S. v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994) (quoting *Mich. Prot. & Advocacy Serv. v. Babin*, 18 F.3d 337, 347 (6th Cir. 1994) (citations and quotations omitted)). *See also Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) ("The language of the [FHA] is

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

broad and inclusive."); *Nevels v. W. World Ins. Co.*, 359 F. Supp. 2d 1110, 1119 (W.D. Wash. 2004) ("interference...has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws.") (internal quotation marks omitted).

Exercising one's "right to be free from sexual harassment" constitutes a protected activity that is covered by the FHA. *See Mariano v. Villa*, No. 5:16-CV-03467-EJD, 2017 U.S. Dist. LEXIS 95116, at *6-7. (N.D. Cal. June 20, 2017). Plaintiff can prove causation by presenting (1) "circumstantial evidence of a 'pattern of antagonism' following the protected conduct," *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3rd Cir. 1997)); or (2) "temporal proximity between [plaintiff's] protected activities and [defendant's] adverse acts," *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004). Here, plaintiff can prove both.

### B. Plaintiff has Presented Evidence that Defendants Violated 42 U.S.C. § 3617.

There is no dispute that Ms. Jay engaged in a "protected activity" when she lodged her complaints with Defendants following McKnight's assault of her in her home. (See, e.g., ECF 28-6.) In addition, the multiple complaints raised by Ms. Jay and her caregiver, Rebecca Mobley, following McKnight's assault were also "protected activity" as both were expressing Ms. Jay's desire to have McKnight's ongoing harassment and her hostile living environment stopped by Defendants. (Jay Decl., ¶12).

There is, likewise, no dispute, that Defendants took an adverse housing action against Ms. Jay when they served her with a termination notice on August 20, 2021 (ECF 28-9.). At a minimum, there is a fact dispute about whether this eviction notice is "causally related" to Ms. Jay's complaint about Mr. McKnight's sexual harassment. But, that fact dispute tilts heavily in

31 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

plaintiff's favor since: (i) three of the four reasons for Ms. Jay's eviction are *literally* based on her protected activity; and (ii) the timing of the notice strongly supports the causal connection.

Ms. Jay's eviction notice was served just a month after she complained about being assaulted by McKnight and less than one week after her caregiver complained of ongoing harassment to Defendant Coleman. (Coleman Dep., 79:16-80:5; ECF 28-9).

Defendant Dawn Cockrum, one of the people who issued the eviction notice to Ms. Jay, said that her recollection of the complaints between Ms. Jay and McKnight was that "she was stalking him" and trying to get him to violate her restraining order. (Cockrum Dep., 28:3-14). Discovery has also shown that the "binoculars" allegation made by Defendants in their eviction notice to Ms. Jay, was solely related to the fact that McKnight complained that she was watching him with binoculars. (Coleman Dep., 65:16-19; 67:11-15; 77:19-22). What is more, the allegation about where Ms. Jay kept her walker is not only aimed at her disability (see supra) but was also very suspiciously timed. Ms. Coleman admitted in her deposition that Ms. Jay had kept her walker outside on her porch since before Ms. Coleman became the on-site manager over a year before (Coleman Dep., 79:4-11), but it was only after Ms. Jay and Ms. Mobley complained of McKnight's harassment that she received an eviction notice for the walker being on her porch. (*Id.*, 79:16-80:5). These retaliatory actions caused Ms. Jay damage, since she feared she would be evicted and become homeless and felt that she could no longer freely assert her right to live free of sexual harassment. (Jay Decl., ¶15)

In sum, plaintiff has presented evidence sufficient for a jury to find in her favor on her 42 U.S.C. § 3617 claim and Defendants' motion on that claim should be denied.

## VII.    Defendants Are Not Entitled to Summary Judgment on Plaintiff's Negligence Claim.

In Oregon, a negligence claim requires the plaintiff to allege and prove

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

> (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.

