1   IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF OREGON

3     PORTLAND DIVISION

4

5 PATSY JAY,      ) Case No. 3:23-cv-656
          )
6     Plaintiff,  )
          )
7   vs.       )
          )
8 GRAND MANAGEMENT SERVICES, )
 INC., EVERGREEN GARDENS  )
9 LIMITED PARTNERSHIP, JERRY )
 MASCOLO, LEONDRA COLEMAN,  )
10 and DAWN COCKRUM,    )
          )
11     Defendants. )
 _____)
12

13

14    DEPOSITION OF PATSY ANN JAY

15    Taken on behalf of Defendants

16      *   *   *

17   BE IT REMEMBERED THAT, pursuant to the

18  Federal Rules of Civil Procedure, the deposition

19  of PATSY ANN JAY was taken before KIM NERHEIM,

20  a Certified Shorthand Reporter for Oregon

21  and Certified Court Reporter for Washington,

22  on Friday, August 16, 2024, commencing at the

23  hour of 9:07 a.m., at the Tillamook County Library,

24  1716 3rd Street, Tillamook, Oregon.

25

**EXHIBIT 1 - Page 1 of 32**

```
 1   Q    And it's important that we get verbal responses from
 2   you, "yes," "no"; we want to avoid the nods of the head
 3   one way or the other, the "uh-huhs" and the "huh-uhs."
 4   A    Yes.
 5   Q    Okay?                                                    09:09:34
 6   A    Yes.
 7   Q    Having said that, I don't think I've done a
 8   deposition in my 40 years of practice that someone hasn't
 9   done that.  So I'll have to remind you.  Don't get
10   offended.  That's just the way we have to do things.        09:09:43
11   Okay?
12   A    Right.
13   Q    Fair enough.
14            Is there any reason why you wouldn't be able
15   to give me your best truthful answers today?               09:09:50
16   A    None.
17   Q    Are you taking any kind of medication which would
18   adversely affect your cognitive ability, your thinking
19   abilities?
20   A    No.                                                     09:10:00
21   Q    You are taking some medications, though?
22   A    Yes.
23   Q    What kinds of medical conditions do you have?
24   A    I have atrial fibrillation; it's a heart condition.
25   I have osteoarthritis.  And then lower spine degeneration, 09:10:09
```

**EXHIBIT 1 - Page 2 of 32**

1   it's pretty severe.  And I just had my second hip

2   replacement a couple of months ago.  I have a history of

3   brain aneurysm and two surgeries around that, but no

4   symptomology today.

5   Q    Okay.                                              09:10:32

6   A    I think that is probably it.

7   Q    Okay.  That's enough.

8   A    Yes.

9   Q    And you're in a wheelchair here today.

10  A    Yes.                                               09:10:41

11  Q    What physical limitations do you have that cause you

12  to be in a wheelchair?

13  A    The spine.

14  Q    The spine --

15  A    The arthritis in my spine.                         09:10:47

16  Q    You talk about degenerative arthritis in your spine

17  and osteoarthritis.  In your mind, are those one in the

18  same?

19  A    Yes.

20  Q    And do you use a wheelchair all the time?          09:11:02

21  A    90 percent of the time.

22  Q    Under what circumstances don't you use a wheelchair?

23  A    Moving from one location to another, say chair to

24  bed.  Sometimes I can take a couple of steps.

25  Q    Okay.                                              09:11:20

**EXHIBIT 1 - Page 3 of 32**

1    Q    And who is your primary care physician?

2    A    Ben Douglas.

3    Q    Is he with a particular clinic?

4    A    Adventist Health.

5    Q    Where is his office located?                    09:14:05

6    A    On 3rd Street on the hospital grounds.

7    Q    In Tillamook?

8    A    Yes.

9    Q    How long have you lived at the Evergreen Gardens

10   apartments?                                          09:14:21

11   A    26 years.

12   Q    And you're in some type of subsidized housing?

13   A    Yes, sir.

14   Q    And you've been that way for 26 years?

15   A    Yes, sir.                                       09:14:33

16   Q    And what's the basis for your subsidized housing?

17   Why are you getting that?

18   A    Social Security Disability, low income.

19   Q    We talked about some of your medical problems.  Which

20   medical problems have led to your Social Security        09:14:48

21   Disability?

22   A    The -- the spinal degeneration, the arthritis.

23   Q    And how long have you been on Social Security

24   Disability?

25   A    Approximately 25 years.                          09:15:02

EXHIBIT 1 - Page 4 of 32
www.LNScourtreporting.com

1    A    Yes, sir.

2    Q    And you could look out your front window and see his

3    apartment?

4    A    I could see the end of the building, but not well,

5    because of a large tree that was there.                    09:23:27

6    Q    Okay.  But could you see his apartment?

7    A    The corner of the building only.  I couldn't see his

8    doorway or window.  Just the corner of the building.

