```
           IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF OREGON PORTLAND DIVISION


PATSY JAY,

        Plaintiff,

v.                              Case No.:  3:23-cv-656

GRAND MANAGEMENT SERVICES, INC.,

EVERGREEN GARDENS LIMITED PARTNERSHIP,

JERRY MASCOLO, LEONDRA COLEMAN, and DAWN COCKRUM,

        Defendants.




                                       DEPOSITION OF

                                       KRISTIN SMITH

                                       TAKEN ON
                              THURSDAY, JULY 18, 2024
                                       9:09 A.M.


                                    OREGON LAW CENTER
                              490 NORTH SECOND STREET
                                COOS BAY, OREGON 97420
```

EXHIBIT 2 - Page 1 of 12

Page 10

1    A.   He's an employee.
2    Q.   Do you know Leondra Coleman?
3    A.   Yes, but I was not her direct supervisor.
4  I don't know that I ever talked to her one-on-one.
5  She was an employee.
6    Q.   Do you know Dawn Cockrum?
7    A.   Yes.
8    Q.   And how do you know Dawn?
9    A.   She's an employee.
10   Q.   Okay.  Do you know Cindy Fargher?
11   A.   Yes, she was an employee, but again, I
12 didn't have much conversation with her one-on-one.
13   Q.   Okay.  Do you know John McKnight?
14   A.   Yes.
15   Q.   In what capacity?
16   A.   He's an ex-tenant.
17   Q.   Was he ever employed by Grand Management?
18   A.   Well, he worked for less than two months
19 just to do some handyman duties.  We were in between
20 handymen.  So he wasn't really an employee.  His
21 total wages were less than $500, but he did a couple
22 repairs on the property for a short amount of time.
23   Q.   Do you know Patsy Jay?
24   A.   Yes.
25   Q.   In what capacity?

Page 11

1    A.   She's a tenant.
2    Q.   Are you familiar with the Evergreen Garden
3  Apartments?
4    A.   Yes.
5    Q.   And what's your relationship to them?
6    A.   I manage the property.
7    Q.   Are you familiar with AppFolio?
8    A.   Yes.
9    Q.   Can you describe AppFolio and what it's
10 used for?
11   A.   It's our property management software.
12   Q.   And is it -- well, okay.  What -- I mean,
13 do you use it for communications or is it --
14   A.   Sometimes.  You can text tenants or
15 owners.
16        MS. MANDT:  Okay, hold on.  Let him get
17 all the way through his question before you jump in.
18        THE DEPONENT:  Okay.
19        MS. MANDT:  Just make sure he gets the
20 whole thing out.
21 BY MR. NIESE:
22   Q.   Is that used to track complaints?
23   A.   Partially, yeah.
24   Q.   Okay.
25   A.   Yes.

Page 12

1    Q.   Is it used to -- is -- keep track of who
2  owes rent?
3    A.   Yes.
4    Q.   Okay.  How often do you use AppFolio in
5  your employment?
6    A.   Oh, every day.
7    Q.   Okay.  Do you get alerts when there's an
8  entry in AppFolio?
9    A.   No.
10   Q.   Do you ever text your employees?
11   A.   Not through AppFolio.
12   Q.   Okay.
13   A.   If I text them, it'd be my phone.
14   Q.   Okay.  And what is your phone number?
15   A.   541-404-9700.
16   Q.   Do you communicate with your employees via
17 email?
18   A.   Yes.
19   Q.   What email address do you use?
20   A.   kristin@grandmgmt.com.
21   Q.   Does Grand Management have a file
22 retention policy?
23   A.   Yes.
24   Q.   And what is that policy?
25   A.   You cannot destroy anything; keep it for

Page 13

1  seven years.
2    Q.   Is that policy in writing?
3    A.   It's the law.
4    Q.   That wasn't my question.
5    A.   I don't know.
6    Q.   Okay.  Does Grand Management have a
7  written employee resignation policy?
8    A.   I'm not sure.  We have an employee
9  handbook, but I don't know if there's a resignation
10 policy.
11   Q.   Okay.  Does Grand Management have a policy
12 on responding to noise complaints from tenants?
13   A.   Yes.
14        MS. MANDT:  Well, object to the form.
15 Overbroad.  You can answer the question.
16        THE DEPONENT:  Okay.  Yes, we respond to
17 noise complaints.
18 BY MR. NIESE:
19   Q.   Okay.  And what is Grand Management's
20 noise complaint policy?
21   A.   Depends on what the complaint is.
22 Sometimes we would call a tenant to remedy.
23 Sometimes we would give a written warning.  Depends
24 on what the situation would be.
25   Q.   Would Grand Management ever issue an

Page 14

```
 1  eviction notice based on noise complaints or noise?
 2       A.   If it was repetitive, then yes.
 3       Q.   Would it require police involvement before
 4  Grand Management would issue that notice of
 5  eviction?
 6       A.   A notice of eviction?  It would definitely
 7  have to be documented.  I don't know that it would
 8  require police action.
 9       Q.   Okay.  Does Grand Management have a policy
10  regarding physical relationships between employees
11  and tenants?
12       A.   Yes.
13       Q.   And is that policy in writing?
14       A.   Yes.
15       Q.   Does Grand Management have a written
16  policy regarding its response to violence between
17  tenants?
18       A.   I -- I'm not sure if it's written.
19       Q.   Okay.
20       A.   We certainly have to take action.
21       Q.   So what would Grand Management's policy be
22  if you had reason to believe that tenant A attacked
23  tenant B?
24            MS. MANDT:  Object -- object to the form.
25  You can answer.
```

