IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PATSY JAY,

    Plaintiff,

vs.                                Case No. 3:23-cv-656

GRAND MANAGEMENT SERVICES, INC., EVERGREEN GARDENS LIMITED PARTNERSHIP JERRY MASCOLO, LEONDRA COLEMAN, and DAWN COCKRUM,

    Defendants.

DEPOSITION OF

LEONDRA COLEMAN

TAKEN ON

FRIDAY, JULY 19, 2024

8:57 A.M.

WILLIAMS KASTNER

1515 SOUTHWEST FIFTH AVENUE, SUITE 600

PORTLAND, OREGON 97201

EXHIBIT 4 - Page 1 of 20

Page 10

1    A.    Other than the forms between John and
2  Patsy, but there wasn't any court ordered things --
3    Q.    Okay.
4    A.    -- as of yet.  Yeah.
5    Q.    All right.  So I'm going to say Grand
6  Management or GMS.
7    A.    Okay.
8    Q.    And if I say that, you'll know that --
9  what I'm talking about?
10   A.    Yes.
11   Q.    Right?
12   A.    Yes.
13   Q.    Okay.  So getting back to -- did you look
14  at -- did you look at documents that you -- that
15  were related to your employment in this incident in
16  preparation for this deposition?  Not -- not court
17  documents, but I mean --
18   A.    Not -- not in preparation for this, no,
19  because --
20   Q.    Okay.
21   A.    Yeah.
22   Q.    Okay.  When was the last time you
23  communicated with Jerry Mascolo?
24   A.    It -- I would say like various years,
25  maybe four years.

Page 11

1    Q.    So back when you were an employee?
2    A.    Yes.
3    Q.    Okay.
4    A.    Only then.
5    Q.    When was the last time you communicated
6  with Dawn Cockrum?
7    A.    The same, yes.  Be four years or -- yeah.
8    Q.    How about Kristin Smith?
9    A.    The same.
10   Q.    All right.  How about John McKnight?
11   A.    The same or probably even a little bit
12  less -- or sorry, more than four years because when
13  he wasn't a tenant anymore.  So like, what, four
14  years and a half.
15   Q.    Okay.  And you haven't communicated with
16  him since he left his apartment?
17   A.    I haven't.  No.
18   Q.    Okay.  Do you know Cindy Fargar
19  (phonetic)?
20   A.    The name is familiar, but I do not know
21  her.
22   Q.    Okay.  Have you ever communicated with
23  her?
24   A.    No.
25   Q.    Okay.  So if I'm counting correctly were

Page 12

1  you 22 years old when you started working for Grand
2  Management?
3    A.    Yeah.  Yes.
4    Q.    Okay.
5    A.    It should be around there.  Yeah.
6    Q.    All right.  So sometimes it takes a long
7  time to go through people's employment history, but
8  I'm guessing it won't take that long since you were
9  22.
10   A.    Right.
11   Q.    So what were you doing before you went to
12  work at Grand Management?
13   A.    Goodness.  I know that pertains, but
14  before that, I had been working at Taco Bell, part-
15  time, and then just home with my children.
16   Q.    Okay.  So was this your first job in
17  residential property management?
18   A.    Yes.  It would be, yes.
19   Q.    Okay.  And since you left Grand
20  Management, have you done other jobs in residential
21  property management?
22   A.    No.  Grand Management was my last job.
23   Q.    Okay.
24   A.    And then I had my daughter shortly after.
25   Q.    Okay.  So you -- you haven't been employed

Page 13

1  since you left there?
2    A.    No, I have not been employed.  No.
3    Q.    Other than raising your kids?
4    A.    Yes.  Other than my kids, yeah.
5    Q.    Okay.  When you -- so I -- I assume you
6  hadn't got -- you -- you hadn't had any Fair Housing
7  training before you started at Grand Management?
8    A.    Training?  No.  I was familiar with some
9  of the rules and regulations just because I've tried
10  to get housing through Fair Housing in the past
11  because I also I'm low income, but other than that,
12  no.
13   Q.    Okay.  Did you get Fair Housing training
14  when you were at Grand Management?
15   A.    Yes.  Yeah, I had to.
16   Q.    Okay.
17   A.    I had to complete courses and then pass
18  those courses.  Yes.
19   Q.    Okay.  Do you remember how many courses?
20   A.    There's like a whole -- I mean, there's
21  various courses in the -- the packet, I guess I'd
22  say.
23   Q.    Okay.
24   A.    No, I cannot tell you how many courses
25  exactly.

Page 14

1   Q.   And was it like a video thing that you
2   could do online or?
3   A.   Yes, it was online.  But yes, there were
4   videos, but it was a lot of questions,
5   questionnaires, reading up on things, answering the
6   questions afterwards.  But there were a lot of
7   videos.  Yes.
8   Q.   And do you remember if this course covered
9   the topic of sexual harassment?
10  A.   Yes.
11  Q.   And what do you remember about your
12  training on sexual harassment?
13  A.   Well, honestly, it's been a while, but for
14  the sexual harassment specifically, a lot of it is
15  reporting to supervisors, documentation, and
16  specific like abusers wouldn't be able to be in
17  contact with a victim if there was an ongoing like
18  criminal investigation.  But other than that, from
19  my standpoint, there wasn't much for me to do.
20  Q.   Okay.  Any -- do you recall anything else
21  about what you learned about sexual harassment in
22  those trainings?
23  A.   Currently, no.
24  Q.   Okay.
25  A.   No.

Page 15

1   Q.   When you're -- what -- what was your job
2   at GMS?
3   A.   I was property -- well, I was like on site
4   manager.  So basically, I was the manager that lived
5   on the property.  Helped manage the grounds, I
6   guess, like upkeep the grounds.  And then I had my
7   office portion of the job, which was recertification
8   for all the tenants, filing complaints, maintenance
9   work orders every day.  Yeah.
10  Q.   Okay.  So you -- you were doing
11  recertification because there was some kind of
12  federal subsidy in these projects?
13  A.   Yes.  That was attached to the -- to the
14  job I had.  Yes.
15  Q.   Okay.
16  A.   Yeah.
17  Q.   And did -- how many projects did you
18  manage when you were at GMS?
19  A.   How many projects?
20  Q.   I mean how many --
21  A.   The properties?
22  Q.   -- properties?  Yeah.
23  A.   Yeah.  Two.
24  Q.   Okay.
25  A.   Two properties.

Page 16

1   Q.   Which -- and which were those?
2   A.   Evergreen and Golden Eagle.
3   Q.   Okay.  And did they have the same kind of
4   federal subsidy?
5   A.   They both, yes, they did.
6   Q.   Okay.
7   A.   Uh-huh.
8   Q.   And do you remember what that was?
9   A.   No.  It was just like the Rural
10  Development funding.  Yeah.  I don't know specific.
11  There were two different kinds.
12  Q.   And that's through the Department of
13  Agriculture?
14  A.   Yes, exactly.
15  Q.   Okay.  And do you recall if there were any
16  rules around those RD properties that limited your
17  ability to evict tenants?
18  A.   Yes.  Yeah.
19  Q.   What -- what do you remember about that?
20  A.   Well, I mean, it doesn't necessarily
21  prevent me from evicting them.  They all still have
22  the same guidelines, so I guess the answer would be
23  no.  No, there isn't anything specific from the RD
24  to the regular renting tenants that they get special
25  rules or something.

Page 17

1   No, that doesn't pertain to evictions
2   unless, like they lie or something on their
3   applications for their rental amount because they do
4   have to do a packet.  I mean, if they falsify
5   something on that, then eventually they could get
6   evicted.  Yes.
7   Q.   Okay.  So let me unpack that a little bit.
8   So I -- I gather what you're saying is that like if
9   somebody lies about their income, they could be
10  evicted for that?
11  A.   Yes.  Exactly, which the people that don't
12  have income required.  Well, I guess certainly they
13  still do.  No, they all follow the same rules.
14  Q.   Okay.  And -- but to the extent, you know,
15  is it -- was there anything about these rural
16  development regulations that limited the kinds of
17  evictions you could give someone compared to just
18  market rate landlord tenant law?
19       MS. MANDT:  Object to form.
20       THE DEPONENT:  Yes.  You might have to
21  reword that one more time.
22  BY MR. JOHNSON:
23  Q.   That's probably a terrible question.
24  A.   That's a long question.
25  Q.   Yeah.

Page 18

1   A.   Yeah.  You --
2   Q.   So do you recall any rules about these --
3 about the subsidy with these properties that limited
4 the kind of eviction notices you could give tenants?
5        MS. MANDT:  I'm still going to object to
6 the form.
7        THE DEPONENT:  No.
8 BY MR. JOHNSON:
9   Q.   You don't recall any?
10  A.   No.  There's no specific rules to separate
11 the two.
12  Q.   Okay.  So as onsite manager you're a --
13 you were a representative of the landlord?
14  A.   Yes.  Yeah.  Yes.  And the management
15 company, yeah.  And the owners as well.  Yeah.
16  Q.   Okay.  And based on your training that you
17 got or anything else, what's your understanding of
18 what legal obligation a landlord has when one tenant
19 accuses another tenant of sexually harassing them?
20       MS. MANDT:  Object to the form.
21 BY MR. JOHNSON:
22  Q.   You can answer if you understood it.
23  A.   Yeah.
24  Q.   Otherwise, I'll try again.
25  A.   Yeah.  Try one more time.

