IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


PATSY JAY,

      Plaintiff,

v.                                    Case No.: 3:23-cv-656

GRAND MANAGEMENT SERVICES, INC., EVERGREEN GARDENS

LIMITED PARTNERSHIP, JERRY MASCOLO, LEONDRA COLEMAN,

and DAWN COCKRUM,

      Defendants.


DEPOSITION OF

DAWN COCKRUM


TAKEN ON

MONDAY, JULY 29,2024

12:59 P.M.


OREGON LAW CENTER

490 NORHT SECOND STREET

COOS BAY, OREGON 97420


**EXHIBIT 13 - Page 1 of 9**

DAWN COCKRUM                              July 29, 2024                              10 to 13
76339

Page 10

1    Q.   Okay.
2    A.   No.
3    Q.   How often do you come here?
4    A.   This is the first time in a year and a
5  half.
6    Q.   Okay.  Okay.  What about Leondra Coleman?
7  Have you spoken to her?
8    A.   No.
9    Q.   Okay.  What about John McKnight?
10    A.   No.
11    Q.   When's the last time you spoke to him?
12    A.   I couldn't --
13    Q.   If you know.
14    A.   -- respond to that.  It's --
15    Q.   Okay.  Who's your current employer?
16    A.   Neighborworks Umpqua.
17    Q.   Okay.  And how long have you worked there?
18    A.   A total of 21 years.  I worked there 19
19  years, left in '19, came to Grand Management for two
20  years, and went back in 2021.
21    Q.   Okay.  So can --
22    A.   So a total of 23 -- 21 years.
23    Q.   Okay.  Twenty-one years.  Can you tell me
24  the dates of your employment with Grand?
25    A.   Mm-hmm.  September 1st, 2019, to November

Page 11

1  10th, 2021.
2    Q.   Okay.  November 10th of '21.  Okay.  So --
3  and you worked at Neighborworks both before and
4  after that?
5    A.   Mm-hmm.
6    Q.   Immediately before and after.  Okay.  And
7  then what was your job title when you worked at
8  Grand Management?
9    A.   Senior compliance specialist.
10    Q.   Okay.  Can you kind of describe what your
11  role was?
12    A.   I oversaw the recertifications, making
13  sure they were being done on time and the paperwork
14  and gave the approval to the managers to close them
15  out.  I reviewed all the violation notices, make
16  sure the language is correct and we were doing what
17  we were supposed to.  And then Jerry Mascolo would
18  be the ultimate overseer of approving those.
19    Q.   Okay.  And recertifications.  Is that of
20  individual tenants?
21    A.   Yes.  Every year they have to recertify
22  their income, household composition, because their
23  rent is based off their income.  So --
24    Q.   Right.
25    A.   -- it's a requirement.

Page 12

1    Q.   Right.  And then violation notices.  Is
2  that lease violation notices?
3    A.   Yes.
4    Q.   Okay.  So those would be given to
5  individual tenants as well?
6    A.   Yes.
7    Q.   Okay.  So you reviewed every violation
8  notice that went out?
9    A.   Not every violation.
10    Q.   Okay.  How -- how --
11    A.   The majority of them.
12    Q.   The majority.
13    A.   Mm-hmm.
14    Q.   Okay.  Can you give me an estimate, is
15  that like 60 percent, or like 90 percent?
16    A.   I'd say 85.
17    Q.   Okay.  Okay.  Can you tell me why you
18  ended your employment there?
19    A.   Because my old employer offered me to come
20  back in a better deal.
21    Q.   Okay.  Fair enough.  So there was no
22  hostility?
23    A.   Oh, no.
24    Q.   Or anything --
25    A.   No.