*Son v. Ashland Community Healthcare Services*, 239 Or. App. 495, 506 (2010), rev den, 350 Or. 297 (2011). Whether the defendant's conduct created a foreseeable risk of harm is usually a question of fact for the jury. *McPherson v. State ex rel. Dep't of Corr.*, 210 Or. App. 602, 613 (2007). The court determines, as a matter of law, whether the case is to be analyzed by *Fazzolari* foreseeability or by a duty based on a relationship or status. *Doyle v. City of Medford*, 356 Or. 336, 358 (2014) ("In the tort field, whether a statute that imposes a duty also gives rise to a tort claim for breach of that duty is generally a matter for court decision."). Defendants correctly acknowledge that the landlord-tenant relationship is a special relationship for the purposes of negligence analysis (ECF 27, at 23), and the Court should analyze Plaintiff's case based on that special relationship.

Defendants misunderstand Plaintiff's claim and cite only to a "failure to warn about the actions of a third person" standard. Nevertheless, *Miller v. Tabor West* is instructive here, and would permit a trier of fact to find in plaintiff's favor on her negligence claim. "The landlord-tenant relationship imposes on a landlord an affirmative duty to take reasonable steps to warn or otherwise protect a tenant from 'foreseeable unreasonable risks of physical harm' posed by another tenant." *Miller v. Tabor W. Inv. Co., Ltd. Liab. Co.*, 223 Or. App. 700, 710 (2008). "Failure to warn or protect should be analyzed in terms of foreseeability and unreasonable conduct. If a specific affirmative duty is imposed by statute, status or relationship, an analysis based on that specific duty is also appropriate." *Id.,* at 709, quoting *Fuhrer v. Gearhart By The*

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

*Sea, Inc.*, 306 Or. 434, 438 (1988); *See also McPherson*, 210 Or App 602 (2007) (a jury could

find it foreseeable that a landlord's neglect to provide a security chain on a door, or a peephole,

or proper lighting, or safe landscaping, or adequate warnings in a laundry shed, all could lead to

a tenant's rape). Here, Defendants had a multitude of specific and serious complaints about

McKnight which they chose to ignore. A jury could reasonably find that the sexual assault of Ms.

Jay by McKnight was foreseeable.

Defendants had a duty to take reasonable steps to prevent the sexual assault by evicting

McKnight a full two years before he assaulted Ms. Jay, but they failed to evict him using a

clearly applicable 24-hour notice. They failed again to take reasonable action to protect Ms. Jay

and other tenants after Ms. Jay was assaulted and even after Ms. Jay's restraining order was

upheld after a contested hearing in front of a judge.

In addition to their collective negligence in failing to evict Mr. McKnight, Defendants

GMS, Mascolo and Coleman failed to properly hire and supervise Ms. Coleman. When Leondra

Coleman was hired by Defendants as property manager, she had no training in property

management or management of any kind: her only work experience had been working part-time

as a cashier at Taco Bell (Coleman Dep., 12:13-15). She had no experience in property

management, much less in the management of multiple properties with a vulnerable tenant

population of elderly and/or people with disabilities. GMS knew the extent of Ms. Coleman's

resume and chose to employ Ms. Coleman to manage two federally subsidized properties at

once. (*Id.*, 15:17-16:5). Also, in Ms. Coleman's own words, Defendants failed to support and

supervise her in this role (Exhibit 18).

A reasonable jury could find that Defendants were negligent in this case and that their

negligence caused Plaintiff injury.

34 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**VIII.    Dismissal of the individual Defendants is not warranted.**

The individual Defendants in this case are liable for their own conduct. "A person is directly liable for…The person's own conduct that results in a discriminatory housing practice [or]…Failing to take prompt action to correct and end a discriminatory housing practice…" 24 C.F.R. 100.7 (see *supra*).