9    Q    And how did your relationship with Mr. McKnight

10   develop from the point where he was just providing        09:23:51

11   maintenance work up to the point of -- let's just say

12   before July 12, 2021?

13   A    As I said, he fell in love with my dog and explained

14   that in a divorce he had lost his dogs and wanted to, in

15   essence, borrow mine.  And I thought that it would be      09:24:13

16   helpful if he walked her, because of the wheelchair and

17   her proclivity for turning around and running back toward

18   me.

19          So he thought it would benefit us both if he

20   could walk my dog, and I agreed to that.                   09:24:31

21   Q    And how often was he walking your dog in, let's say,

22   the -- say January to July 2021?

23   A    Twice a day.

24   Q    When during the day?

25   A    He would come in the morning and then in the          09:24:44

**EXHIBIT 1 - Page 5 of 32**

www.LNScourtreporting.com

1  afternoon.

2  Q    Would you describe yourself as being a friend of John

3  McKnight at that time?

4  A    Yes.

5  Q    Okay.  Did you guys do anything else, other than him        09:24:58

6  simply showing up, taking your dog for a walk, dropping

7  off the dog, and leaving?

8  A    One time, he had made a trail through the woods

9  behind the apartment complex.  He had chopped the

10 shrubbery to make a place to go back in there and observe    09:25:20

11 birds and whatever.

12          And he did invite me to see if I wanted to go

13 back and see the birds, and -- and I love nature.  So I

14 took my walker and did actually manage to get back there,

15 and I think we did that a couple of times.                   09:25:39

16 Q    Okay.  When was the last time you did that?

17 A    (No response.)

18 Q    Again, I don't mean exact date.

19 A    Maybe six months before the assault.

20 Q    Other than walking your dog and these few occasions      09:26:03

21 where --

22          You went with him to the woods?

23 A    Yes.

24 Q    Okay.  Using your walker?

25 A    Yes.                                                     09:26:13

**EXHIBIT 1 - Page 6 of 32**
www.LNScourtreporting.com

1    Q    Okay, all right.  And were you aware of any other

2    incidents involving Mr. McKnight and anyone -- any other

3    females at the Evergreen apartments prior to July 12th,

4    2021?

5    A    No.                                             09:31:09

6    Q    Okay.  Did you, from time to time, walk in your

7    walker or in your wheelchair with Mr. McKnight?

8    A    I don't believe so.  No, I don't think so.

9    Q    Okay.  Now, in July of 2021, who was the manager, the

10   on-site manager at Evergreen Gardens?               09:31:47

11   A    Leondra Coleman.

12   Q    Ms. Coleman.

13          How would you describe your relationship with

14   her before July 12, 2021?

15   A    Before July 12th, it was amicable.             09:31:59

16   Q    What do you mean by "amicable"?

17   A    She was professional.  I respected her as a manager

18   and we got along just fine.

19   Q    Okay.  No problem?

20   A    No.                                            09:32:21

21   Q    Let's move ahead.  July 12th, 2021.  What time of day

22   did this incident with Mr. McKnight take place?

23   A    I believe it was in the morning.

24   Q    About what time?

25   A    I can't say.                                   09:32:48

EXHIBIT 1 - Page 7 of 32
www.LNScourtreporting.com

1  Q    And what had you been doing prior to this incident?

2  A    He had walked the dog and brought it back, and he was

3  standing in front of the door ready to take his leave.

4  Q    Standing in front of your --

5  A    My door.  He was about to leave.                    09:33:15

6  Q    Okay.  Had you had any conversation with him, or he

7  just dropped off your dog?

8  A    He dropped off the dog and we were chatting.

9  Q    Okay.  What were you chatting about?

10 A    He said something about one of the tenants daughters  09:33:30

11 that he didn't like and he was telling me how he harassed

12 her because she had very large breasts and that every time

13 he saw her he would moo like a cow.

14         And I was aghast, and I said -- I said, "Do I

15 even know you?  What?  What?"                            09:33:58

16         And that's when everything went bad.

17 Q    Well, let's -- before we --

18         What time did he usually come get your dog to

19 take the dog for a walk?

20 A    In the mornings, maybe usually around 7.  I'm not     09:34:15

21 certain.

22 Q    Was it generally around 7 --

23 A    Yes.

24 Q    -- give or take?

25 A    Yes.                                                 09:34:22

**EXHIBIT 1 - Page 8 of 32**

www.LNScourtreporting.com

1    Q    What was your dog's name?

2    A    Sweet Pea.

3    Q    Sweet Pea.  How long did you have Sweet Pea?

4    A    Maybe five years.

5    Q    So, anyway, he comes, picks up your dog.  Was there      09:34:37

6    any chitchat with Mr. McKnight prior to -- I mean, before

7    he left with your dog to take a walk?