Page 15

```
 1            THE DEPONENT:  I mean, again, that's a
 2  very broad statement.  I -- I have personally been
 3  attacked and we tried to do an eviction for
 4  substantial harm with 24-hour notice, and that was
 5  not allowed.  You actually have to hit someone.  And
 6  the -- the judge informed me that it has to be an
 7  actual assault.  So we may give a 14/30, that's what
 8  we call it.  It's a notice of intent to evict if it
 9  was repetitive.  I don't know if that answers your
10  question.  It's very broad, your -- your question.
11  BY MR. NIESE:
12       Q.   Okay.  Well, let me see if I can narrow it
13  down.  What would your policy be if a tenant called
14  you and said my neighbor punched me in the face?
15            MS. MANDT:  Well, I'm going to object to
16  the form.  It's an improper hypothetical.  You can
17  answer the question if you can.
18            THE DEPONENT:  Well, we would investigate
19  and hopefully, there would be a police record and
20  they would be issued a notice of intent to evict.
21  That's the most stringent notice that we're allowed
22  to give under the Rural Development Rules and
23  Regulations, and it does allow a cure period.
24  BY MR. NIESE:
25       Q.   Okay.  So that would be a 3014?
```

Page 16

```
 1       A.   Yes.
 2       Q.   What would your investigation entail?
 3       A.   Interviewing both parties and reviewing
 4  police records and any witnesses and the site
 5  manager, if -- if she had record or was a witness or
 6  had documents.
 7       Q.   What would you do if there was no police
 8  involvement in the call?
 9       A.   I mean, we would do the best we can, but
10  if we found, through our investigation, that it
11  actually happened that there was witnesses, then we
12  would issue the 14/30.  That's all we can do.
13       Q.   Okay.  So you -- if there were --
14       A.   If it was physical, though, if it was
15  physical, we would certainly attempt the 24-hour
16  notice of substantial harm.
17       Q.   Okay.  What if there were no witnesses?
18            MS. MANDT:  Object to the form.
19  BY MR. NIESE:
20       Q.   What would -- what would your policy be if
21  tenant A said tenant B punched me in the face, but
22  you could locate no witnesses?
23       A.   Well, is there damages?  Can you see a
24  bruise on the tenant?  I mean, there would have to
25  be some evidence.
```

Page 17

```
 1       Q.   Okay.
 2       A.   But we would do what we could.  You know,
 3  that's what we always try to do.
 4       Q.   Okay.
 5       A.   We do the best we can.
 6       Q.   Does Grand Management have a written
 7  policy for when one tenant sexually assaults or
 8  sexually harasses another tenant?
 9            MS. MANDT:  Object to the form.
10            THE DEPONENT:  We have a lease agreement
11  that states tenant duties and reasons for
12  termination, and that is one of them, yes.  You
13  cannot sexually harass --
14  BY MR. NIESE:
15       Q.   Is -- is that --
16       A.   -- another tenant.
17       Q.   Is that the entirety of your sexual
18  harassment, sexual assault policy, is that --
19       A.   We also --
20       Q.   -- is the -- is the rental agreement?
21       A.   For tenants?  I mean, there is --
22       Q.   Yes, for tenants.
23       A.   -- there is a Rural Development handbook.
24       Q.   Again, that's not my question.  My
25  question is does Grand Management have a written
```

Page 18

1  policy, outside of the rental agreement, dealing
2  with an issue when one tenant sexually assaults or
3  sexually harasses another tenant?
4         MS. MANDT:  Object to the form.
5         THE DEPONENT:  We have a tenant
6  eligibility criteria.  We have a selection plan.  We
7  have a lease.  We have every document in the world.
8  I don't know what that would be under.  We have an
9  employee handbook.  There's no handbook on how to
10 deal with tenants, per se.  There's not a written
11 handbook of how to deal with every situation.
12        I mean, there's a operations manual, but
13 it doesn't go over, you know, stuff like this.  We
14 default to Oregon law and our lease agreement and
15 our rules, and those do state that you cannot
16 sexually harass.  We're also trained in fair housing
17 every year.
18 BY MR. NIESE:
19    Q.   Okay.
20    A.   So we do the best we can, but Rural
21 Development requires a cure period.
22    Q.   Is there a policy for how employees should
23 handle complaints of sexual harassment or sexual
24 assault?
25        MS. MANDT:  Object to form.

Page 19

1         THE DEPONENT:  Yes.
2  BY MR. NIESE:
3     Q.   Okay.  And that's a written policy?
4     A.   I'm not sure if it's written or not.
5     Q.   Okay.  As the owner of Grand Management,
6  do you have a responsibility to keep your tenants
7  safe, even if the police don't intervene?
8         MS. MANDT:  Object to form.
9         THE DEPONENT:  Yes.
10 BY MR. NIESE:
11    Q.   What is Grand Management's policy when a
12 tenant reports being sexually assaulted or harassed
13 in their home?  Is that the same as you -- as -- the
14 same as you previously described?
15        MS. MANDT:  Object to form.
16        THE DEPONENT:  In their home?  Okay.  Can
17 you give me a little more detail on what that would
18 entail?  The --
19 BY MR. NIESE:
20    Q.   Someone is sexually assaulted or harassed
21 in their home --
22    A.   Okay.
23    Q.   -- that they're renting from you.
24    A.   To my knowledge, that wasn't the
25 situation.