Page 19

1   Q.   So do -- do you have an understanding of
2 what obligation a landlord has when one tenant
3 accuses another tenant of sexual --
4   A.   Yes, I would say so.  Yes.  I do
5 understand that.  At some particular point we would
6 have to enforce some type of legal document, like a
7 protective order or something.  Yes.
8   Q.   Okay.
9   A.   Yeah.
10  Q.   What if there's no protective order?  Does
11 the landlord have any other responsibilities?
12       MS. MANDT:  Object to form.
13       THE DEPONENT:  The landlord has a
14 responsibility to ensure that, I mean, the property
15 is safe, yes, for everyone.  But also, like there's
16 rules, like you can't just go ahead and make a rash
17 decision.  Like there has to be some type of legal
18 something.  I -- yeah.  You can't just kick somebody
19 out just because someone says something.
20 BY MR. JOHNSON:
21  Q.   Okay.
22  A.   Whether it's sexual harassment or not.
23 Yeah.  There has to be some type of, yeah, legal
24 police report something.  Yes.
25  Q.   Okay.  So did you always need a police

Page 20

1 report in order to evict a tenant?
2   A.   It depends on the case, but no, no, you
3 don't always need that to evict a tenant.  No.
4 Depending on like their rental history while they've
5 been living at the property would really depend.
6 That's like the -- the breaking factor if somebody
7 gets evicted or not, how they behave --
8   Q.   The --
9   A.   -- how they behave.
10  Q.   The history of their behavior?
11  A.   Exactly.  Yeah, exactly.
12  Q.   Okay.  Who was your supervisor when you
13 were at GMS?
14  A.   The supervisor that would be like right
15 above me would have been Maria Moldt.
16  Q.   Where did she work?
17  A.   She worked at Grand Management as well.
18  Q.   Down in Coos Bay?
19  A.   Yes.  She was my regional manager, so she
20 would have been the head above me.
21  Q.   Okay.
22  A.   Yeah.
23  Q.   And was she the, your direct supervisor
24 the whole time you were there?
25  A.   No.  Jerry Mascolo was.

Page 21

1   Q.   After Maria?
2   A.   Yes, but essentially, not always, I would
3 skip her and go to Jerry directly.
4   Q.   So at some point, did Maria leave while
5 you were there?
6   A.   Yes.
7   Q.   Okay.  And then Jerry filled in for her?
8   A.   No.  Jerry was her supervisor.  So either
9 way he would have been participating in her job.
10  Q.   Okay.  Did -- was there someone who
11 replaced Maria Moldt who was your direct supervisor?
12  A.   No, it was -- no.
13  Q.   Okay.  How far apart are Golden Eagle to
14 -- and Evergreen?
15  A.   How far apart?  I don't know about mile-
16 wise.  I would definitely say like less than 10
17 miles for sure.
18  Q.   They're both in Tillamook?
19  A.   Yeah, they're both very local, like less
20 than 0 minutes.
21  Q.   And how many units does each place have?
22  A.   In total it would be like 93, 94 units.
23 Evergreen has, I think like 30.  Okay.  I guess I'd
24 say like they both have like 35, 37 units.
25  Q.   Okay.

Page 22

```
 1    A.   So I guess like everything was 70 units.
 2    Q.   Where did you live when you were working
 3 there?
 4    A.   Where did I live?  At Evergreen.
 5    Q.   What was your apartment number?
 6    A.   It was 2 -- it was 2A.
 7    Q.   Did anyone live with you?
 8    A.   Yes, my husband and my son.
 9    Q.   Okay.  How old was your son back then?
10    A.   My son was first grade kindergarten age,
11 so like four, five years old.
12    Q.   Okay.  Did you use a cell phone when you
13 were working at GMS?
14    A.   Yes, I did.
15    Q.   Was that your own cell phone?
16    A.   Yes, my own personal cell phone.
17    Q.   Is that the one you still have?
18    A.   Not the same cell phone, no.  And not the
19 same number.
20    Q.   Okay.  Do you remember what the number was
21 back then?
22    A.   Hey, man.  Let's see.  971-707-6823.
23    Q.   Better than I would have done.  Did you
24 use -- did you text on that phone for work purposes
25 when you were working there?
```

Page 23

```
 1    A.   Yes, I did.  Yes, my supervisors --
 2    Q.   Okay.
 3    A.   -- text.  Yeah.
 4    Q.   Did you use any other phones besides that
 5 one when you were working there?
 6    A.   Yeah, like my office phone.  Yeah.
 7    Q.   Okay.  And that was a landline?
 8    A.   Yes.  Yeah.
 9    Q.   Okay.  So I assume you did not text on
10 that phone?
11    A.   No.  No.  You can also text through
12 AppFolio, which is one of the online platforms that
13 we use.
14    Q.   Okay.  I'm going to ask you about that.
15    A.   Okay.
16    Q.   Have you tried to get your texts from that
17 old phone, as part of this lawsuit?
18    A.   No.
19    Q.   Has anyone asked you to do that?
20    A.   No.
21    Q.   Okay.  Did you ever text with other
22 tenants on that phone?
23    A.   Oh, on my personal cell phone?  No.
24    Q.   Like you never texted John McKnight?
25    A.   Personal cell phone, no.  He did not have
```

Page 24

```
 1 my personal cell phone number.
 2    Q.   Okay.  So nobody -- none of the tenants
 3 had yours?
 4    A.   No.
 5    Q.   Okay.
 6    A.   Uh-uh.  Actually, I will correct that.
 7 One person does have my cell phone or did have my
 8 cell phone number at the time, which was Patsy.  She
 9 got it off of a note I had left there when I was
10 doing a birthday party for my son so that she could
11 let me know if there were any issues.
12    Q.   Okay.
13    A.   So at that -- at that point she did have
14 my cell phone number.
15    Q.   Okay.  Did she ever text you?
16    A.   No.  No.  There was never any
17 communication between her.
18    Q.   Okay.  Did -- do you remember what your
19 email that you used?
20    A.   It's the same one that I have now.
21 Simplybliss27 --
22         MS. MANDT:  Just hold on -- hold on.
23         THE DEPONENT:  Oh, sorry.
24         MS. MANDT:  Let him fully ask a question
25 before you jump in.
```

Page 25

```
 1         THE DEPONENT:  Sorry.  Go ahead.
 2 BY MR. JOHNSON:
 3    Q.   What was -- what was the email that you
 4 had back then?
 5    A.   For personal use?
 6    Q.   Yes.
 7    A.   Yeah, simplybliss217@gmail.com.
 8    Q.   And did you use that email to communicate
 9 with other GMS employees during that time?
10    A.   Yes.
11    Q.   Okay.  And have you gone back and tried to
12 find the emails from that period of time off of that
13 email address?
14    A.   No.  I've never needed to go back, no.
15    Q.   Okay.  Did you have a work email?
16    A.   Yes.
17    Q.   Do you remember what that was?
18    A.   My work email should have been -- it would
19 have been -- yeah, I think when I first started it
20 was like goldeneagle2@gmail.com and then my email
21 ended up getting changed.  The new one was -- I
22 think it was evergreengardens something @gmail.com.
23    Q.   Okay.
24    A.   Oh, and then there's one more.  The email
25 we advertise for Craigslist, that's Tillamook
```

Page 26

1  Properties, tillamookproperties@gmail.com.
2      Q.  Okay.  And did you just have one at a
3  time?
4      A.  When I first started, it was the
5  goldeneagle2 and evergreengardens.  They had their
6  own emails separate.
7      Q.  Okay.
8      A.  And then we merged those two together,
9  which was tillamookproperties and it was just
10 tillamookproperties for the remainder of my
11 employment.
12     Q.  Okay.  Do you still have those emails?
13     A.  No.  No.
14     Q.  You haven't had access to that since,
15 right?
16     A.  I don't have access to them.  They may --
17 might still exist, yes.
18     Q.  Okay.
19         THE REPORTER:  Just wait for him to finish
20 his question before you answer.
21         THE DEPONENT:  Okay.
22         MR. JOHNSON:  Yeah.
23         THE REPORTER:  Thank you.
24 BY MR. JOHNSON:
25     Q.  Sorry.

Page 27

1      A.  No, it's okay.  You're good.
2      Q.  My -- my bad too.
3      A.  You don't need to apologize.
4      Q.  I mean, it's how normal people talk, but
5  --
6      A.  It's okay.  You're fine.
7      Q.  -- Court Reporter.
8          When you started -- do you remember when
9  you started at GMS?
10     A.  When I started employment?  No, not
11 really.
12     Q.  Is it --
13     A.  I know the season.  It's the wildfire
14 season because that's --
15     Q.  Yeah.  Was it possibly September 15th,
16 2020?  Like I saw that somewhere.
17     A.  Actually, yeah.  Give or take around
18 there.  Yeah.
19     Q.  And you were there for just over a year?
20     A.  Yeah, a little bit over a year.
21     Q.  Okay.  When you started at GMS, did anyone
22 provide you with information about like, what was
23 going on at the properties?
24         MS. MANDT:  Object to form.  What was
25 going on at the properties?  What does that mean?