Page 13

1    Q.   -- like that.  Okay.  And then senior
2  compliance specialist, is that the only job title
3  you had while you were there?
4    A.   Mm-hmm.
5    Q.   Okay.  So you were never promoted or moved
6  to a different --
7    A.   No.
8    Q.   -- position?  Okay.  And then compliance.
9  Compliance with what?  Can you tell me what means?
10    A.   It's very broad.  Basically, I oversee all
11  the regulatory requirement paperwork.
12    Q.   Okay.  Okay.  So that means, like,
13  compliance with the law and compliant with --
14    A.   Mm-hmm.
15    Q.   -- regulatory --
16    A.   Mm-hmm.  Reasonable accommodations.
17  Recertifications.  Violation notices.
18    Q.   Okay.
19       THE REPORTER:  Just a friendly reminder,
20  you're saying mm-hmm a lot.  Remember to say yes or
21  no.  It's okay.
22       MS. CRIPPS:  Thanks.
23       THE REPORTER:  Just a friendly reminder.
24       MS. CRIPPS:  It happens.  No worries.
25  BY MS. CRIPPS:

Page 22

1    A.   I can't recall.
2    Q.   Okay.  No worries.  But you did review
3 those notes sometimes?
4    A.   Only when I was -- if writing a violation
5 notice was warranted, then I would look at a history
6 of complaints to see why we're at where we're at.
7    Q.   Okay.  Got it.  So when you received a
8 complaint or a report of inappropriate behavior what
9 would you do --
10        MS. MANDT:  Object to form.
11 BY MS. CRIPPS:
12    Q.   -- when you were at Grand?  You can go
13 ahead and answer that.
14    A.   Answer -- repeat the question again.
15    Q.   When you received a complaint of
16 inappropriate behavior from one tenant by another
17 tenant what did you do?
18    A.   Again, that's broad.
19    Q.   Mm-hmm.
20    A.   They're all so separate.  Investigate.
21    Q.   Okay.  Can you tell me what an
22 investigation would entail?
23    A.   Sometimes it would be to call the
24 complainant.
25    Q.   Okay.

Page 23

1    A.   And make sure I was understanding what
2 they were saying.  And then I would get with the
3 manager in some cases to get her feedback on it.
4 You know, was there cameras involved?  Was there
5 footage to see?  What's on the record in the past
6 before I got here.  Things like that.
7         And then we -- I would respond with
8 either, we've done -- you know, we've done our due
9 diligence.  I'm not seeing this happening.  Or,
10 thank you for your complaint we are addressing it.
11 And then we would address it when it was valid.
12    Q.   Okay.  And who would make the
13 determination about validity?
14    A.   It was a combination between Jerry and I.
15    Q.   Okay.
16    A.   We would have a discussion and --
17    Q.   Okay.  So you were pretty involved in
18 those decisions about whether a complaint was valid
19 or not?
20    A.   Yes.
21    Q.   Okay.  Was making determinations about
22 whether to grant or deny reasonable accommodation
23 requests part of your job?
24    A.   Yes.
25    Q.   Okay.  Sorry.  I think I already asked you

Page 24

1 that, or you already said that.  Okay.  So did you
2 ever receive a reasonable accommodation request from
3 Patsy Jay?
4    A.   A long time ago, but I believe she wanted
5 a ADA refrigerator, that's the double doors that
6 open up.
7    Q.   Mm-hmm.
8    A.   They're quite more expensive for us, so I
9 asked her to get me a reasonable accommodation from
10 a qualified professional or person and she did and
11 we accommodated her with that appliance.
12    Q.   Okay.  Thank you.  And -- one second here.
13 Well, I've messed this up.  Okay.  I've got another
14 document to give you.  I believe this has already
15 been entered, but I can't remember what exhibit
16 number it is.
17        MR. MCCLINTOCK:  Well, let's go mark it
18 then as the next exhibit.
19        MS. CRIPPS:  Okay.  All right.  That's
20 fine.  So this will be Exhibit 38.
21        (WHEREUPON, Exhibit 38 was marked for
22 identification.)
23        THE REPORTER:  Do you want the exhibit
24 marked?
25        MS. CRIPPS:  Oh, yes, please.