Defendants incorrectly cite *Adams* as controlling precedent regarding what Plaintiff must establish to prevail on her claims against individual Defendants. *Adams v. United States*, 2022 U.S. Dist. LEXIS 87586, *42 (D. Or. May 16, 2022). *Adams* was a case of medical negligence, and states that expert testimony is necessary when issues of reasonable care or causation turn on facts beyond a layperson's understanding. *Id*.

Here, the question of fact is whether the individual Defendants' conduct resulted in discriminatory housing practices or whether the individual Defendants failed to take prompt action to correct and end a discriminatory housing practice. It does not take an expert to explain to a jury that the individual Defendants did not take any action to protect Ms. Jay and women tenants – the facts at issue are within the understanding of a layperson.

Aggrieved persons "have long been permitted to assert Fair Housing Act claims against individual Defendants who engaged in affirmative acts of discrimination or enforced a corporation's discriminatory rules or policies." *Andujar v. Hewitt*, No. 02-2223, 2002 U.S. Dist. LEXIS 14294 at *10 (S.D.N.Y. Aug. 2, 2002).

**A. Dismissal of Dawn Cockrum is Not Warranted**

Ms. Cockrum was the Senior Compliance Specialist at the time and was a decision-maker about whether to give McKnight a 24-hour eviction notice due to his outrageous behavior (Cockrum Dep., 11:10-12:16, 37:1-16). When asked about the assault of Plaintiff at her

35 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

deposition, Ms. Cockrum stated that McKnight "just grabbed his package," and said something inappropriate (*Id.*, 36:14-36:25). Ms. Cockrum consulted with Ms. Coleman on the August 21, 2021 termination notice (Coleman Dep., 69:17-70:3). Ms. Cockrum did not consider Ms. Jay's August 27, 2021 letter to be a reasonable accommodation request (Cockrum Dep., 25:3-21). She signed the September 1, 2021 "Courtesy Letter-Pre-Eviction Warning" issued to Ms. Jay (Exhibit 19). Ms. Cockrum failed to properly consider Ms. Jay's accommodation request and failed to take reasonable steps to end Mr. McKnight's harassment. She is individually liable.

**B. Dismissal of Jerry Mascolo is Not Warranted**

Jerry Mascolo was the "ultimate overseer of approving" violation notices and other paperwork (Cockrum Dep., 11:12-18). Mr. Mascolo reviewed the incident report that Ms. Jay submitted in July 2021 and spoke to both McKnight and Ms. Jay regarding the assault (Mascolo Dep., 23:14-25:12). After that, he said, they were waiting on the police report. (*Id.*, 24:13-14). According to Mr. Mascolo, he did serve McKnight a 30/14-day termination notice, but did not serve McKnight a 24-hour eviction notice (*Id.*, 31:6-17). Mr. Mascolo failed to take reasonable action to keep Ms. Jay and other tenants at the property safe. He is individually liable.

**C. Dismissal of Leondra Coleman is Not Warranted**

Leondra Coleman was the on-site manager when Ms. Jay was assaulted by Mr. McKnight (Coleman Dep., 31:3-18). Ms. Coleman issued the August 21, 2021, termination notice to Ms. Jay (*Id.*, 67:8-24) and was part of the decision not to issue Mr. McKnight a 24-hour eviction notice (*Id.*, 46:18-47:14). As the on-site manager, Ms. Coleman's actions and inactions contributed to Plaintiff's injury. She is individually liable.

//

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97124
Ph: 503-640-4115/Fax: 503-640-9634