8    A    Oh, I'm sure there was.  Just nothing significant,

9    though.

10   Q    You don't recall the nature of that conversation?      09:34:50

11   A    No.  It would have just had to do with where he was

12   going to take her walking or --

13   Q    Okay.  And when he went for the walk, how long was he

14   away with the dog?

15   A    Oh, usually about a half hour.                          09:35:01

16   Q    And was anything unusual about that particular

17   morning prior to this incident with Mr. McKnight?

18   A    The only thing unusual was that conversation which he

19   told me what he'd been doing to that woman, and I was --

20   that was out of the blue.  I was stunned.                    09:35:22

21   Q    Okay.  You'd never had a conversation with him

22   similar to that about other women in the -- other women,

23   period?

24   A    No.

25   Q    Who was the tenant he was referring to?                 09:35:33

EXHIBIT 1 - Page 9 of 32
www.LNScourtreporting.com

1  leash down on the couch, then he walks past you to the

2  front door?

3  A    Yes, sir.

4  Q    Okay.  And he turns -- he's facing you?

5  A    Yes.                                           09:38:18

6  Q    And he makes this comment about Tracy.

7  A    Yes.

8  Q    Was it just one comment; and that, you know, "every

9  time I see her, I go 'moo' because of her big breasts,"

10 something along those lines?                        09:38:30

11 A    Yes.

12 Q    Okay.  And did you say anything to him in response?

13 A    I did.  I said, "Do I even know you?  What" -- I was

14 aghast.  And I'm not sure what else I said but, "Oh, my

15 gosh," that sort of thing.                          09:38:46

16           And I do believe that I said, "I think I need

17 a new dog walker."  I mean, I was aghast.

18 Q    Okay.  And you have told me everything you remember

19 saying at that time.

20 A    I believe so.                                   09:39:02

21 Q    Okay.  After you said that, did Mr. McKnight respond

22 verbally?

23 A    No.

24 Q    What did Mr. McKnight do at that point?

25 A    He rolled around and turned his back on me.     09:39:22

**EXHIBIT 1 - Page 10 of 32**

www.LNScourtreporting.com

1    Q    So he turned towards the door.  Is that correct?

2    A    Yes.  And I heard a zipper.

3              And when he turned back, I saw his gun.  He

4    wore a gun all the time.  I saw his gun and -- and he was

5    holding his penis.  And he kicked my feet off the footrest    09:39:52

6    and put a foot up there and he was holding himself, and

7    he...

8    Q    Do you want to take a break?

9    A    Nope.

10   Q    Okay.  Because we're going to have to go over this.    09:40:13

11             He turns around.  And what did he say?

12   A    He didn't say anything.

13   Q    He didn't say anything.  Did you hear the zipper

14   before he turned around, or --

15   A    Yes.                                                  09:40:29

16   Q    Okay.  So the zipper noise; he turns around to face

17   you.

18   A    (Nodded head.)

19   Q    And you're about 3 feet away from him.

20   A    He stepped forward.                                   09:40:40

21   Q    Okay.

22   A    When he turned around, he stepped forward and then

23   kicked my feet off the footrest.

24   Q    All right.  So he steps forward.  And this is the

25   footrest on the wheelchair?                                09:40:51

EXHIBIT 1 - Page 11 of 32
www.LNScourtreporting.com

1   A    Yes.

2   Q    How did he kick your feet off the --

3   A    With one of his feet.

4   Q    Okay.  You want a tissue?

5   A    No.  I have one.  Thank you.                    09:41:06

6            MR. PIJANOWSKI:  I'm going to go for some.

7            MR. McCLINTOCK:  Well, that -- she -- that's

8   all right.

9            THE WITNESS:  That's all right.

10  Q    BY MR. McCLINTOCK:  And at the time, he took a step   09:41:15

11  forward and he reached out with his feet and made contact

12  with your feet to move them off the footrest; is that

13  right?

14  A    One foot, yes.  And then he put that foot on the

15  footrest.                                            09:41:33

16  Q    Okay.  So which foot was that?

17  A    I believe it was his right foot.

18  Q    As you're looking at him, it was his right foot takes

19  your foot off of the footrest and he puts his foot on the

20  footrest?                                            09:41:47

21  A    Yes.

22  Q    Okay, all right.  And where were you looking at this

23  point, as he's doing this?

24  A    Where his hand was.

25  Q    Okay.  So you didn't actually see him, you just felt   09:41:55

EXHIBIT 1 - Page 12 of 32
www.LNScourtreporting.com

1  him take your feet off of the footrest?

2  A    I felt it.

3  Q    Okay, all right.  And what did you see?

4  A    What do you mean?

5  Q    Well, I mean, you were looking at him.  What did you          09:42:11

6  see?