Page 20

1         MS. MANDT:  Well -- well, that's not the
2  question.
3         THE DEPONENT:  Okay.
4         MS. MANDT:  Listen to his question and
5  answer his question.
6         THE DEPONENT:  Well, normally, the person
7  would call the police, I would assume, if they were
8  sexually assaulted in their home by a relative or
9  friend or whoever their guest was.  So yes, we would
10 certainly take action if it was a tenant.  I --
11 you're not even explaining if it was another tenant.
12        MS. MANDT:  We're going to take a break.
13        MR. NIESE:  Sure.
14        THE REPORTER:  Okay.  We're off the record
15 at 9:22 a.m.
16        (WHEREUPON, a recess was taken.)
17        THE REPORTER:  We are back on the record
18 at 9:27 a.m.
19 BY MR. NIESE:
20    Q.   Did you rent a unit to Patsy Jay?
21    A.   Yes.
22    Q.   When did you begin renting that unit to
23 Ms. Jay?
24    A.   I would have to look for the date.  It's
25 approximately 24 years ago.

Page 21

1     Q.   Okay.  Do you recall which unit she was
2  renting or is renting?
3     A.   Look on the file here.
4         MS. MANDT:  No.  If you don't remember --
5         THE DEPONENT:  Oh.  I don't remember --
6  BY MR. NIESE:
7     Q.   Okay.
8     A.   -- off the top of my head --
9     Q.   Okay.
10    A.   -- without looking.
11    Q.   Sure.  Has she lived --
12    A.   I want to say --
13    Q.   Has she lived in that unit through the
14 duration of her tenancy --
15    A.   I would have to see if she ever
16 transferred, but she's lived on the complex --
17    Q.   Okay.
18    A.   -- for the duration, yes.
19    Q.   Okay.  And are you aware that Ms. Jay
20 relies on a wheelchair and a walker for support?
21    A.   I don't know.  I've never met her in
22 person.  I just talked to her on the phone.
23    Q.   Okay.  Are you aware of -- of any of Ms.
24 Jay's disabilities?
25    A.   No.

Page 22

1  Q.  Okay.  Was Temera Porter a tenant at
2  Evergreen Gardens?
3  A.  Yes.
4  Q.  Okay.  And were you aware that Ms. Porter
5  filed a stalking protective order against Mr.
6  McKnight?
7  A.  I don't know much about those.  I mean, I
8  have some documents, but --
9  Q.  Okay.  So you weren't aware that she filed
10 the stalking protective order?
11 A.  I am not aware that she filed the
12 document.
13 Q.  Okay.  So were you aware of a deal between
14 Grand Management and Ms. Porter to drop the stalking
15 order against Mr. McKnight?
16 A.  No.
17    MS. MANDT:  Object form.
18    THE DEPONENT:  Okay.
19 BY MR. NIESE:
20 Q.  Okay.  Did you send an email on or about
21 October 15th, 2018, with the following text:  "The
22 deal was for us to meet you at the court after you
23 had dismissed the case, and you would hand us over
24 keys, and we would hand over to you the check"?
25    MS. MANDT:  I'm going to object.  Do you

Page 23

1  have a document that you want her to look at?
2     MR. NIESE:  Sure.  I can pull it up.  We
3  might need to take a break.  I'll go find that
4  document.
5     THE REPORTER:  We are off the record at
6  9:29 a.m.
7     (WHEREUPON, a recess was taken.)
8     THE REPORTER:  We are back on the record
9  at 9:34 a.m.
10    MR. NIESE:  Thank you.  Entering the email
11 dated October 15th, 2018, into evidence.
12    (WHEREUPON, Exhibit 1 was marked for
13 identification.)
14 BY MR. NIESE:
15 Q.  Ms. Smith, do you recognize this document?
16 A.  Yes.
17 Q.  So I'll ask you again.  Were you aware of
18 the stalking protective order that Ms. Porter filed
19 against Mr. McKnight?
20 A.  I wasn't aware of a -- a stalking order by
21 Ms. Porter, no.
22 Q.  Okay.  So what did you think this deal was
23 it -- was for?
24 A.  It was a -- if I --
25    MS. MANDT:  Well, hold on.  Object to the

Page 24

1  form.  Could -- is there a particular section that
2  you're referring to?
3     MR. NIESE:  Yes.
4  BY MR. NIESE:
5  Q.  "The deal was for us to meet you at the
6  court after you had dismissed the case, and you
7  would hand us over keys, and we would hand you over
8  the check."  And then you said, "I'm not going to
9  comply with my part of the deal if you are not
10 complying with yours."
11 A.  Can I answer?
12    MS. MANDT:  Uh-huh.
13    THE DEPONENT:  My recollection was this
14 tenant was moving out and wanted her deposit to be
15 handed to her rather than wait the 31 days allotted
16 by law, so we had made an agreement with her.
17 Again, this was a long time ago, so I don't remember
18 the actual details, but I do remember that part.
19 She wanted her deposit check handed to her, and I
20 agreed to do that, apparently, under these
21 conditions.  And she didn't do what we had agreed,
22 so it never took place.
23 BY MR. NIESE:
24 Q.  Okay.  Were you made aware of an incident
25 report stating that John McKnight exposed his