Page 28

1          MR. JOHNSON:  Well, I don't really know
2  what it means.
3  BY MR. JOHNSON:
4      Q.  So did -- like when you -- when you were
5  onboarded, when you started, did somebody like sit
6  down with you and talk to you about ongoing issues
7  at the property?
8          MS. MANDT:  Object to form.
9          THE DEPONENT:  I can still answer that?
10         MS. MANDT:  Yeah, you can.
11         THE DEPONENT:  Yes.  Yes.
12 BY MR. JOHNSON:
13     Q.  And do you remember who that was?
14     A.  My supervisors, Jerry and Maria.
15     Q.  Okay.  And did they tell you about like
16 any ongoing disputes between tenants?
17     A.  No, because there weren't any ongoing
18 disputes.
19     Q.  Okay.  Did they tell you about any
20 previous complaints that tenants had made about one
21 another before you started?
22         MS. MANDT:  Object to form.
23         THE DEPONENT:  No.
24 BY MR. JOHNSON:
25     Q.  Did anyone inform you when you started

Page 29

1  that a couple of women had gotten restraining orders
2  against John McKnight?
3      A.  No.
4      Q.  Did anyone inform you that John McKnight
5  had been accused of sexual assault by someone who
6  had your job before you?
7      A.  No.
8      Q.  Did Jerry or Dawn say anything about Patsy
9  Jay when you started?
10     A.  No.  No.
11     Q.  Okay.
12     A.  No.
13     Q.  I -- I just --
14     A.  No.
15     Q.  So when you were working at Grand
16 Management, was John McKnight an employee there?
17     A.  No.
18     Q.  Okay.  Do you know if he was ever an
19 employee?
20     A.  Yes.  He was like maintenance.
21     Q.  Do you remember when that ended?
22     A.  Probably like -- I don't know.  No, I
23 don't know.
24         MS. MANDT:  Don't guess if you don't know.
25         THE DEPONENT:  Yeah.  I don't know.

Page 30

1  BY MR. JOHNSON:
2      Q.  It was before you started?
3      A.  Yes.
4      Q.  Okay.  Do you know when you were there if
5  he had keys to other apartments in the complex
6  besides his own?
7      A.  No.  He did not have access to that.  No.
8      Q.  Okay.  When you were at Evergreen, do you
9  know if Mr. McKnight had any romantic or intimate
10 relations with other tenants?
11     A.  No.  Yeah -- no.  I'm sorry.  No.
12     Q.  Did you get complaints from other
13 residents about Mr. McKnight while you were working
14 there?
15     A.  Yeah.
16     Q.  Do you remember the first one?
17     A.  The very first one?  No, I could not tell
18 you.
19     Q.  Just tell me -- can you just tell me what
20 -- which complaints you remember about Mr. McKnight
21 when you were working there?
22     A.  I can --
23         MS. MANDT:  I'm going to object to the
24 form, but you can answer the question.
25         THE DEPONENT:  Like any complaint, every

Page 31

1  single one?
2  BY MR. JOHNSON:
3      Q.  If you -- I mean, I don't want -- you
4  don't have to go into detail, but if you can just --
5  if you remember a person who made a complaint and
6  just generally what it was about.
7      A.  I mean, we all know Patsy made complaints
8  about John.
9      Q.  Right.
10     A.  That was towards the end of my employment,
11 yes.  One of the complaints was that he went into
12 her unit and pushed his genitalia in her face after
13 they were both drinking.  Another complaint was --
14 this was after that, that Patsy had seen John doing
15 finger guns from his unit towards her unit window
16 because they're the direct path of each other.
17 Another complaint that she tried to put in was that
18 Patsy -- that John was following Patsy, sorry.
19         Patsy put in a complaint that John was
20 following her at the local Fred Meyers.  Actually,
21 it's going to be Safeway, to be exact.  There was
22 another complaint from a separate tenant that would
23 be -- sorry, I'm trying to think of her name.  I
24 cannot think of her name specifically.  I'm sorry.
25     Q.  Do you remember which unit she lived in?

Page 32

1      A.  Yes.  She lived in 9.  I -- this would
2  have been unit like 7A before the new tenant moved
3  in.  That John was in the back of the building
4  walking by everyone's bedroom windows.  And she
5  didn't feel comfortable with that.  He was walking
6  Patsy's dog.  Yeah.  I'm sorry.  I would say that's
7  it.
8      Q.  So you -- complaints by Patsy Jay and then
9  woman in --
10     A.  And then one --
11     Q.  -- 7A?
12     A.  Yeah.
13     Q.  And do you remember any other complaints
14 about Mr. McKnight, while you were working there?
15     A.  No, not at the moment.  I'm sorry.
16     Q.  Okay.
17     A.  I'm digging right now.
18     Q.  Did you ever see Mr. McKnight with a gun
19 on the property?
20     A.  Never.  Actually, to go back to your
21 previous question, there was one complaint that John
22 McKnight was seen with a weapon on the property as
23 well.  The police did come out and they looked at
24 his house and his car and, on his person, and they
25 could not find anything.  So it was just dropped, it

Page 33

1  was left alone.
2      Q.  Do you -- do you remember who made that
3  complaint?
4      A.  Patsy.
5      Q.  Okay.  I think you mentioned that it was
6  your understanding that both Mr. McKnight and Ms.
7  Jay were drinking during the incident that this
8  lawsuit is about.  Is that correct?
9      A.  That's what I was told.
10     Q.  Okay.  Did you ever see Mr. McKnight
11 consume alcohol or under the influence of alcohol
12 while you were working there?
13     A.  No.
14     Q.  Okay.  How about Patsy Jay?
15     A.  Yes.
16     Q.  Okay.  How often did you see her
17 intoxicated?
18     A.  In total from my entire period of knowing
19 her, I would only say two times.
20     Q.  Okay.  Regarding the incident that this
21 lawsuit is about, primarily, the -- the incident
22 we've talked about, the -- that you just described
23 between Mr. McKnight and Ms. Jay, do you know what
24 I'm talking about?
25     A.  Yeah.

Page 38

1  office hours or if I have to go to another apartment
2  complex, it'll be filed the next morning.
3      Q.  Okay.
4      A.  Yes.
5      Q.  And like, what kind of incidents warrant
6  an incident report?
7      A.  What kind?  Any incident, and especially
8  incidents that revolve like the police and stuff.
9  Like, well, I wouldn't say any incident.  I mean, it
10 tells you right here, type of incident injury,
11 property damage, police.  I mean there isn't other.
12 So I mean, I guess it would be anything very
13 important.
14     Q.  Okay.  So you wrote on -- in here, "No
15 injury sustained."  Do you mean no physical injury?
16     A.  Yes.  Yes.
17     Q.  Okay.  What do you remember about Ruth
18 Fulks, if -- if anything?
19     A.  She's just another tenant.
20     Q.  Okay.  So she lived on the property?
21     A.  Yes.  Uh-huh.
22     Q.  All right.  Was she with Patsy Jay when
23 Patsy came to you to talk -- to tell you about this?
24     A.  No.  She was not with me.  No.  Patsy came
25 to talk to me about this a few days later after I

Page 39

1  had called her and asked her to come to my office to
2  talk about it.
3      Q.  Okay.
4      A.  This is when the police came to my door.
5  That's when they notified me that this happened.
6      Q.  Oh, okay.  I understand.  So it says,
7  "Reported by Ruth Fulks and Patsy Jay."  But you --
8  you filled this out after --
9      A.  That's -- this is reported to the police.
10     Q.  Let me -- I'm sorry, let me back up and
11 finish that question.  So you -- you filled out this
12 report based on your conversation with the police?
13     A.  Yes.  That's what the incident report is
14 for.
15     Q.  Okay.  I just didn't understand because I
16 thought --
17     A.  Yeah.
18     Q.  It says up top, "Reported by Ruth Fulks
19 and Patsy Jay."  So I thought you were talking to
20 them about this.
21     A.  Oh, no.  This is my altercation with the
22 police involving the tenants.
23     Q.  Yeah.
24     A.  That's why the incident report is made
25 because there was a police altercation involving my

Page 40

1  tenants.
2      Q.  Yeah.
3      A.  So I have to go in description on why --
4      Q.  Okay.
5      A.  -- that happened.
6      Q.  So you were having an interaction with the
7  police about that and this is what this is?
8      A.  Yes.
9      Q.  Okay.
10     A.  Uh-huh.
11     Q.  All right.  That makes more sense now.  I
12 had a bunch of questions that you just answered.
13 Thank you.
14     A.  Yeah, no worries.
15     Q.  Do you remember when you talked with --
16 was it Officer Saddler?  Does that ring a bell?
17     A.  Yes.
18     Q.  Do you remember when that was?  Was it on
19 the 12th?
20     A.  It was on Sunday, the 11th.
21     Q.  Yeah.
22     A.  The date that's first on the incident
23 report.
24     Q.  And where was that conversation?
25     A.  At the apartment complex at my front door.