Page 25

1        THE REPORTER:  Thank you.
2 BY MS. CRIPPS:
3    Q.   Okay.  So I just handed you a letter from
4 Patsy Jay to Grand Management.  Is that right?
5    A.   Yes.
6    Q.   Okay.  Do -- did you receive or review
7 this letter?
8    A.   I do recall.
9    Q.   Okay.  And did you interpret this as a
10 reasonable accommodation request if I understand?
11    A.   No.
12    Q.   No.  Okay.  Can you tell me why not?
13    A.   In the circumstance it's all hearsay.
14 There was a pattern of -- of this.  No evidence to
15 back it up.  No police logs of calls being made.  It
16 was a he said/she said, and at that time Patsy and
17 Mr. McKnight were going back and forth.  Let's see.
18 I remember review the restraining order.  Was still
19 under investigation and when we had the judge
20 allowed him to be on -- Mr. McKnight to be on
21 property.
22    Q.   Mm-hmm.
23    A.   With specific, you know, keep your
24 distance.  Some was 500 feet.  Some was a hundred
25 and fifty.  Some was 10.  Her accusations of sexual

Page 26

1 assault and other people being raped, unconstituted.
2    Q.    Okay.  Okay.  Let's back up a little bit.
3 Do you recall -- well, did you ever meet Patsy Jay?
4    A.    I did not.
5    Q.    Okay.  And did you ever speak to her?
6    A.    On the phone, I think, maybe once or
7 twice.
8    Q.    Okay.  Do you recall what the incidents
9 were --
10    A.    One was about the refrigerator.
11    Q.    Okay.
12    A.    And one was about her care provider's
13 violation behavior.
14    Q.    Okay.  Got it.  So you -- yeah, you never
15 -- you just said you never met Ms. Jay.  Do you
16 recall what unit she was living in, or where she was
17 living?
18    A.    No.
19    Q.    Okay.  No worries.  Are you aware that she
20 relies on a wheelchair and a walker for -- for
21 support?
22    A.    No.
23    Q.    Okay.
24    A.    I -- not at -- at the time I was there.
25 No.

Page 27

1    Q.    Okay.  Did you know that she was disabled?
2    A.    Yes.
3    Q.    Okay.
4    A.    I approved other RAs, but at that time she
5 was not in a wheelchair.  She had a walker that she
6 rarely used.
7    Q.    Okay.
8    A.    But I did accommodate her RA for her
9 disability for that refrigerator.
10    Q.    Okay.  And, do you recall Ms. Jay being
11 given a notice of intent to evict for her walker
12 being on her porch?
13    A.    I'd have to see the document.
14    Q.    Okay.  Okay.  No worries.  Let's see.  Do
15 you know John McKnight?
16    A.    I don't know him.  I -- I did know him as
17 a tenant.
18    Q.    Okay.  Did you speak to him?
19    A.    Oh boy, I don't think I ever spoke with
20 him on the phone.  Went through some complaints with
21 Jerry and I, but I don't think I spoke with him on
22 the phone.
23    Q.    When you say, went through complaints,
24 were those complaints that he made or --
25    A.    Mm-hmm.

Page 28

1    Q.    -- complaints you received about him?
2    A.    No.  Complaints from him.
3    Q.    Okay.  And what were those complaints
4 about?
5    A.    If I recall there was only one or two, and
6 it was during the back and forth between him and
7 Patsy.  So I'm pretty confident it was over how she
8 was stalking him and preventing him from obtaining
9 his restraining order rules.
10    Q.    Sorry.  You said, restraining order rules?
11    A.    Yes.  Like he was going off of his
12 restraining order, keeping distance and she was
13 stalking him and putting him in positions that were
14 causing him to violate.
15    Q.    Oh, okay.  Okay.  I see what you mean.
16 Okay.  Got it.  Did you investigate those
17 complaints?
18    A.    I believe I did not.
19    Q.    Okay.  Do you know if anyone did?
20    A.    I believe Jerry and Leo -- Leondra, the
21 manager, did.
22    Q.    Okay.  And after those were investigated
23 did anyone talk to you about it again?  Was --
24 sorry.
25    A.    No.  I was on my way out at that time.