IX.    **Genuine disputes of material fact exist with respect to Plaintiff's claim for punitive damages.**

The FHA expressly provides for the recovery of punitive damages by plaintiffs who have suffered discriminatory housing practices. 42 U.S.C. § 3613(c)(1). A district court may award punitive damages for violations of the FHA where a defendant's unlawful activity "involves reckless or callous indifference to the federally protected rights of others." *Fair Hous. Ctr. of Wash. v. Breier-Scheetz Props., LLC*, 743 F. App'x 116, 118 (9th Cir. 2018), quoting *Fair Hous. v. Combs*, 285 F.3d 899, 907 (9th Cir. 2002). "Reckless indifference" pertains to whether a defendant engages in discrimination "in the face of a perceived risk that [his or her] actions will violate federal law," and not awareness that they are "engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-6 (1999). Other district courts have found it appropriate to deny a defendant's motion for summary judgment on claims for punitive damages at the summary judgment stage in FHA cases. See, e.g., *El v. People's Emergency Ctr.*, 315 F. Supp. 3d 837, 844 (E.D. Pa. 2018) ("Moving Defendants seek to dismiss the claim for punitive damages. As punitive damages are available under the FHA, this issue is better resolved on a developed record."). *Butler v. Sundo Capital, LLC*, 559 F. Supp. 3d 452, 462 (W.D. Pa. 2021) ("Because Plaintiffs' claims under Sections 3604 and 3617 are moving forward, the Court will deny Defendants' request to dismiss Plaintiffs' corresponding claim for punitive damages."). Additionally, punitive damages may "properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of N. Am. v. Gore*, 517 U.S. 559, 568, (1996).

Ms. Jay's request for punitive damages and contention that Defendants acted with reckless or callous indifference to federal law is supported by the facts described above.

Defendants were aware of serious complaints from many women before Ms. Jay was assaulted and failed to evict Mr. McKnight. Defendants were also aware of Ms. Jay's complaints against McKnight, and rather than issue a 24-hour notice to him, they issued a termination notice to her. A reasonable jury could find that there is a legitimate interest in punishing the Defendants' unlawful conduct and deterring its repetition, to protect vulnerable Oregonians from further harm in their homes.

Plaintiff is entitled to seek punitive damages under the circumstances of this case.

## X. Conclusion

For all of the above reasons, Defendants Grand Management Services, Inc., Coleman, Mascolo and Cockrum's Motion for Summary Judgment should be denied.

Respectfully submitted this 17th day of December 2024.

**OREGON LAW CENTER**

/s/ Jamie Trinkle
**Jamie Trinkle**, OSB #192463
jtrinkle@oregonlawcenter.org
**Carly Cripps**, OSB #223860
ccripps@oregonlawcenter.org
**Edward Johnson**, OSB #965737
ejohnson@oregonlawcenter.org
**Nicole Pritchard**, OSB #164635
npritchard@oregonlawcenter.org
230 NE Second Ave., Suite F
Hillsboro, OR 97124
Tel: (503) 640-4115
Fax: (503) 640-9634

*Attorneys for Plaintiff Patsy Jay*

38 – PLAINTIFF'S RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**OREGON LAW CENTER**
230 NE 2nd Ave. Suite F
Hillsboro, Oregon 97214
Ph: 503-640-4115/Fax: 503-640-9634

## CERTIFICATE OF SERVICE

I certify that I served PLAINTIFF'S RESPONSE TO DEFENDANTS GRAND

MANAGEMENT SERVICES, INC., JERRY MASCOLO, LEONDRA COLEMAN, AND

DAWN COCKRUM'S MOTION FOR SUMMARY JUDGMENT, supporting DECLARATION

of JAMIE TRINKLE and attached EXHIBITS, and DECLARATION OF PATSY JAY via the

court's ECF service on Defendants below on this 17th day of December 2024:

**Attorney for Defendants GMS, Jerry Mascolo, Leondra Coleman, and Dawn Cockrum:**

Heidi Mandt

hmandt@williamskastner.com

**Attorney for Defendant Evergreen Garden LP:**

Nathan B. McClintock

nmcclintock@epuerto.com

**OREGON LAW CENTER**

/s/ Jamie Trinkle_____

Jamie Trinkle, OSB #192463

jtrinkle@oregonlawcenter.org

*Of Attorneys for Plaintiff Patsy Jay*

1 – CERTIFICATE OF SERVICE