7  A    Oh, what did I see?  I saw his hands in front of him

8  and I saw his gun.

9  Q    Okay.  His hand is in front of him.

10 A    Holding his penis.                                             09:42:30

11 Q    Okay.  Did you actually see his penis?

12 A    Just the very end of it.

13 Q    And I take it you had not seen his penis before.

14 A    No.  No, no.

15 Q    So how far is he away from you at this point?                 09:42:49

16 A    He's right here.  Right here.

17 Q    Right in front of you.

18 A    Right here.  He was right...

19 Q    And what did -- did he say anything?

20 A    No.                                                           09:43:07

21 Q    Did you say anything?

22 A    I don't remember.  I screamed.

23 Q    Okay.  You're confident that you screamed?

24 A    Oh, yes.

25 Q    Did you scream loudly, or just -- how would you               09:43:26

EXHIBIT 1 - Page 13 of 32
www.LNScourtreporting.com

1   Q    You mentioned his gun.  Where did he have his gun?

2   A    In his holster.  He had a concealed weapons permit.

3   He wore it all the time.

4   Q    So he had a holster with a concealed weapons permit.

5        What kind of gun did he have?                    09:45:09

6   A    I don't know.

7   Q    Do you know anything about guns?

8   A    No.  It's just a pistol of some sort.

9   Q    Do you know if it was an automatic or a revolver?

10  A    I -- I can't say.                                09:45:21

11  Q    You don't know the difference.

12  A    I know the difference, but I never got -- I've never

13  seen his gun out of the holster, so I really just don't

14  know what kind it was.

15  Q    Okay.  So you screamed.  He has stepped back and put  09:45:38

16  his penis back in his pants.  Did he zip up his pants?

17  A    Yep.  Yes.

18  Q    Okay.  And this all happened in a matter of seconds,

19  a couple seconds; right?

20  A    I suppose.                                       09:45:58

21  Q    Okay.  You don't know for sure.

22  A    Time -- I don't know how long any of it took.

23  Q    And he steps back.  And then what does he do?

24  A    Put his clothing back together, put -- and he left

25  quickly, because I'm screaming "I'm calling the police."  09:46:29

EXHIBIT 1 - Page 14 of 32
www.LNScourtreporting.com

1    And he just left in a hurry.

2    Q    Were you calling the police?

3    A    I told him I was going to be calling the police.

4    Q    What was he wearing?

5    A    I believe Carhartt pants and a Carhartt jacket.  I          09:46:56

6    believe that's what he usually wore.

7    Q    What color of pants?

8    A    The Carhartt's kind of a sandy-orange, I -- brownish.

9    Q    Okay.  And the jacket?

10   A    Same.                                                       09:47:11

11   Q    And did the jacket hang over his holster?

12   A    Yes.

13   Q    So he would --

14   A    Except when he --

15   Q    When he pulled his jacket backwards.                       09:47:25

16   A    Yes.

17   Q    Was there anything else said between you and

18   Mr. McKnight before he left which you have not talked

19   about?

20   A    I said, "I'm calling the police."                          09:47:48

21            He said, "Nobody's going to believe you."  I

22   believe that's all that was said, "Nobody's going to

23   believe you."

24   Q    Okay.

25   A    And then he left.                                          09:48:02

EXHIBIT 1 - Page 15 of 32
www.LNScourtreporting.com

1   A    No.

2   Q    -- information other than what you told her?

3   A    Other than what the police told her -- the police had

4   gone to her before she came to my apartment.

5   Q    So she changed the locks --                          09:56:27

6             When did she change the locks?  That very day?

7   A    Right then and there.

8   Q    Changed the locks.  That's because you had given

9   Mr. McKnight a key to your apartment; is that right?

10  A    Exactly.  Because, some mornings when he would come   09:56:38

11  to get the dog, I wasn't up.

12  Q    All right.  And did you have any further

13  conversations with Ms. Coleman concerning this incident?

14  A    Sometime later, a woman who works for me was leaving

15  to go home later than usual --                             09:57:06

16  Q    Who -- what's the name of this woman?

17  A    Her name was Rebecca Mobley.

18  Q    Okay.

19  A    Rebecca would normally have left about 20 minutes

20  prior, but --                                              09:57:20

21  Q    20 minutes prior to what?

22  A    To the time that I'm going to tell you about right

23  now.

24  Q    Okay.

25  A    She was late leaving my apartment and standing at my   09:57:28

EXHIBIT 1 - Page 16 of 32
www.LNScourtreporting.com

1   door looking out towards the direction he lived and where

2   he parked his truck.  And I wasn't looking out the window,

3   I was looking at her.  And she said, "What the hell is

4   that guy doing down there?"  And so then I moved around so

5   I could see.                                           09:57:48

6            And he was out in front of his truck

7   pretending to shoot at my apartment and pretending to

8   punch and pantomiming an assault and looking at my

9   apartment -- it was clear he was trying to freak me out.