Page 25

1  genitals to Ms. Jay on or about July 11th, 2021?
2     MS. MANDT:  Object to the form.
3     THE DEPONENT:  I'm aware of an incident
4  report that she filled out, correct, yes.
5  BY MR. NIESE:
6  Q.  Okay.  Was Mr. McKnight working for Grand
7  Management in any capacity when this incident
8  occurred?
9  A.  I don't believe so.  I think it was
10 before.
11 Q.  Were you aware of any previous complaints
12 or incidents of sexual assault, sexual harassment,
13 or intimidating behavior from Mr. McKnight against
14 other tenants?
15    MS. MANDT:  Well, I'm going to object to
16 the form.  That is a significantly compound
17 question.  So if you want to break it down?
18    MR. NIESE:  Okay.
19 BY MR. NIESE:
20 Q.  Were you aware of any previous incidents
21 of threatening behavior from Mr. McKnight?
22 A.  Not really threatening behavior.  I was
23 aware of some complaints, but if you have a question
24 about something, if you wanted to refresh my memory,
25 I could take a look at it.

Page 26

1  Q. Sure. What type of -- of complaints were
2  you aware of?
3  A. There was a complaint where he had a gun
4  that he was having on his holster that we told him
5  he couldn't do. And, I mean, I don't know. I guess
6  you'd have to refresh my memory on specific things,
7  but --
8  Q. Okay.
9  A. -- nothing sexual like what happened, you
10 know, allegedly, to Ms. Jay. There was nothing like
11 that before.
12 Q. Any complaints of sexual harassment from
13 Mr. McKnight previously?
14 A. Well, I mean, there was a situation where
15 he apparently dated one of our site managers, Cindy
16 Fargher, which was not allowed. So -- and -- and
17 they had some accusations amongst themselves. She
18 wasn't really a tenant. I mean, she was an
19 employee. She was a manager. They had a
20 relationship.
21 Q. Okay. Aware of any previous incidents or
22 complaints of intimidating behavior from Mr.
23 McKnight?
24     MS. MANDT: Object to form. Overbroad.
25 You can answer if you can.

Page 27

1     THE DEPONENT: When Patsy Jay and Mr.
2  McKnight discontinued their friendship, they were
3  best friends, and this came about, there was back
4  and forth between them involving binoculars and
5  different things on both sides. So there was some
6  complaints and -- but nothing to this extreme.
7  BY MR. NIESE:
8  Q. Were you aware of any other complaints
9  against Mr. McKnight at any time?
10 A. You would have to --
11    MS. MANDT: Form.
12    THE DEPONENT: -- be more specific.
13 BY MR. NIESE:
14 Q. What complaints against Mr. McKnight are
15 you aware of?
16    MS. MANDT: Object to form.
17    THE DEPONENT: I mean, there was some
18 complaints in the file by some tenants, but I -- I
19 would have to review them and refresh my memory, but
20 nothing to this degree.
21 BY MR. NIESE:
22 Q. Okay.
23 A. Nothing where he exposed himself.
24    MR. NIESE: Make another copy. We'll be
25 right back. Make another copy of this?

Page 28

1     THE REPORTER: We are off the record --
2     MR. NIESE: Thank you.
3     THE REPORTER: -- at 9:40 a.m.
4     (WHEREUPON, a recess was taken.)
5     THE REPORTER: We are back on record at
6  9:42 a.m.
7     (WHEREUPON, Exhibit 2 was marked for
8  identification.)
9  BY MR. NIESE:
10 Q. Okay. Ms. Smith, are you familiar with
11 this AppFolio report?
12 A. I mean, I'm reading it right now.
13 Q. Okay.
14 A. But these were not made by me.
15 Q. Okay. So at the bottom, it says page 1 of
16 7 and then page 2, it says page 2 of 7, correct?
17 A. Yeah. Yes.
18 Q. Do you have pages 3, 4, 5, and 6, and 7 of
19 this report?
20 A. No.
21 Q. Do you have access to those -- to that
22 report?
23 A. No. I mean, this is a printout from the
24 software.
25 Q. Okay. Is there a reason that the first

Page 29

1  two pages were produced? Only the first two pages -
2  -
3  A. Probably, it's the only thing that has to
4  do with this case. I don't know. I -- I would --
5  I don't know.
6  Q. Okay. Can you get the entirety of this
7  report and give it to your attorney, who can then
8  give it to us?
9  A. I can certainly look.
10 Q. So are you aware of an incident that
11 occurred between Mr. McKnight and Cindy Fargher?
12 A. Yes.
13 Q. What do you know about that incident?
14 A. I guess that they were dating, we were
15 told after the fact, and they had a sexual incident
16 in which I heard that he bit her on her rearend
17 during sex. And I guess, I don't know when, the
18 next day or the day after, I don't know if she
19 reported it or not, but she certainly reported it to
20 us.
21 Q. Okay.
22 A. But it was consensual sex. It was not --
23 you know, it was consensual sex. They were dating.
24 Q. And how do you know that it was
25 consensual?