Page 41

1      Q.  Okay.
2      A.  Yeah.  Well, actually inside my unit.
3      Q.  Okay.  And after you talked to Officer
4  Saddler, did you talk to other residents about this
5  incident?
6      A.  I talked to Patsy and I talked to John
7  McKnight and I talked to Ruth Fulks about it, yes.
8      Q.  Okay.
9      A.  The people that are on the incident
10 report.
11     Q.  Did you talk to Carolyn Degon?
12     A.  No, I did not talk to Carolyn Degon about
13 this.  That would --
14     Q.  Did you talk to Shirley Rose?
15     A.  No.
16     Q.  Do you remember Officer Saddler telling
17 you that other women had been -- had made
18 allegations about John McKnight?
19     A.  That's --
20         MS. MANDT:  Object to form.
21         THE DEPONENT:  Yeah.  Could you actually
22 reword that one more time?  Sorry.
23 BY MR. JOHNSON:
24     Q.  Well, I'm just looking at page -- the
25 first page of this exhibit.  It says, "John began to

Page 42

1  brag about how he manipulates the other women in the
2  complex." And then in parentheses, "Carolyn Degon,
3  Shirley Rose."
4       A.   Yes.  This is me repeating what they're
5  telling me.  So when it says, "John began to brag,"
6  that's somebody telling me that John began to brag.
7  I'm just repeating what was said.
8       Q.   By Officer Saddler?
9       A.   Yes.  That's him repeating what he was
10 told by Patsy and Ruth.
11      Q.   Okay.
12      A.   That there's no one actually -- there's no
13 one actually saying that they saw him do that, other
14 than Patsy and Ruth.
15      Q.   Okay.
16      A.   So they're just repeating to the police
17 officer and he's repeating to me.
18      Q.   Got it.  So after you learned this, you
19 did not follow up with Carolyn Degon or Shirley
20 Rose?
21      A.   No.
22      Q.   Okay.  Did you ever get complaints from
23 Carolyn Degon or Shirley Rose about John McKnight?
24      A.   Carolyn Degon, yes.  But not Shirley Rose.
25      Q.   Is she the person that you were referring

Page 43

1  to in 7A or is that a different person?
2       A.   Actually, it is Carolyn Degon now I think
3  about it.  Yes, it is her.
4       Q.   Okay.
5       A.   And she does not live in 7A.  She lives in
6  7C.
7       Q.   Okay.  What did you do after you got this
8  report from Officer Saddler?
9       A.   Oh, I reported instantly to my -- my
10 supervisors.
11      Q.   And your -- was Maria your supervisor at
12 that time?
13      A.   It was Maria and Jerry.
14      Q.   Okay.
15      A.   They were like co-supervisors together.
16 Yeah.
17      Q.   Do you remember how you reported it to
18 them?
19      A.   Through my office, landline phone I
20 called.
21      Q.   Okay.
22      A.   And faxed this in.
23      Q.   Okay.  So on the second page of that
24 exhibit -- let's see here.  On the second page of
25 this exhibit, it says, "Management went to Patsy's

Page 44

1  unit to rekey her front door."  Was that -- why was
2  that?
3       A.   Because Patsy requested, and Grand
4  Management thought it was appropriate to have her
5  front door rekeyed because -- because John had a key
6  to her unit is what Patsy had said.
7       Q.   Okay.  And do you know how he got a key to
8  her unit?
9       A.   He gave -- she gave him a key.
10      Q.   Because he walked her dog?
11      A.   Yes.
12      Q.   Okay.
13      A.   I'm pretty sure John dog sitted (sic) for
14 her, not just watched her -- like, not just walk the
15 dog, but dog sitted.
16      Q.   When she was gone?
17      A.   Yes.
18      Q.   Okay.  Did you have any conversations with
19 Maria Mant?
20      A.   Is that her name?
21      A.   Maria Moldt.
22      Q.   Moldt?
23      A.   Yeah.  Sorry.
24      Q.   The name was familiar.
25      A.   Yeah.

Page 45

1       Q.   Did you have any conversations with Maria
2  Moldt or Jerry Mascolo about what to do in response
3  to this incident?
4       A.   Yes.  Yes, I did.
5       Q.   What do you remember about those?
6       A.   The conversations we were had was just to
7  communicate as clear as possible with Grand
8  Management to notify them what was going on, filing
9  everything that they can, rekey Patsy's unit, and
10 that they weren't able to do anything.  And specific
11 was that we were not able to move forward with any
12 sort of process with John without some type of
13 police report or like charges being pressed against
14 John.
15      Q.   Okay.
16      A.   Like, some type of order, safety order
17 something.
18      Q.   And who -- who was -- who was making that
19 decision?
20      A.   Jerry is the one that specifically told me
21 that.
22      Q.   Did -- did Jerry, as part of this
23 conversation, mention that other women had gotten
24 restraining orders against John McKnight in the
25 past?

Page 46

1       MS. MANDT: Asked and answered.
2       THE DEPONENT: I answered.
3  BY MR. JOHNSON:
4    Q.   Well, I think what I asked before was that
5  when you started at the job --
6    A.   Uh-huh.
7    Q.   -- did anybody tell you that. And you
8  said no. But when this happened in July of 2021,
9  did anyone mention that other women had gotten
10 restraining orders against John McKnight?
11   A.   I had already known by then.
12   Q.   Okay. How did you find that out?
13   A.   Me going through my tenants' files.
14   Q.   Okay.
15   A.   Yes.
16   Q.   Like AppFolio?
17   A.   Yes. And just their paper files as well.
18   Q.   Okay. So when this -- when you had this
19 conversation with Maria Moldt and Jerry Mascolo, did
20 it -- did it factor into what you did the fact that
21 this -- that there had been multiple women who had
22 accused John McKnight of sexual harassment?
23   A.   No. No. They're all separate. No. I --
24 I can't mix things, no.
25   Q.   Did anybody talk about giving him a 24-

Page 47

1  hour notice?
2    A.   Yes.
3    Q.   Who -- do you remember what was said about
4  that?
5    A.   We talked about giving him a notice
6  depending if everything worked out. Like if we got
7  the paperwork and things followed through --
8    Q.   A 24-hour notice?
9    A.   -- and Patsy followed through. And
10 specific not a 24-hour notice unless the paperwork.
11 So I would have to have like -- I don't know, like a
12 police report saying that there's proof or
13 something, and I cannot give that. My supervisor
14 has to do it.
15   Q.   Okay. Did he get any eviction notice as a
16 result of this incident report?
17   A.   He got a 14/30, which is like a repair
18 notice. So he --
19   Q.   Do you remember -- do you remember when
20 that was?
21   A.   I don't know the date. No, sir.
22   Q.   Okay. Do you remember Deborah Greaves?
23   A.   Yes.
24   Q.   Do you know anything about her
25 relationship with John McKnight?

Page 48

1    A.   Yes. I guess they --
2    Q.   Was there anything other than neighbors
3  that comes to mind?
4    A.   Friends.
5    Q.   Yeah.
6    A.   Or acquaintances, I guess.
7    Q.   Do you know if they were in a romantic
8  relationship?
9    A.   No.
10   Q.   You don't know?
11   A.   I don't know if anyone -- yeah.
12   Q.   Okay. I think that was asked and
13 answered. How did you learn that Deborah Greaves
14 had information about this incident?
15   A.   She came to me about it. She came to me
16 letting me know that Patsy had told her, or confided
17 in her that this was all a hox. That she made it up
18 to get back at John for not wanting to be in a
19 romantic relationship with Patsy. That's how I know
20 that Deborah knows something.
21   Q.   Okay. And do you know if Deborah Greaves
22 had spoken to John McKnight about this incident
23 before?
24   A.   Yes, I do know that.
25   Q.   What do you remember about that?

Page 49

1    A.   Debbie told me that she talked with John.
2  She told me that she felt for him because she knew
3  how Patsy could get and that she didn't think it was
4  right what Patsy was doing.
5    Q.   Okay. And did you record this
6  conversation with Deborah Greaves?
7    A.   I did record a -- yes, I did. Not this
8  whole conversation, but a portion of it, yes.
9    Q.   Okay. And did you record any other
10 conversations?
11   A.   No. That's the only conversation I've
12 ever recorded.
13   Q.   How come you recorded that one and not
14 like others when you were talking to people about
15 this?
16   A.   Because this pertained to like a legal
17 issue. This was after the police report and stuff
18 had already been made, and I wanted to be safe.
19   Q.   Okay. And did you relay this -- the
20 substance of this conversation to Officer Saddler?
21   A.   Yes.
22   Q.   And did you relay any other conversations
23 that you'd had with Patsy or John or anybody else to
24 Officer Saddler or --
25   A.   Yes.