Page 29

1    Q.    Okay.
2    A.    Yeah.
3    Q.    So after it was investigated there was no
4 decision made of how to respond to that --
5    A.    I can't --
6    Q.    -- by --
7    A.    -- answer that.
8    Q.    Okay.  Do you mean you can't answer it
9 because you weren't there?
10    A.    I don't remember.
11    Q.    Okay.  No.  Okay.
12    A.    It's three years.
13    Q.    Okay.  Okay.  Did John McKnight work for
14 Grand Management?
15    A.    I don't know.
16    Q.    Okay.
17    A.    I don't remember him being an employee
18 when I was there.
19    Q.    Do you recall him doing any maintenance
20 work?
21    A.    No.
22    Q.    Okay.  Let's see.  Okay.  Was Temer Porter
23 a tenant at Evergreen Gardens?
24    A.    Don't know who that is.
25    Q.    Okay.  So you weren't aware that she filed

Page 30

1 a stalking protective order against John McKnight?
2     A.   No.
3     Q.   Okay.  So that was never reported to you?
4     A.   Not that I can remember, no.
5     Q.   Okay.  And were you aware of complaints by
6 Cindy Fargher about John McKnight?
7     A.   Can't recall her.  Don't know.
8     Q.   Okay.  So you never received any incident
9 reports from Cindy Fargher?
10    A.   Not that I'm aware of.
11    Q.   Okay.  Let's see here.  I had these all
12 organized at one time.  One second.  Oh, sorry, to
13 go back a ways.  What was your email address when
14 you worked at Grand Management?  Do you remember?
15    A.   I think it was dcockrum@epuerto.us.
16    Q.   Okay.
17         THE REPORTER:  That's E --
18         THE DEPONENT:  Epuerto, E-P-U-E-R-T-O.
19 It's whatever Jerry Mascolo's is, but dcockrum.
20 BY MS. CRIPPS:
21    Q.   Okay.
22         MS. CRIPPS:  This will be Exhibit 39.
23         THE REPORTER:  Correct.
24         MS. CRIPPS:  Correct.  Okay.
25 BY MS. CRIPPS:

Page 31

1     Q.   Can you look over that document for me and
2 tell me what it is.
3     A.   No.  Because --
4         THE REPORTER:  Exhibit 39.
5         (WHEREUPON, Exhibit 39 was marked for
6 identification.)
7         THE DEPONENT:  -- it's March 2019.  I was
8 not an employee then.
9 BY MS. CRIPPS:
10    Q.   Oh, okay.  All right.  All right.
11        MR. NIESE:  These are part of the same
12 exhibit?
13        MS. CRIPPS:  Yes.
14        MR. NIESE:  Okay.
15        MS. CRIPPS:  Oh, yeah.
16        MR. MCCLINTOCK:  Would you pass the
17 stapler again?
18        MR. NIESE:  The stapler.
19        MS. CRIPPS:  Oh, sure.
20        MS. MANDT:  Yeah.
21        MR. NIESE:  Thanks.
22        MR. MCCLINTOCK:  Do you need the stapler,
23 Heidi?
24        MS. MANDT:  Yeah.  If you don't mind.
25        MR. MCCLINTOCK:  Yeah.  Not at all.

Page 32

1         MS. MANDT:  Thank you.
2         MR. MCCLINTOCK:  Mm-hmm.
3 BY MS. CRIPPS:
4     Q.   Okay.  So we talked about what was
5 included in the fair housing training that you
6 received.  I want to go back a little bit.  Does --
7 does GMS have a written policy about how to deal
8 with tenant complaints about another tenant?
9     A.   I couldn't tell you.
10    Q.   You don't know?
11    A.   Can't remember.
12    Q.   Do you know if they have a written policy
13 regarding harassment?
14    A.   Don't know.
15    Q.   Okay.  What about a written policy
16 regarding when an employee complains about a tenant?
17    A.   I might have read that back in 2019, but
18 without seeing documentation I can't answer yes or
19 no.
20    Q.   Okay.  So you're not aware of it, if one
21 exists?
22    A.   No.
23    Q.   Okay.  And then what about a written
24 policy regarding sexual harassment?
25    A.   I can't remember reading it, but I know as