10            But I wouldn't have seen it, if she hadn't    09:58:11

11   seen it.  But when I did see it, I freaked out.  He was a

12   success.  I went --

13   Q    What do you mean "freaked out"?

14   A    I went hysterical, because the man's gun scared the

15   hell out of me.                                         09:58:28

16   Q    Had it always scared the hell out of you?

17   A    No.  But at that point, it sure as heck did.

18   Q    Okay.

19   A    And pretending to shoot me.

20            And so I called Leondra.  And I said, "Please    09:58:37

21   go down there and make that man stop this.  You know what

22   he did to me."

23   Q    Did she?

24   A    No.  She said to call the police.

25   Q    Did she know what he did to you?                 09:58:49

EXHIBIT 1 - Page 17 of 32
www.LNScourtreporting.com

1  A    -- of that, and we wouldn't even be here today.

2  Q    Okay.  Ms. Coleman, you've talked about all the

3  conversations you had with her concerning Mr. McKnight;

4  correct?

5  A    I believe that's everything.                        10:04:07

6  Q    All right.  And the incident -- the last conversation

7  you just talked about with respect to the rec room, the

8  camera, that kind of thing, when was that -- how long was

9  that after this incident on July 12th, 2021?

10 A    I don't know for sure.                               10:04:30

11 Q    Okay.

12 A    Maybe a couple of weeks.  I really don't know.

13 Q    And when you had this conversation with Ms. Coleman,

14 how did she respond to it?  What did she say to you?

15 A    I can't remember exact words.  She just stuck to her  10:04:45

16 story that several tenants had observed it, and -- there

17 really wasn't much.  I was just simply saying it's a

18 flat-out lie, and she was just holding her ground.

19 Q    All right.  Now, you obtained a restraining order

20 against Mr. McKnight?                                     10:05:09

21 A    I did.

22 Q    You actually got two different restraining orders,

23 didn't you?

24 A    No.  Just one.

25 Q    Just the one?  Okay.                                 10:05:16

EXHIBIT 1 - Page 18 of 32
www.LNScourtreporting.com

```
 1              And what was your understanding of -- did you
 2   have some understanding as to the obligation of management
 3   at Evergreen to enforce that restraining order?
 4   A    It was my belief that they were required to enforce
 5   it.                                                          10:05:36
 6   Q    What did you base that belief on?
 7   A    Because the judge said that if he lived within a
 8   certain number of feet of my apartment that he could not
 9   live there anymore.  And so I took that to mean that they,
10   of course, would be the ones to ask him to move.            10:05:54
11   Q    You assumed that.
12   A    I did make that assumption --
13   Q    Okay.
14   A    -- because of that requirement, the distance.
15   Q    Okay.  Now, when did Mr. McKnight actually leave --    10:06:03
16   permanently leave the Evergreen apartment complex?
17   A    I can't give you a date.
18   Q    How many times did you have interaction with
19   Mr. McKnight between the time -- between December 12th --
20   excuse me, I keep saying December 12th -- July 12th and     10:06:22
21   the present time?
22   A    How many times did I talk to him, have --
23   Q    Have interaction, would see him.
24   A    Oh, see him.
25   Q    Yeah.                                                  10:06:39
```

**EXHIBIT 1 - Page 19 of 32**

www.LNScourtreporting.com

1   didn't have his gun in his hand.  I didn't know.

2   Q    Did you report any of these incidents --

3   A    I did --

4   Q    -- to Grand Management?

5   A    Oh, yes.                                              10:08:07

6   Q    Okay.  How many did you report?

7   A    I think just a couple, because I was told I just had

8   to take a picture of it.

9           I didn't have a smartphone.  I couldn't take a

10  picture of it.                                             10:08:18

11  Q    Who told you you need to take a picture of it?

12  A    Somebody in Coos Bay, and I think it was Kristen.

13  I'm not certain of that, though.  I think it was Kristen.

14  Q    Okay.  When did you have that conversation with

15  someone at Coos Bay about Mr. McKnight doing the shooting  10:08:30

16  motion towards you?

17  A    Are you asking when?

18  Q    When.

19  A    I don't know the exact date, but I believe it was --

20  I'm not certain.  I believe it was after the incident      10:08:50

21  where I was supposed to have come in the rec room and

22  threatened him, but I'm just not clear on the date.

23  Q    So you contacted someone in Coos Bay Grand Management

24  office.