Page 30

1   A.   She did not claim that it was not
2  consensual.  She just said that it was too rough
3  that -- than what she was expecting, I guess.  I
4  don't know.
5       Q.   Was the bite consensual?
6            MS. MANDT:  Object to form.
7            THE DEPONENT:  I don't -- I can't answer
8  that.
9  BY MR. NIESE:
10      Q.   Okay.
11      A.   I can't answer that.
12      Q.   Well, you said you know if it was
13 consensual or not.
14      A.   I can't answer that.
15      Q.   Okay.
16      A.   That's their business.
17           MR. NIESE:  I apologize.  I did not make
18 enough copies of these.  I'm going to have to do
19 that today.
20           THE REPORTER:  We're off the record at
21 9:35.
22           (WHEREUPON, a recess was taken.)
23           THE REPORTER:  We are back on the record
24 at 9:49 a.m.
25           MR. NIESE:  Okay.  Introducing this --

Page 31

1            THE REPORTER:  Okay.
2            MR. NIESE:  -- as new evidence.
3            (WHEREUPON, Exhibit 3 was marked for
4  identification.)
5  BY MR. NIESE:
6       Q.   Okay.  Have -- have you seen this document
7  before, Ms. Smith?
8       A.   I'm not sure.
9       Q.   Do you know what this is, what this
10 document is?
11      A.   It looks like a restraining order,
12 petition for a restraining order.
13      Q.   So are you aware that Ms. Fargher stated
14 that Mr. McKnight waved a gun in her face?
15           MS. MANDT:  Object to form.  You're asking
16 her to read a document that she said she doesn't
17 know.
18           MR. NIESE:  No, I'm asking her if she was
19 aware of it.
20           THE DEPONENT:  No.
21 BY MR. NIESE:
22      Q.   Were you aware that Ms. Fargher stated
23 that Mr. McKnight sexually assaulted her?
24           MS. MANDT:  Object to the form.
25           THE DEPONENT:  I was aware that they had a

Page 32

1  sexual relationship and she claimed that he bit her
2  on the rearend and that she did not want to be
3  bitten on the rearend during sex, during consensual
4  sex.  And I also know that she is not a tenant, she
5  was an employee, and it was against her employee
6  contract to have a relationship with a tenant.  So
7  she did not tell Grand Management about these
8  incidences until after the fact because, you know,
9  again, it was not allowed.
10 BY MR. NIESE:
11      Q.   You stated earlier that you were aware
12 that Mr. McKnight was showing his gun off, correct?
13      A.   No.
14           MS. MANDT:  Object to the form.
15           THE DEPONENT:  He had --
16           MS. MANDT:  It misstates her prior
17 testimony.
18           THE DEPONENT:  He had a gun on his
19 holster, and that's what I'm aware of.
20           MR. NIESE:  Thanks.  Okay.  Introduce this
21 into evidence.
22           MR. MCCLINTOCK:  This is Exhibit 4, isn't
23 it?
24           MS. MANDT:  Should be.
25           MR. MCCLINTOCK:  All right.  Just want to

Page 33

1  make sure.
2            (WHEREUPON, Exhibit 4 was marked for
3  identification.)
4  BY MR. NIESE:
5       Q.   Is this email from Cindy?
6       A.   Don't know, it doesn't say.  I'm assuming
7  so.
8            MS. MANDT:  Don't assume.  Okay?
9            THE DEPONENT:  I don't know.  It doesn't
10 say.  It just says Evergreen Gardens Apartments.
11 BY MR. NIESE:
12      Q.   Why would you assume?  Why would you
13 assume it's from Cindy?
14           MS. MANDT:  Object to the form.
15           THE DEPONENT:  I would have to look at her
16 dates of employ.
17 BY MR. NIESE:
18      Q.   Was Cindy employed on May 25th, 2019?
19      A.   I would have to look at that.  I don't
20 know.  It's been a long time.
21      Q.   Okay.  Who else would write this?
22           MS. MANDT:  Object to form.
23           THE DEPONENT:  I don't know.
24 BY MR. NIESE:
25      Q.   Okay.

Page 54

1   A.   They're not usually allowed to leave them
2   there to impede the common pathway for other
3   tenants.
4   Q.   Okay.  What if they're not impeding the
5   pathway and they're just on the porch; is that okay?
6
7   A.   That is fine, but -- yes, that's allowed.
8   Q.   Okay.  Did you issue Patsy Jay an eviction
9   notice on or about August 20th, 2021?
10  A.   I personally did not, no.
11  Q.   Are you aware of her being issued an
12  eviction notice --
13  A.   I am aware of a document that someone else
14  wrote, Dawn Cockrum.
15  Q.   Okay.  Did that notice list having a
16  walker on her porch as a reason for its issuance?
17  A.   I don't know if it was on the porch or in
18  the planted area with gravel, but yes, it was left
19  in an area that was against the rules.
20  Q.   Okay.  Did Grand Management receive a
21  request for reasonable accommodation for Ms. Jay?
22  A.   I believe after that was issued, yes, we
23  received it --
24  Q.   Do you --
25  A.   -- and we granted it.