**Page 50**

1  Q.  Okay.  Did you tell John McKnight what
2  Debbie Greaves said about Patsy Jay?
3  A.  No.
4  Q.  Okay.  I'm going to show you exhibit --
5      Can you mark this as 16?
6      (WHEREUPON, Exhibit 16 was marked for
7  identification.)
8      THE DEPONENT:  Thank you.
9  BY MR. JOHNSON:
10 Q.  You don't have to read this whole thing.
11 It's not your --
12 A.  It's all good.
13 Q.  -- document.  But I'm going to direct you
14 to page 99.  It says page 6 of 7 at the bottom, then
15 GMS --
16 A.  Yeah.
17 Q.  -- 00099.  So do you see up there the
18 first full paragraph that starts on 7/15/21?
19 A.  Okay.
20 Q.  Do you remember talking to an officer
21 named Barrett -- Barnett?
22     MS. MANDT:  Why don't you let her read it
23 before you --
24     MR. JOHNSON:  Okay.
25     THE DEPONENT:  Okay.

**Page 51**

1  BY MR. JOHNSON:
2  Q.  So you didn't talk to Officer Barnett.
3  This was -- this is about McKnight talking to
4  Officer Barnett.  Is that --
5  A.  Yeah, I have -- I have not spoken.
6  Q.  Okay.
7  A.  In this case, no, not here.
8  Q.  So it -- it looks like according to
9  Officer Barnett, John said he received the
10 information about Debbie Greaves from a person at
11 the apartment complex named Leondra.
12 A.  Yeah.  I read that.  Yes.
13 Q.  Is that not true?
14 A.  Honestly, I could not say it's not or it
15 isn't.  I don't know if he's specifically saying
16 that he is -- is he saying that he knows that Debbie
17 made the video for me?  Is that what this is saying?
18 Q.  I mean, I know as much about it as you do.
19 I guess --
20 A.  Honestly, I -- I can't tell you.  I can't
21 answer that.  I don't think so.  No.
22 Q.  So I think when I -- I -- when I asked you
23 if you told John McKnight about what Debbie Greaves
24 had said to you -- you said no.
25 A.  Yeah.  No, I didn't tell him.

**Page 52**

1  Q.  Okay.
2  A.  I can't -- I'm not able to cross
3  conversations between one tenant to another,
4  especially if there's gossip.  It just stirs for a
5  --
6  Q.  Yeah.
7  A.  -- unhealthy workplace.  So no.  I guess
8  so -- for -- to answer your question.  Yeah, I guess
9  he lied.
10 Q.  Okay.
11 A.  To state that, yeah.
12 Q.  Okay.  And then for the next one down, I
13 think is a conversation that you had with Officer
14 Saddler, and I'm just going to direct you to the
15 bottom of this.
16 A.  Okay.
17 Q.  There's a line that starts, "I spoke to
18 Leondra Coleman."  Do you see that?  It's like --
19 A.  Yeah, I see that.
20 Q.  Okay.  The next part of that says, "I
21 asked Leondra about John.  Leondra said there has
22 been many written reports about John harassing some
23 of the women that live in the apartment.  Leondra
24 said that there has been reports of John looking
25 through Windows and following them home.  Some have

**Page 53**

1  reported being followed at the store too."
2      So that -- is that -- were there any other
3  reports or incidents that you were talking about to
4  Officer Saddler besides the ones that you mentioned
5  to me earlier?
6  A.  No, those are all the same ones.
7  Q.  Okay.
8  A.  Yeah, they're all listed off.
9  Q.  Okay.
10 A.  Yeah, those are all the same ones.
11 Q.  So when you say, "There are many reports,"
12 do you remember how many approximately?
13 A.  With me specifically, I would say it would
14 be five to seven.  Before I became employed there,
15 there had already been at least five to seven
16 reports from before I was the manager.
17 Q.  So a total of 10 to 14?
18 A.  Yes.
19 Q.  Okay.
20 A.  Yes.  And these would all be from down to
21 an incident report to even just a note of one of the
22 tenants coming to the office and complaining, not
23 necessarily a formal complaint, but a verbal one.
24 We make notes of everything in their files.
25 Q.  When you went back and looked at the --

Page 54

1  did you go back and look through John McKnight's
2  file after you had started working there?
3      A.  Yes.
4      Q.  And did you read the allegations that the
5  former onsite manager, Cindy Fargar, had made about
6  him?
7      A.  Yes, I did read that.  I don't remember
8  everything, but I do remember reading that, yes.
9      Q.  Okay.  What -- what do you remember about
10 the nature of her allegations?
11         MS. MANDT:  Object to form.
12         THE DEPONENT:  I think it was that they
13 were like, kind of in cahoots, like they were dating
14 a little bit or like messing around.  And then
15 honestly, I couldn't really tell you the rest.  I
16 know that they were messing around.  I think that
17 either John took it too far somehow.  I'm -- I'm not
18 sure.
19 BY MR. JOHNSON:
20     Q.  Do you remember if she accused him of
21 threatening her with a gun?
22     A.  Oh, yeah.  That's what it is about.  Yes.
23 Yes.
24     Q.  Okay.  And do you remember if she accused
25 him of sexual assault?

Page 55

1      A.  No.  I don't know about the sexual assault
2  portion, no.
3      Q.  Did you ever read her restraining order
4  against him?
5          MS. MANDT:  Object to form.  Misstates the
6  record.
7  BY MR. JOHNSON:
8      Q.  Do you know if she got a restraining order
9  against him?
10     A.  Honestly, I don't know.  I don't know if
11 she got a restraining order against him.
12     Q.  So you've never seen that?
13     A.  No.
14     Q.  Okay.
15     A.  It wouldn't make sense because then --
16 yeah.
17     Q.  Why wouldn't it make sense?
18     A.  Just because she was the apartment manager
19 and he was a tenant, so I wouldn't see how that
20 relationship would work.
21     Q.  But you said they were in a sexual
22 relationship?
23     A.  I don't know.  No, I didn't say sexual.  I
24 said they might have been doing something together.
25 I couldn't tell you if it was sexual or just

Page 56

1  communicating or I don't know, being friends.  But
2  that's just from what was in the file.  Okay.  That
3  was what was written down.
4      Q.  I think I misinterpreted messing around.
5      A.  Yeah.  I'm not 100 percent sure.
6      Q.  Yeah.
7      A.  But yeah, I don't see how that would work
8  though if he was still a tenant there because I
9  mean, eventually he did stop working there, but he
10 still lived there.
11         MR. JOHNSON:  Okay.
12         Let's mark this as 17.
13         Wait a minute.  Let's see.  Let's mark.
14 Hold on a second.  Sorry.
15         Can I --
16         (WHEREUPON, Exhibit 17 was marked for
17 identification.)
18         THE REPORTER:  Yeah.
19         MR. JOHNSON:  Can you mark this one as 17?
20 Okay.
21         THE DEPONENT:  Thank you.
22         THE REPORTER:  Mm-hmm.
23 BY MR. JOHNSON:
24     Q.  Do you recognize this?
25     A.  Yes, I do.

Page 57

1      Q.  What is this?
2      A.  This is a complaint from Patsy Jay about
3  John.
4      Q.  Same incident we've been talking about?
5      A.  Yes.
6      Q.  Okay.  And did you ask her to fill out a
7  --
8      A.  Yes.  I asked her to fill out an incident
9  report, yes.
10     Q.  Okay.  And it looks like at the very end
11 of the second page there, she says, "Now I
12 understand others have had it done and it can't be
13 stopped unless someone charges."  Did you ask her
14 who else had had it done to them?
15         MS. MANDT:  Form.
16         THE DEPONENT:  No.
17 BY MR. JOHNSON:
18     Q.  Okay.
19     A.  I did not ask her who else, no.
20     Q.  Did you tell her that he can't be stopped
21 unless someone charges him with a crime?
22     A.  No.
23     Q.  Okay.  This is just her --
24     A.  Yeah.
25     Q.  -- giving her understanding?

LEONDRA COLEMAN                July 19, 2024                      58 to 61
76216

Page 58

1    A.  Yes.
2    Q.  Okay.  After this incident, I think you
3 mentioned that Ms. Jay complained to you about Mr.
4 McKnight making gun gestures toward her.  Is that
5 right?
6    A.  Yes.
7    Q.  How many times did she complain to you
8 about that?
9    A.  Once.
10   Q.  Okay.  And do you remember when that was
11 in relationship to this incident?
12   A.  I don't know the specific date, but it was
13 after the restraining order.
14   Q.  Okay.  Do you remember when she got a
15 restraining order?
16   A.  No.  I don't remember the date, no.
17   Q.  What -- what did you tell her when she
18 said that he was making gun gestures toward her
19 after she had a restraining order?
20   A.  I told her to just -- honestly, I told her
21 to ignore it.  I told her to try her best to just
22 stay to herself while all of this gets handled,
23 while all this works out.
24   Q.  Okay.  Had he been given his 30/14
25 eviction notice by then?

Page 59

1        MS. MANDT:  It's a 14/30.
2        THE DEPONENT:  It is 14/30.  But I am
3 going to say had he been given the 14/30 by the
4 finger gun incident?  That's the question?
5 BY MR. JOHNSON:
6    Q.  By the time she, yeah, complained to you
7 about the finger gun incident.
8        MS. MANDT:  Don't guess if you don't
9 recall.
10       THE DEPONENT:  Yeah.  I'm going to say, I
11 don't know.
12 BY MR. JOHNSON:
13   Q.  Okay.  Did you report the finger gun
14 incident to your supervisors?
15   A.  Yes.
16   Q.  Did you discuss it with any of your
17 supervisors?
18   A.  Yes.
19   Q.  Who did you discuss it with?
20   A.  Maria and Jerry.
21   Q.  Okay.  And does it refresh your
22 recollection?  Were -- was -- did anybody talk about
23 whether this might have been a repeat violation for
24 his eviction notice?
25   A.  That's what I'm trying to think as well.