Page 33

1 a company they have one, I'm sure.
2     Q.   Okay.  So GMS has a written policy
3 regarding sexual harassment, but you don't know if
4 you read it?  Is that what you said?
5     A.   Right.
6     Q.   Okay.
7     A.   I don't remember things I read three years
8 ago with the company.  It's not --
9     Q.   It's okay.  That's fair.  Okay.  Did you
10 ever have to reprimand John McKnight?
11    A.   No.
12    Q.   Okay.  So did you ever give him a notice
13 of eviction?
14    A.   I'd have to see the document.
15    Q.   Okay.  Did you ever --
16    A.   Unless --
17    Q.   -- give him a notice of intent to evict?
18    A.   Sounds familiar, but I can't answer
19 without seeing it.
20    Q.   Okay.
21        MS. CRIPPS:  And that was entered into the
22 record already, but I don't know --
23        MR. NIESE:  Which one?
24        MS. CRIPPS:  I do not -- the notice of
25 intent to evict to John McKnight.

Page 34

```
1              MR. NIESE:  Oh, yeah.  Didn't that just go
2  in today?
3              MS. CRIPPS:  Yeah.
4              MR. NIESE:  Was that 30?  Was that the
5  first one that was put in?  I don't recall.
6              MS. MANDT:  I think that it was 31.
7              MS. CRIPPS:  Thirty-one.  Okay.  Thank
8  you.
9              THE DEPONENT:  Oh, to go back to your
10 Grand Management having thing.  I do know that the
11 RD lease that every tenant signs addresses all those
12 issues about tenant complaints and -- and how they
13 follow through and how they do it.
14 BY MS. CRIPPS:
15     Q.   Okay.
16     A.   It's a -- it's in the RS lease, so yes,
17 they do.
18     Q.   Okay.  So every tenant sees that?
19     A.   Yes --
20     Q.   Correct?
21     A.   -- ma'am.
22     Q.   Do you know if every employee -- employee
23 sees that or reads that?
24     A.   I'm sure it's in their hiring packet.
25     Q.   Okay.
```

Page 35

```
1      A.   But again, if you -- if you were to
2  provide that it would -- I'm -- it would be in
3  there.  I'm sure.
4      Q.   Great.  Let's see.
5              MS. CRIPPS:  I was going to bring this up,
6  but said that she wasn't there.
7              MR. NIESE:  Hmm?
8              MS. CRIPPS:  So I guess we can skip it
9  because she wasn't working there at that time.
10             MR. NIESE:  Would you like to take a quick
11 -- quick break?
12             MS. CRIPPS:  Sure.
13             MR. NIESE:  All right.  Thank you.
14             THE REPORTER:  Off the record at 1:31.
15             (WHEREUPON, a recess was taken.)
16             THE REPORTER:  Back on the record.  It's
17 1:33.
18 BY MS. CRIPPS:
19     Q.   Okay.  So you were not working at GMS on
20 March 9th of 2019, right?
21     A.   No.
22     Q.   Okay.  So were you aware after you were
23 hired by GMS that a notice of intent to evict had
24 been given to John McKnight?
25     A.   Yes.
```

Page 36

```
1      Q.   Okay.  How were you made aware of that?
2      A.   I reviewed his file in dealing with Patsy
3  and his incidences that would come forth.
4      Q.   Okay.  Okay.  Great.  So did you ever
5  receive complaints from Ms.
                                              Jay regarding Mr.
6  McKnight?
7      A.   Not from her personally, no.  Went to the
8  manager and the manager sent it to me.
9      Q.   Okay.  So you -- but you were aware that
10 Ms. Jay made a complaint regarding --
11     A.   Yes.
12     Q.   -- John McKnight?
13     A.   Yes.
14     Q.   And what was that -- why did she make that
15 complaint?
16     A.   If I remember correctly it was about him
17 grabbing his crotch and saying something in a manner
18 that she thought was sexual inappropriate behavior.
19     Q.   Okay.  And so did you investigate that
20 incident?
21     A.   Yes.  I and the manager did on that case
22 and we talked with -- with people and it was just
23 him and her.  He -- he said/she said.  And he said,
24 all I did was grab, you know, he went like this.  He
25 won't own to it.  No one witnessed it.
```