25  A    I needed --  Yes, sir.  I needed to know what they    10:09:07

EXHIBIT 1 - Page 20 of 32
www.LNScourtreporting.com

1   were going to do about him being there, and I'd asked --

2           Oh, I have to modify something.  You asked how

3   many conversations I had with Leondra.  I just now

4   remembered that numerous times when she would be leaving

5   her office to go to her apartment, if I'd see her outside,    10:09:25

6   I'd say, "Have you heard anything about when they are

7   going to make John move, because he does live too close?"

8           "I don't have an answer for you," she'd say.

9           And maybe that happened four or five days.  I

10  had forgotten about those contacts.                           10:09:43

11  Q    Okay.

12  A    But finally, one day, I'd had enough and I called

13  Coos Bay and said, "When is something going to happen?

14  Leondra says she has no answer for me."

15          And that's when I was told, "Well, you need to        10:09:54

16  be taking a picture," and -- that was -- they just shut me

17  down.

18  Q    Before you contacted Coos Bay and complained about

19  John McKnight and his shooting gestures, had you called

20  the police to inform them that he was in violation of the    10:10:14

21  restraining order?

22  A    Oh, yes.

23  Q    And what did the police do?

24  A    Well, Nick Troxel, Officer Nick Troxel came out with

25  a measuring laser device, saw how far he lived from my       10:10:28

EXHIBIT 1 - Page 21 of 32
www.LNScourtreporting.com

1   Q    Do you know where?  What unit?

2   A    No, I don't.  No.

3   Q    And that's an apartment complex?

4   A    Yes.

5   Q    Is that subsidized housing, as well?          10:46:32

6   A    I believe it is.

7   Q    In May of 2020, did you get a notice from Grand

8   Management about your placing your walker on your porch?

9   A    I think that was part of my notice of intent to

10  evict -- yes, I did get warned about that.          10:47:04

11  Q    Now, I'm asking you, and I just want to make sure I'm

12  clear, prior to the notice of intent to evict, did you

13  receive a posted notice on your door concerning the

14  appropriate items that should be left on the porch?

15  A    Yes.                                            10:47:22

16  Q    Okay.  And you indicated at that time that you'd

17  comply?

18  A    I took it off the porch and put it under the kitchen

19  window, which is off the porch, on the gravel.  It's the

20  same identical location as the woman down the way from me   10:47:36

21  had parked her bicycle for the previous five years, and so

22  I assumed that that would be okay for me to do it, but no.

23  Q    In May of 2021, before you received this notice,

24  where were you putting your walker?

25  A    On the porch, where most people would have a lawn    10:47:57

EXHIBIT 1 - Page 22 of 32
www.LNScourtreporting.com

1  chair or a porch chair.  The chair -- the walker was my

2  chair.  It was the four-wheel walker and I could water my

3  plants and scoot around in the walker, rather than trying

4  to get up and walk.  So it was my porch chair.

5  Q    And after you received this notice on May 13, 2021,    10:48:16

6  what did you do different?

7  A    I took it off the porch and put it under the window,

8  just like the lady down the way had done for ten years or

9  whatever; and it was okay with her, so I assumed it would

10 be okay for me.  But no.                                    10:48:32

11 Q    And you were asked to move it?

12 A    Yep.

13 Q    Okay.

14 A    Yep.

15 Q    Did Grand Management eventually permit you to go        10:48:41

16 ahead and put it where --

17 A    No.

18 Q    -- where you put it?

19 A    No.

20 Q    Where do you have it now?                               10:48:47

21 A    Inside my bedroom.

22 Q    Okay.

23 A    Can't have it out there.

24        However, last week, I just took a photograph

25 of an apartment two doors from the manager.  And his        10:48:54

EXHIBIT 1 - Page 23 of 32

www.LNScourtreporting.com

1   walker is on his porch, and she walks by it two times a

2   day.  Selective enforcement of rules there.

3   Q    Who was your caretaker at that time, in around

4   July/August 2021?

5   A    Rebecca Mobley.                                10:49:22

6   Q    Okay.  And Rebecca would be taking care of you how

7   often?

8   A    I believe she was coming three days a week.

9   Q    And how long was she there?

10  A    Do you mean time-wise per day?                 10:49:35

11  Q    Yeah.  I mean, you're counting so many hours --

12  A    Maybe three or four.

13  Q    Three, four hours.

14  A    I'm not clear on that anymore.

15  Q    Are you aware if she ever had a conversation with  10:49:47

16  anybody at Grand Management concerning anything having to

17  do with John McKnight?

18  A    Oh, she had many conversations with Leondra Coleman,

19  because -- well, she confronted Leondra, "Why are you

20  making up lies about Patsy?"  It didn't turn out too well.  10:50:01

21  Yeah, she spoke to Leondra quite directly.

22  Q    And aggressively.  Would you agree?

23  A    I don't think it was aggressive.  I heard her say it.

24  She just said, "I am -- I am really curious why you're

25  making up lies about Patsy."                       10:50:17

EXHIBIT 1 - Page 24 of 32

www.LNScourtreporting.com

1   bird --  No.