Page 55

1   Q.   -- do you recall when that was -- okay.
2   A.   No.
3   Q.   Okay.  And you did grant the request you
4   said, correct?
5   A.   Yes.
6   Q.   Okay.  And are you aware that Ms. Jay
7   filed a HUD complaint against Grand Management on or
8   about August 30th, 2022?
9   A.   Yes.
10  Q.   On or about March 28th, 2023, did Grand
11  Management issue Ms. Jay a notice of lease violation
12  warning?
13  A.   I would have to look --
14  Q.   Okay.
15  A.   -- at the document.  I -- I didn't issue
16  it to her.
17       MR. NIESE:  Okay.  I have it.  I just need
18  to make some copies.  Let me take a quick break.
19       THE REPORTER:  We are off the record at
20  10:36.
21       (WHEREUPON, a recess was taken.)
22       THE REPORTER:  We are back on at 10:41.
23       MR. NIESE:  Okay.  Thank you.
24       (WHEREUPON, Exhibit 12 was marked for
25  identification.)

Page 56

1   BY MR. NIESE:
2   Q.   So do you recognize -- without talking
3   about the substance of the document, do you
4   recognize what this document is?
5   A.   It looks like a lease violation --
6   Q.   Okay.
7   A.   -- for not turning in all of her recert
8   paperwork needed to complete her tenant
9   recertification.
10  Q.   Okay.  And was that information on her
11  life insurance policy?  Is that what was requested?
12  A.   I'm not sure.  I do know that she
13  submitted it, like, the next day.
14  Q.   Okay.
15  A.   So it was cured.
16  Q.   Okay.
17  A.   But she's supposed to only have 14 days.
18       MS. MANDT:  Just --
19       THE DEPONENT:  Oh, okay.
20  BY MR. NIESE:
21  Q.   If you could look on the second page?
22  Thank you.
23  A.   Okay.
24  Q.   Does that refresh your memory?  Is that --
25  can you -- can you state that --

Page 57

1   A.   Oh, yeah.  It says Colonial Life Insurance
2   Policy.
3   Q.   Okay.
4   A.   Yeah.
5   Q.   Okay.  Thank you. Is that life insurance
6   policy information necessary to recertify her?
7   A.   It appears so, yes.
8   Q.   Okay.  Before -- let me -- let me
9   rephrase.  Had Ms. Jay ever been given a notice
10  based on not submitting her life insurance policy?
11  A.   I don't know.
12  Q.   Do -- do -- okay.  Do you know a Sharon
13  Elrod?
14  A.   She was a manager there --
15  Q.   Okay.
16  A.   -- after Cindy.
17  Q.   Are you aware that Ms. Elrod informed Ms.
18  Jay that her life insurance information was not
19  required?
20  A.   If it's whole life, it is required.  I
21  don't know if it's whole or -- or part, but we need
22  that information for the file.
23  Q.   But are you aware that Ms. Elrod informed
24  Ms. Jay that it wasn't?
25  A.   No.

Page 58

1  Q. Okay. Do you recall submitting a letter
2  to HUD on October 2nd, 2022?
3       MS. MANDT: Object to form.
4       THE DEPONENT: In response to the
5  complaint?
6  BY MR. NIESE:
7  Q. Yes. Did you respond to the --
8  A. Yes, I had to respond to the complaint.
9  Yes.
10 Q. Okay. And what was that complaint in
11 regards to? What was the --
12 A. I would have to look again, but it was in
13 relation to this case.
14 Q. Okay.
15 A. Same situations.
16 Q. Do you believe that the situation between
17 Mr. McKnight and the other tenants is a he said/she
18 said situation?
19 A. My opinion is yes.
20 Q. Okay.
21 A. I think that's been documented.
22 Q. Okay. Do you believe that a 14/30 notice
23 is an appropriate response to a tenant sexually
24 assaulting another tenant?
25      MS. MANDT: Object to the form.

Page 59

1       THE DEPONENT: I believe it's the only
2  response I could have taken. The only action that I
3  could have taken.
4  BY MR. NIESE:
5  Q. Do you believe that it's appropriate?
6       MS. MANDT: Object to the form.
7       THE DEPONENT: Yes.
8  BY MR. NIESE:
9  Q. Okay. Do you believe that a 14/30 notice
10 is appropriate when a tenant branches a firearm?
11 A. Yes.
12      MS. MANDT: Form.
13 BY MR. NIESE:
14 Q. Okay. Why would those actions not be
15 considered outrageous for a 24-hour notice?
16      MS. MANDT: Object to the form.
17      THE DEPONENT: I believe he has a
18 concealed weapon permit, so that was his response.
19 But we don't want it on the property, certainly. So
20 we did what we could, which was give a 14/30.
21 BY MR. NIESE:
22 Q. Okay. Why would brandishing a firearm not
23 warrant a 24-hour notice?
24      MS. MANDT: Asked and answered. You can
25 answer it again.