Page 60

1    Q.  Yeah.
2    A.  That's why I'm saying no, no.
3    Q.  Was -- is the finger gun incident
4 something you would have put into --
5    A.  Yes, that would have been in AppFolio.
6    Q.  Okay.  Let me finish my questions.  That
7 is what I was going to ask.  So -- so you --
8    A.  Sorry.
9    Q.  -- you would have put that an AppFolio.
10 Would you have done an incident report about that?
11   A.  Yes.  Yes.
12   Q.  Did you, eventually -- I think you said
13 you -- you -- did you issue Mr. McKnight his 14/30
14 notice?
15   A.  Yes.  I did issue him that, yes.
16   Q.  Okay.
17   A.  And -- and -- and aside with my
18 supervisors.  I cannot do that alone.
19   Q.  Okay.  And -- and again, I think I've
20 asked this, but I can't remember the answer.  Did
21 you discuss with your supervisors the possibility of
22 giving him a 24-hour notice?
23   A.  Yes.  If everything was by the book.
24   Q.  Okay.
25   A.  Like if -- yeah.  If we had all the

Page 61

1 paperwork and everything followed the rules, yes.
2    Q.  Okay.  And who made the decision to give
3 the 14/30 notice?  Do you remember?
4    A.  Well, I mean, that question isn't really
5 asked right because no one else, I mean, the -- the
6 tenant and the issues would come into play on why a
7 notice is given.  So, I mean, I would have to write
8 the notice -- I guess me, because I would have to
9 write the notice regarding what they do.  But it has
10 to be approved by my supervisors.  So I guess my
11 supervisor.
12   Q.  So am I -- if I'm understanding correctly,
13 you talk -- you spoke with your supervisors about
14 the possibility of giving a 24-hour notice if
15 something happened with the paperwork in the future,
16 but there was a decision made, at least at this
17 moment --
18   A.  Mm-hmm.
19   Q.  -- to give him the 14/30.
20   A.  Yes.
21   Q.  Do you recall if that was your decision or
22 Jerry's decision or Dawn's decision or Maria's
23 decision?
24   A.  I mean, it would have to be Jerry's
25 because he would have to approve it.

Page 62

```
 1         MR. JOHNSON:  Okay.
 2         Are we at 18?
 3         THE REPORTER:  Yes.
 4         (WHEREUPON, Exhibit 18 was marked for
 5   identification.)
 6         MR. JOHNSON:  Oh, are you giving me
 7   originals back or you'll get those?
 8         THE REPORTER:  I'll grab those.
 9         MR. JOHNSON:  Oh my God.  I've walked out
10   with those so many times.  Somebody needs to check
11   me before I leave.
12         THE REPORTER:  We'll chase you down.
13   BY MR. JOHNSON:
14     Q.  This looks like a written complaint from
15   John McKnight to you.  Is that correct?
16     A.  Yeah.  Yes.  This is a complaint that John
17   had left at the office.
18     Q.  Do you remember him dropping it at the
19   office or getting it after he left it there?
20     A.  Yeah.  I remember finding it in my
21   doorstep.
22     Q.  Okay.  And just to direct you to the date,
23   8/14/21, that's about a month after the 7/11/21
24   incident.  Does that sound about right?
25     A.  Yes.
```

Page 63

```
 1     Q.  Okay.  And when he -- so on page -- second
 2   page of this document, is that -- as far as you
 3   know, is that Mr. McKnight's handwriting?
 4     A.  The -- yeah.
 5     Q.  Okay.
 6     A.  I would say, yeah.
 7     Q.  So there, in the third line there, he says
 8   something about there's another Eleanor in 5B.  Do
 9   you have any memory of what he was talking about
10   there?
11     A.  He is talking about a letter that Patsy
12   Jay had written to Eleanor in 5B.  That's a letter
13   that Patsy's trying to turn Eleanor against John.
14   Eleanor is another really older lady on the
15   property.
16     Q.  Okay.  So he's -- he's attaching this
17   other letter to -- by this person, Monte?
18     A.  Yes.
19     Q.  To this person, Monte, and saying, "Oh,
20   this is another one like the one that Patsy sent to
21   Eleanor in 5B"?
22     A.  Yes.
23     Q.  Okay.  I got it.  Further down that page
24   he -- Mr. McKnight, there's a little quote there.
25   It says, "Gee whiz, I wonder which member of
```

Page 64

```
 1   management is strongly encouraging me to prosecute.
 2   Man, he's a glutton for punishment.  Classic bully."
 3   Do you have any idea who Mr. McKnight is talking
 4   about there?
 5         MS. MANDT:  Object to form.  Calls for
 6   speculation.
 7         THE DEPONENT:  Do I answer that?
 8         MS. MANDT:  Yeah.
 9         THE DEPONENT:  Jerry.
10   BY MR. JOHNSON:
11     Q.  Had you spoken to Mr. McKnight about Jerry
12   before this?
13     A.  Mr. McKnight has said things to me about
14   Jerry before this.
15     Q.  Okay.  That's how you knew he was
16   referring to Jerry?
17     A.  Yes.
18     Q.  Okay.  And then he asks for a face-to-face
19   with Kristin.  Is that Kristin Smith at GMS?
20     A.  Yes.
21     Q.  Do you know if they had -- do you know if
22   they had a face-to-face about this?
23     A.  I don't know.  I am unaware of that.
24     Q.  Okay.  And then there's this letter that I
25   believe is from Ms. Jay to someone named Monte, and
```

Page 65

```
 1   I think you said Monte was another tenant out there?
 2     A.  Yes.
 3     Q.  Okay.  And do you -- did he live in 11B?
 4     A.  Yes.
 5     Q.  Okay.  On the second to last page of her
 6   letter, there's some stuff written along the side of
 7   it.  Is that Mr. McKnight writing on Ms. Jay's
 8   letter, if you know?
 9     A.  Oh, like if -- if this is John's writing
10   here?
11     Q.  Yeah.  On the side.
12         MS. MANDT:  Well, it calls for
13   speculation, but you can answer.  Yeah.
14         THE DEPONENT:  Yes, that's John.
15   BY MR. JOHNSON:
16     Q.  Okay.  And so he -- did he complain to you
17   about her -- about Ms. Jay looking at him with
18   binoculars?
19     A.  Yes, he did.
20     Q.  Okay.
21     A.  There should also be a written complaint
22   about that as well.
23     Q.  From him to you?
24     A.  From him to Grand Management, but yes.
25     Q.  Okay.  And then shortly after you got this
```

Page 66

```
 1  letter from, or this complaint from Mr. McKnight,
 2  did you issue an eviction notice to Ms. Jay?
 3       A.   Sorry, what was the question again?
 4       Q.   Shortly after you got the August 14th,
 5  2021 complaint from Mr. McKnight --
 6       A.   Uh-huh.
 7       Q.   -- did you issue an eviction notice to Ms.
 8  Jay?
 9            MS. MANDT:  Object to form.
10            THE DEPONENT:  She got probably a 14/30,
11  not an eviction notice.
12  BY MR. JOHNSON:
13       Q.   So why are you saying that's not an
14  eviction notice?
15       A.   Well, because a 14/30 -- eviction notice
16  is like a notice stating that you are evicted and
17  you have to vacate between this timeframe.  And a
18  14/30 is a -- a notice to fix the problem.  Your
19  attempt to not get evicted.  If you don't fix the
20  problem, or I guess you'd say the problem keeps
21  happening, then you will get evicted and you'll have
22  a whole different notice and everything before the
23  eviction is actually there or done.
24       Q.   Okay.  What do you remember about the
25  reason for that 14/30 notice that you gave Ms. Jay?
```

Page 67

```
 1       A.   The reason --
 2            MS. MANDT:  Well, I'm going to object to
 3  form because it misstates her testimony.  She said
 4  probably.  She did not say she did.
 5            THE DEPONENT:  What was the question
 6  again?
 7  BY MR. JOHNSON:
 8       Q.   So, do you remember if you ever gave Ms.
 9  Jay a 14/30 notice?
10       A.   Yes.
11       Q.   And do you remember what the reason for
12  that notice was?
13       A.   Multiple reasons.  But one of the reasons
14  was that she didn't stop watching John through the
15  window with binoculars.
16       Q.   Okay.  What are -- what do you recall
17  about the other reasons for giving that notice?
18       A.   Well, the other reasons would have been
19  her also not following through with her commitment
20  to keep her front patio up to the lease standards.
21  And then there would have also been sending letters
22  to the other -- the other tenants, the -- the
23  disturbing of other tenant's peace regarding the
24  situation.
25       Q.   Okay.  Do you remember anything else about
```