Page 37

```
1              So we -- I -- I just basically made the
2  decision on, you know, we believe both parties.
3  They're both saying this.  And nothing happened.
4  But, there was no eyewitnesses.  It wasn't around a
5  camera and nothing was made.  It was after that, so
6  --
7      Q.   Okay.  So you believed that Mr. McKnight
8  exposed his genitals to Ms. Jay?
9      A.   No.  No.  I think he made a gesture.
10     Q.   Okay.  So the decision not to give Mr.
11 McKnight a 24-hour notice for outrageous behavior --
12     A.   That does not fall in outrageous conduct.
13     Q.   Okay.
14     A.   Or in tenant-landlord law.  That kind of
15 -- if someone just went, oy, and grabbed their
16 package, that's not outrageous conduct.
17     Q.   Okay.  What about exposing a gun?  Does
18 that --
19     A.   It would depend --
20     Q.   -- fall under --
21     A.   -- on the manner.
22     Q.   -- outrageous conduct?
23             THE REPORTER:  I'm sorry.
24             THE DEPONENT:  Or --
25             THE REPORTER:  I didn't -- I didn't hear
```

DAWN COCKRUM                          July 29, 2024                          38 to 41
76339

Page 38

1  the end of that question.
2  BY MS. CRIPPS:
3      Q.   What about showing a gun, or exposing a
4  gun, I think is what I said.
5      A.   Outrageous conduct is explicit, but it has
6  to be in an intimidating manner.
7      Q.   Okay.
8      A.   Threatening manner.
9      Q.   Okay.
10     A.   If you have an open carry and you say,
11 hey, check out my .45.  That's not outrageous
12 conduct.
13     Q.   Okay.  But if someone is waving a gun and
14 making threatening gestures to another tenant?
15     A.   That could be in the intimidating, yes.
16     Q.   Okay.  So as a response to the incident
17 between Ms. Jay and Mr. McKnight was Mr. McKnight
18 given any sort of eviction notice?
19     A.   For what time?
20     Q.   In 2021 for the incident between him and
21 Ms. Jay -- or sorry, when he -- or grabs his
22 genitals.
23     A.   I believe might have given a -- if you
24 have the documentation there. I don't know if Jerry
25 did it or Leondra did it.  We basically encouraged

Page 39

1  Patsy to go get a restraining order or call the
2  police if something like this happens, so we as
3  landlords have a -- the -- the proper documentation
4  we need to go further if she felt that way.
5          And I believe a discussion was made by the
6  manager with John to just, you know, just leave her
7  alone and stay away from her.
8      Q.   Okay.
9      A.   Yeah.
10     Q.   So you were aware that Ms. Jay sought a
11 restraining order against Mr. McKnight?
12     A.   Yes.  But not for that incident.  I don't
13 think.  I -- I can't remember what incident it was,
14 but, yes, I was still with the company when she --
15 when she went to court to get one.
16     Q.   Okay.  And so --so you were aware that Ms.
17 Jay received a restraining order against --
18     A.   Yes.
19     Q.   -- Mr. McKnight?
20     A.   Yeah.
21     Q.   All right.
22     A.   Mm-hmm.
23     Q.   And then were you aware that he violated
24 that restraining order?
25     A.   No.

Page 40

1      Q.   Okay.  Were you aware of any other
2  complaints about Mr. McKnight?
3      A.   No.
4      Q.   Okay.  So no one else made complaints
5  about John McKnight's behavior?
6      A.   No.
7      Q.   During your time at Grand?
8      A.   No.
9      Q.   Okay.
10          MS. CRIPPS:  I'm sorry.  Can we take a
11 quick break?
12          MS. MANDT:  Sure.
13          MR. MCCLINTOCK:  Sure.
14          MS. CRIPPS:  Thanks.
15          THE REPORTER:  Going off the record, 1:39.
16          (WHEREUPON, a recess was taken.)
17          THE REPORTER:  Back on the record.  It's
18 1:45.
19          MS. CRIPPS:  Okay.  Thanks.
20 BY MS. CRIPPS:
21     Q.   Okay.  Hand you a document here.
22          MS. CRIPPS:  So this is Exhibit 37?
23          THE REPORTER:  Forty.
24          MS. CRIPPS:  Forty, sorry.  Thank you.
25          (WHEREUPON, Exhibit 40 was marked for