2   Q   Did you ever talk to anybody and did you ever ask if

3   they had ever complained about it?

4   A   I did, and they all laughed and said, "That's the

5   stupidest thing.  We all know you watch birds, and you          10:51:35

6   couldn't have seen us because of the tree."

7   Q   Did you ever -- strike that.

8                   (Deposition Exhibit No. 42 was marked

9      for identification.)

10  Q   BY MR. McCLINTOCK:  I'm going to show you what I've          10:52:51

11  marked as Exhibit 42.

12  A   Okay.

13  Q   And this is a photograph taken of your place, is it

14  not?

15  A   Yes.                                                         10:52:59

16  Q   Okay.  Does it show the walker?

17  A   That's where I put it when they said to get it off

18  the porch, yes.

19  Q   So it was in the gravel.

20  A   Yes.                                                         10:53:15

21  Q   And how would this facilitate your watering the

22  plants?

23  A   I'd have to wrestle it back up on the porch -- it was

24  hard.  It wasn't satisfactory, but at least it was outside

25  and I didn't have to wrestle it through the doors.              10:53:30

EXHIBIT 1 - Page 25 of 32
www.LNScourtreporting.com

1  Q    All right.

2  A    If I wanted to sit outside on the porch, that's what

3  I sat in.

4  Q    You received this notice of intent to evict in August

5  of 2021?  Do you remember that?                          10:54:07

6  A    I don't remember specific dates, but...

7  Q    All right.  But you were never evicted.

8  A    No.

9  Q    Did you change -- alter your behavior in any manner

10 in response to that notice of intent to evict?           10:54:22

11 A    I'm not certain which one it was.  If there were

12 things I needed to correct, I probably would have done it.

13 Q    Well, the one in August had to do with -- just bear

14 with me a second.

15       Just summarizing, had to do with the walker;        10:54:46

16 the McKnight incident at the community room; the

17 approaching the management in an aggressive and demanding

18 manner; and watching people with your binoculars.

19 A    Okay.  Did I change my behaviors.

20 Q    Yes.                                                  10:55:14

21 A    First of all, I never watched through the binoculars,

22 it was just a lie, so there was nothing to change there.

23       The thing in the community room never

24 happened, and so nothing to change there.

25       And then the walker, I took it off the porch,        10:55:26

EXHIBIT 1 - Page 26 of 32
www.LNScourtreporting.com

1   put it on the gravel, but that wasn't good, so then I put

2   it in my bedroom.  So that was a change.

3              And was there something else?

4   Q    Aggressive demanding behavior.

5   A    Oh.  That was another lie.  Nothing ever happened        10:55:38

6   like that.  I've never been aggressive with anyone.  It's

7   not even -- not even Leondra.  So it was not --

8   Q    Did you ever file a formal complaint of John

9   McKnight's behavior in terms of this fake shoot guns or

10  coming up to your window, anything like that?  A written    10:55:58

11  complaint.

12  A    I'm not certain.  I'm not certain about that.  I

13  don't -- I think I just called them and said, "Hey, this

14  is what he's doing."

15  Q    Okay.                                                   10:56:16

16  A    I'm just not sure.

17  Q    So you got that notice of intent to evict and you

18  weren't evicted.

19              And then there was an allegation in your

20  Complaint about another one -- or, at least another police  10:56:24

21  violation in March of 2023.  Do you recall that?  Having

22  to do with an insurance policy issue?

23  A    Oh, boy, do I.  M-hm.

24  Q    I'm sure you do.

25              So tell me about that.  Were you required to     10:56:42

EXHIBIT 1 - Page 27 of 32
www.LNScourtreporting.com

1          I'm not asking you for any conversations or

2    information that you have obtained from your attorneys.

3    And so, if the only way you know an answer to one of my

4    questions is because your attorney told you, I'm not

5    entitled to know that.  Okay?                    11:10:27

6    A    Okay.

7    Q    Let me ask you this.  Before your Complaint was

8    filed, did you review it?

9    A    I believe so.

10   Q    And so, if I ask you, you've alleged that Grand    11:10:39

11   Management failed to reasonably accommodate you, is it my

12   understanding that you do not understand the basis of that

13   claim?

14   A     If you mean something like I needed my walker on the

15   porch and they wouldn't allow it, when other people could  11:11:05

16   do it, is that what you're talking about, that sort of

17   thing?