Page 60

1       THE DEPONENT: In my history, I've tried a
2  couple of times in my career and the judge has told
3  me that you actually have to physically harm
4  someone. They said that the law is gray area, but
5  you actually -- this -- the precedent was that you
6  actually have to hit someone, rape someone, or
7  actually cause an assault to warrant the 24-hour
8  notice.
9  BY MR. NIESE:
10 Q. Okay.
11 A. So RD Lease says the only other thing I
12 can do is give a 14/30, which I did, several times -
13 -
14 Q. Okay.
15 A. -- to Mr. McKnight.
16 Q. So given that answer, why do you believe
17 that it's an appropriate response to give a 14/30 --
18 let me rephrase. Given that answer, why wouldn't a
19 sexual -- a -- a tenant sexually assaulting another
20 tenant warrant a 24-hour notice?
21      MS. MANDT: Object to form. Lacks
22 foundation, calls for speculation.
23      THE DEPONENT: He took or pointed at his
24 genitals. He did not touch or physically assault
25 her. So it was my -- my only recourse was to issue

Page 61

1  the 14/30.
2  BY MR. NIESE:
3  Q. Okay. Let's take a quick break.
4       THE REPORTER: We are off the record at
5  10:46.
6       (WHEREUPON, a recess was taken.)
7  BY MR. NIESE:
8  Q. Do you have a general number of how many
9  complaints Grand Management received about Mr.
10 McKnight's actions?
11      MS. MANDT: Object to form. Asked and
12 answered.
13      THE DEPONENT: I would be guessing.
14 BY MR. NIESE:
15 Q. Okay. If it was from a number of women,
16 would that change your opinion on whether or not it
17 was a he said/she said situation?
18      MS. MANDT: Object to form. Calls for
19 speculation, lacks foundation.
20      THE DEPONENT: No, because the woman
21 that's suing me now was the witness in the first one
22 for John McKnight. So that would lead me to believe
23 that it was a he said/she said, because Patsy Jay
24 was his number one supporter two years before this
25 case came. I mean, before her restraining order, so

**Page 62**

1  yes.
2  BY MR. NIESE:
3      Q.  So yes, it would change your opinion?
4      A.  It would be a he said/she said situation,
5  in my opinion.
6      Q.  If multiple women came forward, it would
7  still be a he said/she said situation?
8          MS. MANDT:  Object to form.  Asked and
9  answered.
10         THE DEPONENT:  Yes.
11 BY MR. NIESE:
12     Q.  Okay.
13     A.  Based on what I just said.
14     Q.  Okay.
15         MR. NIESE:  Now we can take a quick break.
16 Thank you.
17         THE REPORTER:  We are off the record at
18 10:47.
19         (WHEREUPON, a recess was taken.)
20         THE REPORTER:  We are back on the record
21 at 10:49.
22         MS. MANDT:  Sorry about that.
23 BY MR. NIESE:
24     Q.  Are you aware of any facts concerning the
25 situation, the -- the sexual assault between Mr.

**Page 63**

1  McKnight and -- I'm sorry, let me rephrase.
2          Are you aware of any facts regarding the
3  situation between Mr. McKnight and Cindy Fargher
4  that we've not discussed here?
5      A.  No.
6      Q.  Okay.  Are you aware of any facts between
7  the situation concerning Patsy Jay and Mr. McKnight
8  that we've not discussed here?
9      A.  I mean, there's other topics that you
10 haven't brought up.
11     Q.  What would those be?
12         MS. MANDT:  Well, no, you're not.
13         MR. NIESE:  Well, like --
14         MS. MANDT:  If you have a question, you
15 can ask her a question.
16         MR. NIESE:  Okay.
17 BY MR. NIESE:
18     Q.  What facts have we not discussed?
19         MS. MANDT:  Object -- object to the form.
20         THE DEPONENT:  Didn't she object?  I don't
21 know if --
22 BY MR. NIESE:
23     Q.  Oh, you still have to answer the question.
24         MS. MANDT:  You can still answer.
25         THE DEPONENT:  I don't know how to answer

**Page 64**

1  that.  I mean, you'd have to ask me a question --
2  BY MR. NIESE:
3      Q.  Okay.
4      A.  -- related to something and I can answer.
5  That's very vague.
6      Q.  Okay.
7      A.  There's a lot of things that went on in
8  this case, so you'd have to ask me about each issue,
9  the witnesses, different things.
10     Q.  Okay.  So -- well, we might have to extend
11 this, but we can do this.
12         (WHEREUPON, a discussion was held off the
13 record.)
14         MR. NIESE:  Okay.  Like to enter this into
15 evidence.
16         (WHEREUPON, Exhibit 13 was marked for
17 identification.)
18 BY MR. NIESE:
19     Q.  So this is an email sent to you on March
20 27th, 2019, correct?
21         MS. MANDT:  It actually wasn't.  Misstates
22 the document.
23 BY MR. NIESE:
24     Q.  Ms. -- Ms. Smith?
25     A.  It looks like it's from Evergreen Gardens.