Page 68

```
 1  that?
 2       A.   About the --
 3       Q.   About the --
 4       A.   -- the letter?
 5       Q.   The 14/30 notice.  Yeah.
 6       A.   She ended up fixing all the things, so
 7  that's what I remember.
 8       Q.   Okay.
 9       A.   All the requirements.
10            MR. JOHNSON:  We at 19?
11            (WHEREUPON, Exhibit 19 was marked for
12  identification.)
13            THE REPORTER:  Correct.
14            MR. JOHNSON:  Oh, sorry.
15            THE REPORTER:  No problem.
16            MR. JOHNSON:  You get paper cuts a lot?
17            THE REPORTER:  Actually, no.
18  BY MR. JOHNSON:
19       Q.   I'm going to show you an exhibit that's
20  been marked Number 19.
21       A.   Okay.
22       Q.   Is this the document that you were
23  referring to as the 14/30?
24       A.   No.  The 14/30 states it's a 14/30.
25       Q.   Do you recognize this document?
```

Page 69

```
 1       A.   Yes.  I do know this.
 2       Q.   What is this?
 3       A.   This is the intent to evict notice.  This
 4  is what you get after you get a 14/30 when the
 5  problems have continued, the problems that are
 6  listed on your 14/30.
 7       Q.   So this is an eviction notice?
 8       A.   No.  There will be one more before this
 9  that actually states the eviction has been put in
10  process.
11       Q.   Okay.  So -- but this document is called
12  Notice of Intent to Evict?
13       A.   Yes.  This means that if you don't follow
14  through with actually fixing the cures here on the
15  -- the second to last page, that the eviction will
16  be put in, like to the courthouse.
17       Q.   So Ms. Jay got some -- a 14/30 notice
18  prior to getting this?
19       A.   Yes.  Yes.
20       Q.   Okay.  Did you issue this --
21       A.   No.
22       Q.   -- this notice to Ms. Jay?
23       A.   Yes.
24       Q.   Did you write it?
25       A.   Me and Don.
```

Page 70

```
 1    Q.   So you consulted with Dawn Cockrum about
 2  this?
 3    A.   Yes. Dawn Cockrum. Yes. Yes.
 4    Q.   Anyone else?
 5    A.   Jerry Mascolo would have also been in on
 6  this as well, like consulted.
 7    Q.   Okay.
 8    A.   Yeah. For verbiage.
 9    Q.   And do you remember if there was a
10  particular person who made the decision to issue
11  this notice?
12    A.   In specific, it would have been Dawn and
13  Jerry. That's a joint decision. Yeah.
14    Q.   Okay. Were you aware at the time that
15  this notice was issued that Ms. Jay is a person with
16  disabilities?
17    A.   Wait, ask -- sorry, what was that again?
18    Q.   Were you aware at the time that this
19  notice was issued that Ms. Jay was a person with
20  disabilities?
21    A.   Yes.
22    Q.   How did you know that?
23    A.   Because she was my tenant and I could see
24  that she was in a wheelchair.
25    Q.   Okay. At the bottom of page 281, which I
```

Page 71

```
 1  guess is the third page of this, there's a
 2  description of May 13, 2021, management posted a
 3  notice. Is that the 14/30 that you were referring
 4  to?
 5    A.   No. No. That would just be a regular --
 6  that would just be like a regular notice. It would
 7  not be called a 14/30. That's just me letting you
 8  know that there's a problem you have to fix. That
 9  hasn't even gone down to the -- the three strikes
10  rule kind of thing.
11    Q.   So this notice that you're referring to on
12  May 13th was not any kind of eviction notice? It
13  was just like a here's the rules, you're breaking
14  them?
15    A.   Yes, exactly. Yes.
16    Q.   Okay. Like a warning?
17    A.   Yes. Exactly, a warning.
18    Q.   Okay. Do you remember what she had on her
19  front porch back in May?
20    A.   Yeah. That would have been the chair.
21  The -- it's like a push chair. It's not a
22  wheelchair, but you push it while you walk.
23    Q.   Okay.
24    A.   Like assisted chair, you would call.
25    Q.   Did she tell you why she kept it on her
```

Page 72

```
 1  front porch?
 2    A.   She kept it on her front porch because she
 3  didn't have space in her unit for it.
 4    Q.   Okay. And did she need it to get around
 5  as a walker?
 6    A.   I couldn't tell you that. I don't know
 7  her physical condition.
 8    Q.   Okay.
 9    A.   But no.
10    Q.   What do you mean?
11    A.   I would assume not, no.
12    Q.   You would assume she didn't need it?
13    A.   No.
14    Q.   Okay.
15    A.   Or that she couldn't use it because it's a
16  walker and she was in a motorized chair.
17    Q.   Oh.
18    A.   And had complained to me various times
19  that she could not use her legs.
20    Q.   Okay. So you never saw her using a
21  walker?
22    A.   I've never seen her walk before.
23    Q.   Okay. But it was her walker?
24    A.   Yes. I would assume so. And she said so.
25  Yes, it's her walker.
```

Page 73

```
 1    Q.   Okay.
 2    A.   Yeah.
 3    Q.   So I'm going to walk through some of these
 4  dated incidents. So the next one is July 30th,
 5  2021. Do you see that?
 6    A.   Okay. Yeah.
 7    Q.   Do you remember -- so do you remember this
 8  incident?
 9    A.   Yes. I do remember -- I remember Patsy
10  coming to me regarding this incident. Yes.
11    Q.   So you weren't there?
12    A.   I was not there, no.
13    Q.   Okay. And did you write the part that's
14  bold and underlined -- underlined there?
15    A.   I did not specifically write that, no.
16    Q.   Do you know who did?
17    A.   Yes. Dawn.
18    Q.   Okay. So did you know at this time that
19  Patsy Jay had a restraining order that said Mr.
20  McKnight had to stay 500 feet away from her?
21    A.   I did know that, yes.
22    Q.   Okay. Was it your understanding that she
23  also had to stay 500 feet away from him pursuant to
24  this order?
25    A.   Yes.
```

Page 74

1  Q. So she could violate the order if she came
2  within 500 feet of him?
3  A. Yes. Yes.
4  Q. Okay. Did you tell Ms. Jay that she
5  needed to stay out of the community room if Mr.
6  McKnight was in there?
7  A. I personally did not state that. The
8  order did right here.
9  Q. Okay.
10 A. Yeah.
11 Q. At the top of the next page, there's an
12 incident from August 11th, 2021 involving Ms. Jay's
13 caretaker. Do you remember that?
14 A. Oh, yes. I remember that. Yeah.
15 Q. What do you recall about that incident?
16 A. I -- I think her name was Rebecca.
17 Patsy's caretaker, came to my office. She was
18 banging on the door. I let her in. She was just
19 really mean, yelling at me, calling me names, saying
20 I wasn't doing my job. And that the process wasn't
21 moving fast enough for Patsy to feel safe.
22 Q. And did you write this part of the
23 eviction notice?
24 A. Which part?
25 Q. Just the entry under August 11th, 2021.

Page 75

1  A. The entire thing? Between me and Dawn, it
2  was both of us.
3  Q. Okay. But the only people that were
4  present for this were you and -- I'm sorry, what was
5  the caregiver's name?
6  A. Rebecca.
7  Q. Rebecca. Is that right?
8  A. Yes.
9  Q. Okay.
10 A. Were just, me and Rebecca were together
11 for this. Yeah.
12 Q. Okay. And it -- so did Rebecca say to you
13 that you were not following up on John's daily
14 harassment?
15 A. She said that to me.
16 Q. Okay.
17 A. Yes.
18 Q. Okay. And prior to this, were you aware
19 that Patsy Jay was saying that John was harassing
20 her every day?
21 A. Yes, but I told Patsy that she -- she
22 knows there's a process for me to do anything. I
23 can't do anything just verbal. I have to have a --
24 I have to have a written complaint from -- from
25 Patsy to start anything.

Page 76

1  Q. Okay.
2  A. That's for every single encounter that
3  somebody's doing wrong. I need a written complaint
4  first because word of mouth means that I can't do
5  anything with that.
6  Q. Okay. But -- but Patsy Jay got an
7  eviction notice for this, right?
8     MS. MANDT: Object to form.
9     THE DEPONENT: No. Patsy Jay got an
10 eviction notice for her caretaker verbally harassing
11 me in my office, alongside the other issues.
12 BY MR. JOHNSON:
13 Q. Okay. Did you follow up on this
14 allegation that the -- that Rebecca is making about
15 John's daily harassment?
16 A. What do you mean follow up on the
17 allegation?
18 Q. Like did you ask her to put it in writing
19 or?
20 A. I asked him to put in written complaints
21 for anything that they need to tell about John.
22 Q. Okay.
23 A. It needs to be a complaint.
24 Q. Okay.
25 A. It needs to be them filing that he did

Page 77

1  something wrong.
2  Q. Okay. And did you get a report about the
3  finger gun gesture?
4  A. For the finger gun incident? Did I get a
5  report for that? Yes, I did. I'm sure I got a
6  written report, yes.
7  Q. Okay. Do you know if you got other
8  reports from Jay or -- or from Patsy or Rebecca
9  about John harassing her after she'd gotten the
10 restraining order?
11 A. No. No.
12 Q. The next one, I think we've covered August
13 16th. Did -- was it -- was it Mr. McKnight who
14 complained about Patsy Jay and the binoculars?
15 A. Yes. It was -- yes, it was. And then
16 Monte -- Monte Dunn, who was the guy from the other
17 letter had stated that he witnessed Patsy watching
18 John.
19 Q. Okay. Other than Patsy watching John,
20 were there any allegations that she was looking at
21 anybody else with binoculars?
22 A. No. She was only looking at John.
23 Q. Okay.
24 A. Yeah. I didn't get a written complaint
25 regarding anything else.