Page 41

1  identification.)
2          THE REPORTER:  But, I think
3          MS. CRIPPS:  Here.  I'm going to use that
4  one.
5          THE REPORTER:  Oh, it's okay.
6  BY MS. CRIPPS:
7      Q.   Can you tell me what I just handed you?
8      A.   That's before I was hired there, but it's
9  a 14-day eviction.
10          MS. MANDT:  You see --
11 BY MS. CRIPPS:
12     Q.   What's the date on that?
13     A.   March 26, 2019.
14     Q.   Okay.
15          MR. MCCLINTOCK:  Excuse me.
16 BY MS. CRIPPS:
17     Q.   So -- and who's it addressed to?
18     A.   John McKnight and any other unknown
19 occupants.
20     Q.   Okay.  So you were not involved in the
21 decision to issue this?
22     A.   No.
23     Q.   Right?  Okay.  Sorry.  I should have
24 looked at the date.  That's my fault.  Okay.  So
25 when did John -- to your knowledge, do you know when

(800) 528-3335    NAEGELI DEPOSITION & TRIAL    NAEGELIUSA.COM
Established 1980

EXHIBIT 13 - Page 7 of 9

DAWN COCKRUM                                July 29, 2024                                42 to 45
76339

---

Page 42

1  John McKnight actually left Grand Management (sic)?
2      A.   I do not.
3      Q.   Do you know when he moved out?  Okay.  And
4  do you know why he moved?
5      A.   I do not.
6      Q.   No.  Okay.  But he was living there when
7  you worked there, right?
8      A.   Yes.
9      Q.   Okay.
10         MS. MANDT:  And just to be clear, you said
11  Grand Management.  I think you meant --
12         MS. CRIPPS:  I meant --
13         MS. MANDT:  -- Evergreen --
14         MS. CRIPPS:  -- Evergreen.
15         MS. MANDT:  -- Gardens.
16         MS. CRIPPS:  Thank you.  Yes, I did mean
17  Evergreen, you're right.
18  BY MS. CRIPPS:
19     Q.   Okay.  So -- and you were not aware of any
20  other complaints other than the one made by Patsy
21  Jay?  Sorry, that was a terrible --
22     A.   Correct.
23     Q.   -- question.  So how many complaints did
24  Patsy Jay make about John McKnight, to your
25  knowledge?

---

Page 43

1      A.   I couldn't -- I can't answer that.  I
2  don't know.
3      Q.   More than one?
4      A.   More than one.
5      Q.   Okay.  And do you know what those were
6  regarding?
7      A.   I couldn't recall.
8      Q.   Okay.
9      A.   I'd have to have records.
10     Q.   Okay.  And did Patsy Jay's caregiver also
11  make complaints about him?  John McKnight?
12     A.   I can't recall that.  I can only recall
13  what I talked with her about -- about the
14  refrigerator.
15     Q.   Okay.
16     A.   That's all I remember with her care
17  provider.
18     Q.   Okay.  Do you recall any complaints about
19  John McKnight by Jennifer Holland?
20     A.   Do not.
21     Q.   Okay.  What about Ruth Fulks?
22     A.   I do not.
23     Q.   Okay.  Let's see here.  Was Cindy Fargher
24  living there when you worked there?
25     A.   Don't know who that is.

---

Page 44

1      Q.   Okay.  Let me look.  Let's see.  Were you
2  aware that John McKnight -- that Patsy Jay
3  complained that John McKnight was standing outside
4  of her window and making threatening gestures at
5  her?
6      A.   No.
7      Q.   Okay.  So you weren't then privy to the
8  decision about why that wasn't considered outrageous
9  behavior?
10     A.   No.
11     Q.   Okay.  Do you know who would have been
12  involved in those decisions or discussions?
13     A.   No.
14     Q.   Okay.  So you don't know if it would have
15  been the property manager at Evergreen or Kristin
16  Smith --
17     A.   (No audible response.)
18     Q.   -- or -- okay.
19         THE REPORTER:  You shook your head.
20         THE DEPONENT:  Oh, no.
21         MS. CRIPPS:  Sorry.
22         THE DEPONENT:  Thank you, Ryan.
23  BY MS. CRIPPS:
24     Q.   Okay.  Were you asked to testify on John
25  McKnight's behalf in court?