18   Q    Well, if that's what gives rise to the

19   failure-to-accommodate claim, then, yes, that's what I'm

20   asking.                                          11:11:20

21   A    I'm sure that's part of it, yeah.

22   Q    Okay.  Did you ever specifically make a request to

23   Grand Management that they accommodate you in this regard?

24   A    Yes.

25   Q    Did you do so in writing or verbally?     11:11:32

EXHIBIT 1 - Page 28 of 32

www.LNScourtreporting.com

1   A    I did a reasonable accommodation form, I filled it

2   out and turned it in.

3   Q    And is it your testimony that that was denied and

4   continues to be denied to this day?

5   A    They never actually responded directly.                11:11:49

6   Q    So you've never received anything that said, "We've

7   considered your reasonable accommodation request" --

8   A    No.

9   Q    -- "and this is our response"?

10  A    I got no response to that, no.                          11:12:09

11  Q    Have you ever filed any other request for

12  accommodation with Grand Management?

13  A    Yes.

14  Q    Such as?

15  A    Access to the kitchen sink so that I could drive my    11:12:22

16  wheelchair straight up to it, not have to go on the side

17  and twist.  So I asked them to make the kitchen sink

18  approachable like the bathroom, so I could drive straight

19  up to it.

20  Q    Did they do that?                                       11:12:42

21  A    Yes, they did.

22  Q    Any other reasonable accommodation requests that you

23  made to Grand Management?

24  A    I don't remember any more.

25  Q    Okay.  Do you have an opinion one way or the other as  11:12:59

EXHIBIT 1 - Page 29 of 32

www.LNScourtreporting.com

1  to who would have made the decision not to allow you to
2  keep your walker on the front porch?
3  A    I think, since Leondra was the manager, I assumed it
4  was her.
5  Q    Did you ever call anyone at Grand Management in          11:13:22
6  Coos Bay and ask for a reasonable accommodation?
7  A    No.  I just sent the form letter to Coos Bay and
8  spoke with Leondra in person.
9  Q    And I think Mr. McClintock asked you this, but you
10 were never terminated -- your tenancy at Grand Management    11:13:47
11 was never terminated as a result of the placement of your
12 walker on the front porch; correct?
13 A    Correct.
14 Q    With respect to the incident with Mr. McKnight in
15 July of 2021, was there ever physical contact between        11:14:00
16 yourself and Mr. McKnight?
17 A    Yes.
18 Q    And what was that physical contact?
19 A    He kicked my feet off the footrest and grabbed my
20 hair and tried to pull my head forward to make contact       11:14:23
21 with his penis.
22 Q    What hand did he grab your hair with?
23 A    Right.
24 Q    Was he continuing to hold his penis in his hand at
25 this point in time?                                          11:14:45

EXHIBIT 1 - Page 30 of 32
www.LNScourtreporting.com

1    A    Yes.

2    Q    And when he attempted to pull your head forward, what

3    did you do?

4    A    Turned my head to the side and screamed.

5    Q    Did you tell that to the police officers?                11:14:58

6    A    Yes.

7    Q    Why did you not press charges?

8    A    I tried to.  The DA wouldn't prosecute because he

9    said there were no witnesses and that McKnight would sue

10   the County, so he wouldn't press charges.                      11:15:18

11   Q    Do you recall being asked by the police officers that

12   responded if you wanted to press charges?

13   A    Yes.

14   Q    And do you recall telling them no?

15   A    Initially, that was my answer.  But later, I changed      11:15:31

16   my mind.

17   Q    And who did you relay that change of mind to?

18   A    The police.

19   Q    Did you ever speak with the Tillamook County DA?

20   A    Nope.  He wouldn't talk to me.                            11:15:53

21   Q    Do you know if there was a DA ever assigned to your

22   case?

23   A    I'm not certain.  One of the police officers was so

24   upset that they wouldn't prosecute that he went over and

25   talked to the DA himself, I think.  So I don't know if        11:16:12

EXHIBIT 1 - Page 31 of 32
www.LNScourtreporting.com

1                        CERTIFICATE

2            I, Kim Nerheim, an Oregon Certified Shorthand

3   Reporter and a Washington Certified Court Reporter, hereby

4   certify that said witness personally appeared before me at

5   the time and place set forth in the caption hereof; that

6   at said time and place I reported in stenotype all

7   testimony adduced and other oral proceedings had in the

8   foregoing matter; that thereafter my notes were

9   transcribed through computer-aided transcription, under my

10  direction; and that the foregoing pages constitute a full,

11  true and accurate record of all such testimony adduced and

12  oral proceedings had, and of the whole thereof.

13            I further certify review of the transcript was

14  not requested.

15            Witness my hand at Portland, Oregon, this 26th

16  day of August, 2024.

17

18

19

20  _____

21                            Kim Nerheim

22                            Oregon CSR No. 90-0138

23                            Expires 9/30/2026

24                            Washington CCR No. 0003038

25                            Expires 3/28/2025

EXHIBIT 1 - Page 32 of 32

www.LNScourtreporting.com