**Page 65**

1  It's from Cindy, it looks like, and to Sharon Peak,
2  with a cc to me.  What's your question about it?
3      Q.  Well, the question is given the text of
4  this email, along with the other evidence, is it
5  unbelievable to you that a crime had been committed
6  on your property and GMS appeared to be protecting
7  the perpetrator and not the victim?
8          MS. MANDT:  Object to form.
9  Argumentative.
10         THE DEPONENT:  I don't know that a crime
11 had been committed.  There was a consensual dating
12 relationship.
13 BY MR. NIESE:
14     Q.  He was arrested, wasn't he?
15     A.  I was not aware of until after the fact.
16 So she made me aware of this, like, on the day she
17 filed that restraining order.  I have that
18 knowledge.  She shouldn't have had a relationship
19 with the tenant.  That was clearly a violation of
20 her employment.  But this issue, you know --
21         MS. MANDT:  You answered the question.
22 BY MR. NIESE:
23     Q.  Jerry Mascolo is one of your -- he works
24 under you, correct?  You supervise him?
25     A.  Yes.

Page 66

1  Q.  So would he tell someone that a
2  restraining order would be an automatic 24-hour
3  eviction without you giving him that order?
4  A.  Absolutely not.  Absolutely not.
5  Q.  He wouldn't tell them that?
6  A.  He would not.
7  Q.  Okay.
8  A.  And it sounds like you're deposing him, so
9  you can ask him directly, but that was not something
10 that we would say.
11 Q.  Did you ever issue a notice to Mr.
12 McKnight regarding termination of employment?
13 A.  We never used him again.  He wasn't really
14 an employee.  We -- he fixed a couple things on the
15 property when we were in between handymen at Cindy's
16 request, apparently, because he was her boyfriend.
17 We didn't know that at the time.  But -- but no, we
18 didn't use him again.
19 Q.  Okay.  This email states that every
20 resident here is in danger.  Do you agree with that
21 assessment?
22 A.  No.
23 Q.  Why not?
24 A.  She's a --
25 Q.  Who's she?

Page 67

1  A.  She -- Cindy, sounds like a -- a person --
2  you know, she obviously broke up with this man and
3  they had a -- a situation.  Again, I'm not going to
4  speculate what happened in their sexual life, but
5  she's clearly mad and wants him out of there, so
6  this is her opinion.  But again, she was in the
7  wrong.
8  Q.  Did you respond to this email?
9  A.  I don't believe so.
10 Q.  Okay.
11 A.  It wasn't to me.
12 Q.  Did you talk to Sharon about this email?
13 A.  I don't remember.  It was a long time ago.
14 Probably, but I don't remember.
15 Q.  Probably?
16 A.  I don't remember.
17 Q.  Okay.
18     MR. NIESE:  Okay.  Another short break,
19 please.
20     THE REPORTER:  We are off the record at
21 10:56.
22     (WHEREUPON, a recess was taken.)
23     THE REPORTER:  Back on at 10:56.
24     MR. NIESE:  No further questions.
25     MR. MCCLINTOCK:  I have no questions at

Page 68

1  this time.
2     MS. MANDT:  All right.
3  EXAMINATION
4  BY MS. MANDT:
5  Q.  Ms. Smith, how long has Grand Management
6  Services been in existence?
7  A.  Since about 1994.
8  Q.  How many units does Grand Management
9  manage?
10 A.  Currently, almost 1,300.
11 Q.  And are those located, excuse me,
12 throughout the state of Oregon?
13 A.  Yes, in 15 counties.
14 Q.  How many of those units are RD or low-
15 income units?
16 A.  About half, so about 650.
17 Q.  And Evergreen Gardens, is that a RD, Rural
18 Development Program, living situation?
19 A.  Yes.
20 Q.  So can you -- what does the -- basically,
21 what is the Rural Development Program?
22 A.  It's a program through USDA Rural
23 Development under the Department of Agriculture that
24 provides subsidy to low-income tenants.
25 Q.  Is it basically Section 8 housing?

Page 69

1  A.  It is not.  Section 8 is through HUD --
2  Q.  Okay.
3  A.  -- so it's a different division.
4  Q.  Okay.
5  A.  But it is similar.
6  Q.  But it's similar?  Okay.  And so specific
7  to Evergreen Gardens, what are the requirements to
8  apply and obtain housing at that apartment complex?
9  A.  You have to be 62 years of age or older or
10 disabled, handicapped, regardless of age.  And you
11 have to meet income parameters.
12 Q.  Okay.  And you -- and so each tenant,
13 whether it's Ms. Jay, Mr. McKnight, or anyone else,
14 has to apply to reside there; is that correct?
15 A.  Yes.
16 Q.  Okay.  And is that just simply filling out
17 a one-page application?
18 A.  It's several pages, but yes, they fill out
19 an application.
20 Q.  And is that information required by RD?
21 A.  Yes.
22 Q.  Okay.  And you talked about a couple of
23 different things that I want to clarify.  You talked
24 about the recertification process, and you talked
25 about the one-year lease agreement.  How do those

```
 1                        CERTIFICATE
 2
 3        I, Valerie Barna, do hereby certify that I
 4   reported all proceedings adduced in the foregoing
 5   matter and that the foregoing transcript pages
 6   constitutes a full, true and accurate record of said
 7   proceedings to the best of my ability.
 8
 9        I further certify that I am neither related to
10   counsel or any party to the proceedings nor have any
11   interest in the outcome of the proceedings.
12
13        IN WITNESS HEREOF, I have hereunto set my hand
14   this 7th day of August, 2024.
15
16
17
18
19
20                        Valerie Barna
21
22
23
24
25
```