Page 78

1  Q. Okay. This -- and then the next thing is
2 the walker on the front patio. Did you -- you
3 personally saw the walker?
4  A. Yes.
5  Q. Okay.
6  A. Various times.
7  Q. And did you take this?
8     Let's go ahead and mark this. Oh, that's
9 going to go over here. Sorry. You get the one with
10 the sticker.
11    (WHEREUPON, Exhibit 20 was marked for
12 identification.)
13    THE DEPONENT: Thank you.
14    THE REPORTER: Mm-hmm.
15 BY MR. JOHNSON:
16  Q. Did you take that picture?
17  A. Yes.
18  Q. This is the -- why is this a lease
19 violation?
20  A. Because the walker is on her patio
21 section, and we cannot have anything that is not up
22 to six live plants or patio furniture. It has to be
23 specifically patio furniture that is allowed on the
24 front porch. It keeps the property more appealing.
25 And then also it's a fire hazard to have extra

Page 79

1 things by your windows and doors in the front of the
2 unit in case like fire department or something
3 needed to access quickly.
4  Q. And was this the only day that you saw the
5 walker out there?
6  A. No.
7  Q. Was it always out there?
8  A. The beginning of my employment, yes. It
9 was always outside. And then started trickling down
10 on things. This chair used to be on the other side
11 of her patio.
12  Q. Okay.
13  A. Over here.
14  Q. And you -- but the August 16th --
15  A. August 16th pertains to this picture.
16  Q. August 17th. Yeah. And that was right
17 after Ms. Jay's caregiver had complained to you
18 about not dealing with the daily harassment?
19    MS. MANDT: Object to form.
20    THE DEPONENT: No.
21 BY MR. JOHNSON:
22  Q. But it -- there's just six days apart,
23 right?
24  A. Yes, but this like I had said, had been
25 previously on the other side of the yard. So Patsy

Page 80

1 had knowledge that it wasn't supposed to be there,
2 so she moved it on the other side so it could be
3 more concealed by the giant bush out front, which
4 she knows is still breaking the -- the cure to her
5 conditions.
6  Q. So what did you see on August 17th that
7 was different than the preceding days when you --
8 did you always do a walkthrough of the property
9 every day?
10  A. Yes. Every morning.
11  Q. Okay.
12  A. Yes. This chair was on the other side of
13 her patio.
14  Q. And that was not a lease violation?
15  A. No, it was. This isn't the first time
16 she's gotten a notice regarding this being outside.
17 So she's aware that she's breaking it and now she's
18 moving it back and forth, which she knows it just
19 shouldn't be outside in the first place. This is
20 her second time, actually, honestly, this would be
21 her fourth time being told about this chair because
22 I have verbally told her twice that this cannot be
23 outside.
24  Q. Okay.
25  A. Prior to anything with John McKnight.

Page 81

1  Q. Did -- after -- after getting this
2 eviction notice, did Ms. Jay ask for a reasonable
3 accommodation for her disability?
4  A. For the chair in specific?
5  Q. I mean, do you remember any request for
6 reasonable accommodation about this eviction notice?
7  A. For the chair -- for the chair.
8  Q. For the chair?
9  A. Yes.
10  Q. And did -- what did you do with that
11 request?
12  A. I have to fax that in to my supervisor and
13 then they handle that. They just give me the
14 results and then I print it and post it.
15  Q. Do you remember the results?
16  A. I do not specifically remember the
17 results, no.
18  Q. But it wasn't your job to grant or deny
19 reasonable accommodations?
20  A. No, it was not my job to do that.
21  Q. Was it Jerry Moscalo's?
22  A. It was Dawn's job, but she would have to
23 consult with Jerry.
24  Q. Okay.
25  A. But it was Dawn -- Dawn Cockrum's job for

Page 98

1  A.  If he got the 500 feet thing figured out,
2 he would be able to come back and still stay there
3 within that timeframe.  He has until October 31st to
4 figure out the 500 feet thing.
5  Q.  Okay.
6  A.  For him to be able to be back on property.
7  Q.  So again, I feel -- I'm sorry if I've
8 already asked this.
9  A.  It's okay.
10  Q.  Did he -- did -- did Mr. McKnight get any
11 kind of eviction notice or 14/30 or a 30-day follow
12 up -- follow up notice because he violated the
13 restraining order?
14      MS. MANDT:  Object to form.  Asked and
15 answered.
16      THE DEPONENT:  Honestly -- sorry, I did
17 not input something here.  It would say like, John
18 received a notice for this and it doesn't say that.
19 So I would -- I don't know.  I couldn't -- I don't
20 know.
21 BY MR. JOHNSON:
22  Q.  So -- so if Mr. McKnight got an eviction
23 notice, that would be something that would go into
24 AppFolio?
25  A.  Yes.  Yes.  It would state like the day he

Page 99

1 received a -- a notice for this.  Yeah.
2  Q.  Okay.
3  A.  It would be in there.
4  Q.  But again, going back to this document,
5 which maybe was like two of the --
6      THE REPORTER:  I believe it's like --
7      THE DEPONENT:  The courtesy letter?
8 BY MR. JOHNSON:
9  Q.  Pre-eviction warning.  So this was given
10 to Ms. Jay --
11  A.  Uh-huh.
12  Q.  -- the day after Mr. McKnight was taken to
13 jail for violating the restraining order.  So he
14 didn't get any notice, but she got this notice.  Is
15 that -- is that a correct assessment?
16  A.  I couldn't say that because I don't know
17 if John got a notice or not.  Like I would have to
18 see his paper file because sometimes when things are
19 hectic, some things just don't get logged.  And
20 unfortunately, that does happen.  So I could not
21 answer that.  I don't know if he got a notice or
22 not.  He could have gotten a notice.
23  Q.  But you don't recall?
24  A.  Honestly, I don't.  From the top of my
25 head, I don't recall if he got a notice for this

Page 100

1 specific date.  Like there's a lot going on here and
2 there was court and stuff too.  So yeah, I cannot
3 tell you.
4  Q.  Okay.
5  A.  I'm sorry.
6      MR. JOHNSON:  That's fine.
7      Let's take a super quick break.  I think
8 we're almost done.  I'm going to get you out of here
9 in --
10      THE DEPONENT:  Okay.
11      MR. JOHNSON:  -- just a couple of minutes.
12      THE REPORTER:  Okay.  We're off record at
13 10:49 a.m.
14      (WHEREUPON, a recess was taken.)
15      THE REPORTER:  We're back on record at
16 10:52 a.m.
17      MR. JOHNSON:  Let's mark this whatever's
18 next.
19      (WHEREUPON, Exhibit 25 was marked for
20 identification.)
21      THE REPORTER:  24.
22      THE DEPONENT:  25.
23      MR. JOHNSON:  Somebody's keeping track.
24      THE REPORTER:  Yeah, 25.
25      THE DEPONENT:  Okay.

Page 101

1      THE REPORTER:  There you go.
2 BY MR. JOHNSON:
3  Q.  Is this -- do you recognize this?
4  A.  Yes.
5  Q.  What is it?
6  A.  This is John's 30-day notice.
7  Q.  And did he vacate after 30 days following
8 this?
9  A.  He vacated before 30 days, but yes.
10  Q.  Okay.  Did you ever see him after he gave
11 this notice?
12  A.  Yes.  I did see him after he gave this
13 notice.
14  Q.  Was he like moving out or?
15  A.  Yes.  It was the day I got his keys.
16  Q.  Okay.  Do people call you Leo?
17  A.  Yes.
18  Q.  So this is how his tenancy terminated.  He
19 gave a 30-day notice to Grand Management?
20  A.  This -- yes.  That's how he terminated it.
21 Yeah.
22      MR. JOHNSON:  Last exhibit here.
23      (WHEREUPON, Exhibit 26 was marked for
24 identification.)
25 BY MR. JOHNSON:

LEONDRA COLEMAN                    July 19, 2024                    113
76216

CERTIFICATE

1
2
3       I, Rowan Folske, do hereby certify that I
4  reported all proceedings adduced in the foregoing
5  matter and that the foregoing transcript pages
6  constitutes a full, true and accurate record of said
7  proceedings to the best of my ability.
8
9       I further certify that I am neither related to
10 counsel or any party to the proceedings nor have any
11 interest in the outcome of the proceedings.
12
13      IN WITNESS HEREOF, I have hereunto set my hand
14 this 5th day of August, 2024.
15
16  *[signature]*
17
18 Rowan Folske
19
20
21
22
23
24
25