---

Page 45

1      A.   No.
2      Q.   Okay.  Do you know if anyone at Grand was?
3      A.   I don't know.
4      Q.   Okay.  Were you aware that John McKnight
5  violated the restraining order against Patsy Jay?
6      A.   I am not.
7      Q.   Okay.  Did you know that he was arrested
8  for violating that restraining order?
9      A.   Did not.
10     Q.   Okay.  Did you send a letter to Patsy Jay
11  about -- that she could potentially be evicted?
12         MS. MANDT:  Object to the form.
13  BY MS. CRIPPS:
14     Q.   Did you send a letter to Patsy Jay as a
15  courtesy notice that she might be evicted if her
16  caretaker's behavior did not change?
17     A.   I would have to see that document.  But I
18  am known to send courtesy letters to avoid an
19  eviction.
20     Q.   Okay.  Can you -- why do you send a
21  courtesy letter?
22     A.   To give people an extra chance before we
23  go file.
24     Q.   Okay.  Is that GMS' general policy?  To
25  give people an extra chance?

---

Page 46
1    A.   They allow -- it was when I was there.
2    Q.   Okay.
3    A.   Mm-hmm.
4    Q.   Is that the policy for -- in every
5 situation?
6    A.   When I was there, yes.
7    Q.   Okay.  So every time someone violated the
8 lease they received a courtesy notice --
9    A.   It would --
10   Q.   -- for the --
11   A.   -- depend on the violation.
12   Q.   Okay.  Sorry.  If GMS was going to evict
13 someone, would they send a courtesy notice in every
14 situation?
15   A.   I can't answer that right now.
16   Q.   Okay.
17   A.   When I was there, we were doing it.  I
18 don't know what they're doing now.
19   Q.   Okay.  Thank you.  I did -- I worked that
20 poorly, thank you for answering that well.  Okay.
21 Okay.
22        MS. CRIPPS:  Okay.  I think that's all my
23 questions.
24        MR. MCCLINTOCK:  I don't have any
25 questions.

Page 47
1        MS. MANDT:  No questions.
2        MS. CRIPPS:  Okay.
3        THE REPORTER:  All right.  That concludes
4 the deposition.
5        Ms. Cripps, would you like to order the
6 transcript?
7        MS. CRIPPS:  Yes, please.
8        THE REPORTER:  Ms. Mandt --
9        MS. MANDT:  Yes.
10       THE REPORTER:  -- would you like a copy?
11 And, Mr. McClintock.
12       MR. MCCLINTOCK:  Yes.
13       THE REPORTER:  Alrighty.  Going off the
14 record at 1:53.
15       (WHEREUPON, the deposition of DAWN COCKRUM
16 was concluded at 1:53 p.m.)

Page 48
                    CERTIFICATE

    I, Ryan Batterson, do hereby certify that I
reported all proceedings adduced in the foregoing
matter and that the foregoing transcript pages
constitutes a full, true and accurate record of said
proceedings to the best of my ability.

    I further certify that I am neither related
to counsel or any party to the proceedings nor have
any interest in the outcome of the proceedings.

    IN WITNESS HEREOF, I have hereunto set my hand
this 15th day of August, 2024.

                    Ryan Batterson

Page 49
            CORRECTION SHEET
Deposition of: Dawn Cockrum       Date: 07/29/24
Regarding: Jay vs. Grand Management Services, Inc.
Reporter: Batterson  /  Munro

Please make all corrections, changes or
clarifications to your testimony on this sheet,
showing page and line number.  If there are no
changes, write "none" across the page.  Sign this
sheet and the line provided.
Page  Line  Reason for Change

            Signature: _____
                    Dawn Cockrum

(800) 528-3335   NAEGELI DEPOSITION & TRIAL   NAEGELIUSA.COM
Established 1980
EXHIBIT 13 - Page 9 of 9