IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **PATSY JAY**, | Case No. 3:23-cv-656-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **GRAND MANAGEMENT SERVICES, INC.; EVERGREEN GARDENS LIMITED PARTNERSHIP; JERRY MASCOLO; LEONDRA COLEMAN;** and **DAWN COCKRUM**, | |
| Defendants. | |

Jamie Trinkle, Carly Cripps, Edward Johnson, and Nicole Pritchard, OREGON LAW CENTER, 230 NE Second Avenue, Suite F, Hillsboro, OR 97124. Of Attorneys for Plaintiff.

Heidi L. Mandt, WILLIAMS KASTNER, 805 SW Broadway, Suite 2440, Portland, OR 97205. Of Attorneys for Defendants Grand Management Services, Jerry Mascolo, Leondra Coleman, and Dawn Cockrum.

Nathan B. McClintock, CORRIGALL & MCCLINTOCK, 936 Central Avenue, PO Box 1178, Coos Bay, OR 97420. Of Attorneys for Defendant Evergreen Gardens Limited Partnership.

**Michael H. Simon, District Judge.**

Plaintiff Patsy Jay had sued Defendants Grand Management Services, Inc. ("GMS"),

Evergreen Gardens Limited Partnership ("Evergreen"), and GMS employees Jerry Mascolo,

Leondra Coleman, and Dawn Cockrum. Plaintiff asserts three claims under the Federal Fair

Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, and one claim for common law negligence. She alleges that Defendants—who owned and managed the residential property where she lived—exposed her to a hostile living environment and that Defendants retaliated against her after she sought a restraining order against a neighbor who allegedly sexually assaulted her. GMS, Mascolo, Coleman, and Cockrum (the "Moving Defendants") have moved for summary judgment against all claims asserted against them. For the reasons stated below, the Court grants in part and denies in part the Moving Defendants' motion.[1]

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set

---

[1] Notwithstanding the Moving Defendants' request for oral argument, the Court does not believe that oral argument would assist in resolving the pending motion. *See* LR 7-1(d)(1).

forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## BACKGROUND

### A.  Evergreen Gardens and Its Tenant Policies

Evergreen Gardens is an apartment complex in Tillamook, Oregon. The property is owned by Evergreen Gardens Limited Partnership and managed by GMS. At the time of the events that gave rise to this case, GMS employed all three individual defendants. Mascolo and Coleman were on-site property managers, and Cockrum was a compliance specialist. *See* Mascolo Depo. Tr. (ECF 28-4) 13:11-22; Coleman Depo. Tr. (ECF 28-2) 15:1-9; Cockrum Depo. Tr. (ECF 28-3) 11:6-9.

Plaintiff has resided at Evergreen Gardens for 26 years. Decl. of Patsy Jay (ECF 31-20) ("Jay Decl.") ¶ 2. She signed a standard subsidized lease agreement with GMS. *See* ECF 31-15, ECF 31-16. Several provisions of the lease are relevant to this case. For example, the following provision regulates tenants' patios and decks:

> Patios and Decks. Patios and entrances to apartments are to be kept clean and free of debris and cobwebs. Only patio type furniture and planters are allowed on patios or decks.

ECF 31-16 at 20.

The lease also outlines the process of eviction:

> *Good Cause*. The Landlord may terminate this lease at any time, by the giving of written notice to the Tenant not less than thirty (30) days prior to termination. Such notice may only be given for good cause, such as serious or repeated damage to the premises, creation of physical hazards, refusal to follow project rules, or due to violations of government regulations or over-income status. . . . The notice shall clearly state the reasons for the termination. The Tenant shall have fourteen (14) days within which to cure the violation. The notice will provide the date by which the Tenant must vacate the apartment if Tenant fails to cure the violation.

*Id.* at 12. The parties refer to this process as a "14/30 notice."

The lease also requires GMS to notify the tenant after the 14-day period as to whether the tenant has "satisfactorily corrected the problems or acts prompting [a] notice." ECF 28-9 at 5.

When there is more egregious conduct, however, GMS can take immediate action:

> *Outrageous Conduct*. Landlord may immediately terminate the lease and take possession after twenty-four (24) hours written notice if:
>
> > (1) Tenant . . . threatens to immediately inflict personal injury or actually inflicts substantial personal injury upon the Landlord or the Landlord's employees or any other Tenant or any neighbor living in the immediate vicinity,
> >
> > . . .
> >
> > (4) Tenant . . . commits any act that is outrageous in the extreme.

ECF 31-16 at 12. This provision provides as non-exhaustive examples of "outrageous acts" prostitution, the manufacture or delivery of controlled substances, intimidation, and burglary. *Id.*

PAGE 4 – OPINION AND ORDER

The provision also states, however, that "an act can be proven to be 'outrageous in the extreme' even if it is one that does not violate a criminal statute." *Id.*

As a recipient of a federal rural development housing subsidy, Evergreen Gardens is subject to certain housing laws and regulations. *See, e.g.*, *id.* at 29. To comply with these regulations, GMS developed a series of written policies, practices, and training related to fair housing. For example, GMS developed policies and practices regarding disability accommodation. Plaintiff's lease includes the following provisions:

> 3. Requests by tenants or applicants for reasonable accommodation and/or modification to structure, rules, policies or procedure must be made in writing and directed to either the site manager or Grand Management Services central office @ 420 Park Avenue, Coos Bay, Oregon 97420. If it is not possible for the person requesting the modification to provide a "written request" an alternative request can be made as an accommodation to the tenant or applicant. The form Grand Management Services uses to receive "reasonable accommodation requests" is attached for your review.

> 4. Reasonable accommodation requests will be evaluated within 14 days of receipt from tenant or applicant by central office personnel. A decision will be made to either accept or deny the accommodation within 14 days. The decision will be made in writing and delivered to tenant/applicant via first class mail. The applicant/tenant will have 30 days to file a grievance in the case of an adverse decision. All accommodation action will begin to take place no later than 30 days after approval of the accommodation.

*Id.*

GMS also has policies and practices for dealing with disputes and inappropriate conduct between co-tenants. These policies are not provided in the lease itself but were described by Cockrum and Kristin Smith—a compliance specialist and the property manager, respectively—at their depositions for this case. Cockrum explained that complaints would be forwarded to her from the property manager. Cockrum Depo. Tr. 20:23-21:6. Sometimes, she would get these

complaints in writing and other times by telephone call. *Id.* Cockrum would log notes on a

program called AppFolio based on her correspondence with the complainant. *Id.* 21:14-17.

Smith explained that when there was an allegation by one tenant of misconduct by

another, GMS "would investigate, and hopefully, there would be a police record and [the

misbehaving tenant] would be issued a notice of intent to evict. That's the most stringent notice

that we're allowed to give under the Rural Development Rules and Regulations, and it does allow

a cure period." Smith Depo. Tr. (ECF 28-1) 15:12-23. Such an investigation would include

interviewing both parties and any witnesses, and reviewing police records. *Id.* 16:2-6. Smith

continued:

> [Y]ou can't evict just for waiving a gun or threatening to hurt
> someone or kill someone or to punch someone. It has to be, you did
> it. . . You have to issue a 14/30, that is the [Rural Development]
> regulations. There must be a cure period in subsidized housing,
> unless there is substantial harm. Like I said, an assault or a rape or
> physical action. It has to have taken place.

*Id.* 37:4-12.

## B. Plaintiff's Experience with Tenant John McKnight

Because of several health conditions—including atrial fibrillation and osteoarthritis—and

a series of surgeries in recent years, Plaintiff has limited mobility. Jay Depo. Tr. (ECF 31-1) 6:24-

7:4. In 2021, at the time of the encounter that gave rise to this case, she was about 75 years old

and used a walker or wheelchair most of the time.[2] Jay Decl. ¶ 3. Due to her medical history,

Plaintiff has resided in subsidized housing as part of her Social Security Disability benefits. Jay

Depo. Tr. 16:12-13, 16:16-18.

---

[2] For example, Plaintiff states that in 2021, she used a walker "about ninety percent of the
time." Jay Decl. ¶ 3.

In 2019 or 2020, Plaintiff first met her neighbor, fellow tenant John McKnight. Jay Decl.
¶ 5. McKnight had moved into Evergreen Garden Apartments in 2018 and unofficially worked as
a maintenance worker on the property. Smith Depo. Tr. 66:13-16 (explaining that McKnight
"wasn't really an employee"). McKnight did some maintenance work in Plaintiff's apartment,
soon became friendly with her dog Sweet Pea, and offered to walk Sweet Pea on occasion. Jay
Decl. ¶ 5. Plaintiff, who had difficulty taking her dog outside because of her limited mobility,
agreed. *Id.* During the following year, McKnight would visit Plaintiff's apartment twice each day
to pick up Sweet Pea, and as a result, McKnight and Plaintiff "developed a platonic friendship."
*Id*. "After a while of knowing him," Plaintiff gave McKnight a spare key to her apartment so he
could walk Sweet Pea even when Plaintiff was not at home. *Id.*

On the morning of July 12, 2021, Plaintiff was in her residence when McKnight returned
with Sweet Pea from a walk. Jay Depo. Tr. 22:21-23, 23:2-3. McKnight lingered to talk with
Plaintiff. *Id*. 23:8. Plaintiff was seated in her wheelchair during the conversation. *See id.* 28:22-
23. McKnight began to talk about "how he harassed [another tenant's daughter] because she had
very large breasts and that every time he saw her, he would moo like a cow." *Id*. 23:9-13. Plaintiff
was "aghast" at the comments and informed McKnight that she needed a new dog walker. *Id.*
at 23:14, 27:13-17. At that point, McKnight turned away from Plaintiff. *Id*. at 28:1-2. Plaintiff
heard a zipper, and when McKnight turned back towards Plaintiff, he was holding his exposed
genitalia in his hand. *Id.* at 28:2-5. He stepped towards Plaintiff, kicked her feet off her
wheelchair's footrest, used the footrest to lean forward, and used his free hand to pull Plaintiff's
head closer to his genitalia. *Id*. at 28:2-7, 28:22-23, 29:14-15, 30:10, 85:14-23; Jay Decl. ¶ 6.

Plaintiff could see that McKnight wore a holstered gun[3] throughout this interaction. Jay Depo. Tr. 30:7-8, 32:2; Jay Decl. ¶ 6. Plaintiff screamed. Jay Depo. Tr. 30:22-24. McKnight stepped back, zipped up his pants, and left quickly. *Id.* 32:15-25. Plaintiff "was so frightened that [she] vomited in [her] lap." Jay Decl. ¶ 6.

Later that day, Plaintiff was taking Sweet Pea for a walk and encountered her friend, Ruth Fulks. *Id.* ¶ 7. Plaintiff explained what had happened, and Fulks encouraged Plaintiff to call the police. *Id.* When Plaintiff declined to do so, Fulks called the police herself. *Id.* Plaintiff gave her account, and the police officer then talked with McKnight and Coleman. *Id.*; *see* ECF 31-5 at 4-6 (police report describing conversations with Plaintiff, McKnight, and Coleman). The officer drafted a report. *See generally* ECF 31-5. The report does not mention that McKnight made any physical contact with Plaintiff. *See id.* at 4-6. After the officer left, Coleman changed Plaintiff's locks. Jay Depo. Tr. 40:5-9. GMS issued a 14/30 notice to McKnight. Coleman Depo. Tr. 47:17-18. Mascolo decided, however, that GMS would go no further "without some type of police report or . . . charges being pressed against [McKnight]." *Id.* 45:1-14.

On July 16, 2021, Plaintiff filed for and was granted an Elderly Persons and Persons with Disabilities Abuse Prevention Act restraining order. Jay Decl. ¶ 11. The order required McKnight always to stay at least 500 feet away from Plaintiff's residence and forbade him from contacting Plaintiff by telephone or mail. *See* ECF 28-7 at 1-2. McKnight was arrested on August 31st for violating his restraining order. *See* ECF 28-8 at 3. He was released by September 1st. ECF 31-3 at 1. After a hearing in October, that order was modified such that McKnight could not get closer than 200 feet to Plaintiff's residence. Jay Decl. ¶ 11. Given the proximity of McKnight's

---

[3] Plaintiff was aware that McKnight had a concealed weapons permit and wore a gun in his holster "all the time"; she had never seen that gun outside of its holster. Jay Depo. Tr. 32:4-14.

residence to Plaintiff's he was unable to comply with the terms of the order and eventually moved

out of Evergreen Gardens in November 2021. *See* Smith Depo. Tr. 50:12-14; ECF 31-3 at 1.

Nevertheless, from July 12th until when he left GMS, McKnight "continued to stalk and

harass [Plaintiff] daily." Jay Decl. ¶ 11; *see also* Jay Depo. Tr. (ECF 28-5) 48:8 ("He stalked me

every day."). "He would come to [Plaintiff's] bedroom window at night and make noises to scare

[her]." Jay Decl. ¶ 11. On one occasion, McKnight "was out in front of his truck pretending to

shoot at [Plaintiff's] apartment and pretending to punch and pantomiming an assault and looking

at [Plaintiff's] apartment." Jay Depo. Tr. 41:6-9. Plaintiff testified that "the man's gun scared the

hell out of me." *Id.* 41:14-15. In short, "there was rarely a day when [McKnight] didn't either

come to [Plaintiff's] window or follow [Plaintiff] around pretending to shoot [her]." *Id.* 48:11-17

(ECF 28-5 at 17). Three or four times, McKnight approached Plaintiff and asked her, "Patsy,

Patsy, are you sure you're not talking too much?" *Id.* 68:3-11 (ECF 28-5 at 18). Plaintiff reported

some—but not all—of this behavior to Coleman, who allegedly told Plaintiff either to call the

police or to ignore it. *Id.* 41:20-24; Jay Decl. ¶ 11. Coleman testified that Plaintiff's caretaker,

Rebecca Mobley, made a series of complaints regarding McKnight's conduct towards Plaintiff.

Coleman Depo. Tr. 74:16-21. Coleman further testified that she received a written report

concerning McKnight pretending to shoot at Plaintiff. *Id.* 77:2-6.

## C. Defendants' History with John McKnight

McKnight has had a history at Evergreen Gardens of women reporting him for

misconduct. The Court intentionally excludes the names and dates of the reported incidents to

maintain the reporters' anonymity, but notes that all of the incidents are alleged to have occurred

between September 2018 and March 2021. *See generally* ECF 31-3. At least ten separate

complaints—including two filed by female employees of GMS—were filed in this time frame. *Id.*

At least two complainants had physical disabilities or a mental health condition. *E.g.*, *id.* at 19, 26,

76. The women[4] allege a variety of misconduct, including McKnight following a complainant around, yelling at her in a way that made her fear for her life, staring at her through a window, and deliberately showing a complainant McKnight's gun. One woman, for example, alleged that McKnight stood outside her kitchen window and lifted his shirt to show her his gun. *Id.* at 12. Another asserted that McKnight would watch her apartment at night, waiting until she turned her lights off, and would then start pounding on her walls. *Id.* at 38. At least one tenant obtained a stalking order against McKnight. *Id.* at 3. Several women reported feeling unsafe at Evergreen Gardens with McKnight as a co-tenant and requested GMS to take action. *E.g.*, *id.* at 25, 28, 30, 68-9.

There were also at least two allegations of inappropriate touching. In one account, a tenant stated that during a conversation involving that tenant, McKnight, and a GMS employee, McKnight "rubbed" the tenant's upper arm. *Id.* at 26. A different individual, who was then a GMS employee herself, reported a more serious incident. In her incident report, she explained that McKnight got close enough that she could smell alcohol on his breath, pulled out his gun, and waved the gun in her face. *Id.* at 14. In a follow-up email that she sent to Smith and Mascolo, she added further detail, including that McKnight had sexually assaulted her and left bite marks on her body. *Id.* at 6.

These complaints were documented in AppFolio, GMS's tenant tracking application, tagged by McKnight's name. From AppFolio's documentation and from conversing with tenants directly, GMS employees—including the individual defendants in this case—were put on notice of these allegations. For example, Coleman told the police officer who responded to Plaintiff's

---

[4] It does not appear that any male tenants or male GMS employees filed complaints against McKnight.

incident that there had been "many written reports about [McKnight] harassing some of the women that live in the apartments," and that there were reports of McKnight "looking through windows and following them home." ECF 31-5 at 5. Indeed, GMS "tried several times to evict John McKnight." Smith Depo Tr. 35:14-15.

**D.  Plaintiff's Walker and GMS's Notice of Eviction of Plaintiff**

Because of her limited mobility, Plaintiff kept a walker on her porch to assist her in caring for her plants and enjoying her porch. *See* Jay Depo. Tr. 71:23-72:4. On May 13, 2021, Plaintiff received a notice on her door listing what kinds of items appropriately may be kept on her porch. *Id.* 71:11-15, 72:5-6. This notice was not a formal "14/30 notice," but instead just  a "warning." Coleman Depo. Tr. 71:17; *id.* 71:7-8 ("That's just me letting you know that there's a problem you have to fix."). Upon receiving that notice, Plaintiff moved her walker off the porch and put it in the gravel outside her apartment, under the kitchen window. Jay Depo. Tr. 71:18-20. Keeping the walker on the gravel was "hard" because Plaintiff would have to "wrestle it back up on the porch" to water her plants. *Id.* 75:23-25. At some point after receiving the May 13th notice and before August 20, 2021, Plaintiff made a verbal request to Coleman that Plaintiff be allowed to keep her walker on the porch because of Plaintiff's disability. Jay Decl. ¶ 12. Plaintiff did not receive a response to that accommodation request. *Id.*

On August 20, 2021, Plaintiff received a formal 14/30 notice (the "August Eviction Notice"). *Id.* This notice asserted that Plaintiff had breached several terms of her lease agreement, reading as follows:

> **On May 13, 2021**, Management posted a notice on your door regarding the appropriate items we can allow on the front porches per the lease. You had voiced your opinion and notified management you are an enforcer of the lease and will obey it.
>
> **On July 30, 2021**, Management received a call regarding you and John McKnight being in the community room at around the same

time. You saw John and followed him out of the community room with your phone up stating that you were going to call the police because he was breaking the restraining order. The community room is a shared space between all tenants. **Your current restraining order does NOT give you the right to keep John from using the community room or laundry room. If he is there first, you need to wait until he has left before you enter, and he is to do the same for you according to the language of the order**.

**On August 11, 2021**, Your care taker approached management in an aggressive and demanding manner. Stating that management is not doing their job regarding the civil case between yourself and John McKnight. After management has let you know on multiple occasions that we have exhausted all resources and that we need to let The Tillamook police and court system do their job. She also stated that we are not following up on "Johns' daily harassment"; although management has not received any tenant complaints; or police reports of these incidents other than the initial police report and written tenant complaint of the private indecency.

**On August 16, 2021**, Management received a written tenant complaint stating you are watching other tenants through your window with binoculars.[5] These tenants have expressed that this behavior is making them uncomfortable, and invading their privacy.

**On August 17, 2021**, Management noticed you have a walker on your front patio. You have been given notice on 5/13/2021 regarding the appropriate items we allow on the front porch, and ensured your cooperation.

ECF 28-9 at 3-4 (emphasis in original); *see also* Coleman Depo. Tr. 67:13-24 (explaining that

Plaintiff received the August Eviction Notice for "[m]ultiple reasons," including "watching John

[McKnight] through the window with binoculars," "sending letters to . . . other tenants" and

"disturbing" their peace, and "not following through with her commitment to keep her front patio

up to the lease standards."); ECF 31-19 (email from Cockrum explaining to Plaintiff that

---

[5] At deposition, Coleman clarified that the only complaints she received about this issue concerned Plaintiff watching McKnight with the binoculars, and not any other tenants. Coleman Depo. Tr. 77:12-25.

the August Eviction Notice was issued in part because Plaintiff "cussed and yelled" at management on "several occasions").

On August 25, 2021, Plaintiff wrote a 12-page letter to GMS in which she responded to the allegations in the August Eviction Notice. *See* ECF 28-10. In that letter, she asked to be allowed to keep her walker on her patio instead of a patio chair due to her disability. *Id.* at 8. She also noted that she had used her binoculars to look at "bird nests and eagles" and that she had "no interest" in watching tenants' units. *Id.* at 7. She also explained her bird watching in her declaration, describing that she is an avid birdwatcher and that she often sits at her window or porch and watches birds through her binoculars. Jay Decl. ¶ 4. Additionally, in the letter and at her deposition, she explained that the purported "community room incident" never occurred. ECF 28-10 at 1-2; Jay Depo. Tr. 76:23-24. She also contends that neither she nor her caretaker were ever aggressive towards management. Jay Depo. Tr. 73:23-25, 77:5-7. She did, however, permanently move her walker indoors, from her the gravel on her patio to her bedroom. *Id.* 72:21, 77:1-2. Plaintiff was never evicted.

In March 2023,[6] Plaintiff received another "14/30 notice." Jay Depo. Tr. 77:21. Plaintiff explains that in the past, whenever she went to recertify her rent subsidy policy, she would have to bring with her several documents. *Id.* 78:9-10 (ECF 28-5 at 28). In March 2023, however, the form that described her appointment stated that she had to bring only one, her Social Security award letter. *Id.* 78:10-14 (ECF 28-5 at 28). Plaintiff attended her appointment with Sharon Elrod, the new manager at GMS, during which Plaintiff confirmed with Elrod that Plaintiff did not need

---

[6] There is some confusion regarding when this incident occurred. In her deposition, Plaintiff describes a similar account as happening in March *2022*, and then receiving *another* 14/30 notice in March 2023. Jay Decl. ¶¶ 16-17. In her deposition, she describes only a singular incident that occurred in March 2023. Jay Depo. Tr. 77:19-22. This discrepancy does not affect the outcome of the pending motion.

to provide additional documents. *Id.* 78:18-25 (ECF 28-5 at 28). Nevertheless, Plaintiff received another notice of intent to evict for violating the recertification policy. *Id.* 79:10-16 (ECF 28-5 at 29). After Plaintiff received the notice, she gathered the allegedly missing information and sent it to Elrod, to which Elrod responded that she already had it. *Id.* 79:23-80:4 (ECF 28-5 at 29-30). Plaintiff was never evicted. *Id.* 80:7-8 (ECF 28-5 at 30).

## DISCUSSION

Plaintiff asserts four claims, and the Moving Defendants seek summary judgment on all four. The Court addresses each claim in turn, and then discusses whether punitive damages, which Plaintiff also seeks, may be appropriate in this case. Before turning to the merits, however, the Court briefly addresses the parties' dispute about the meet and confer requirement in LR 7-1. Plaintiff alleges that the Moving Defendants failed to confer with her before filing this motion and argues that the Court should deny the motion on this basis alone. The Moving Defendants counter that the parties had "numerous communications" about Plaintiff's claims. The Moving Defendants assert that during a meeting on September 13, 2024, Plaintiff affirmed that they were free to file dispositive motions by November 12, 2024. The Court finds these discussions sufficient and will not deny the pending motion solely on the grounds of a failure to confer.

## A.  Plaintiff's First Claim: Violation of FHA (Disability Discrimination)

Plaintiff alleges that Defendants violated the FHA by failing reasonably to accommodate Plaintiff's disability because they denied her request to keep her walker on her patio. She states that because Defendants denied her accommodation request, she continues to keep her walker off her porch and in her bedroom, which makes it cumbersome for her to access her patio.

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of . . . that person." 42 U.S.C.

§ 3604(f)(2)(A). "Discrimination" includes, among other conduct, "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). "Thus, the [FHA] imposes an affirmative duty upon landlords reasonably to accommodate the needs of handicapped persons, not only with regard to the physical accommodations, but also with regard to the administrative policies governing rentals." *Giebeler v. M & B Assocs.*, 343 F.3d 1143, 1146-47 (9th Cir. 2003) (cleaned up). An accommodation is "reasonable" when it "imposes no fundamental alteration in the nature of the program" or "undue financial or administrative burdens." *Id.* at 1157 (quotation marks omitted). To prevail on a claim brought under 42 U.S.C. § 3604(f)(3)(B), a plaintiff must show that (1) she or her associate is "handicapped" within the meaning of 42 U.S.C. § 3602(h); (2) the defendant knew or reasonably should be expected to know of the handicap; (3) "accommodation of the handicap may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling"; (4) the accommodation is reasonable; and (5) the defendant refused to make the requested accommodation. *Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006).

The Moving Defendants' primary argument addresses the fifth element of the *Dubois* test. They argue that after Plaintiff submitted a request for a reasonable accommodation in her August 25, 2021, letter, "it is undisputed" that GMS *granted* it. The Court finds, however, that there is a genuine dispute as to whether Defendants granted the accommodation request. Plaintiff states that she never received a response—written or oral—to her reasonable accommodation request or the expected Notice of Cure from GMS regarding the August Eviction Notice. *See* Jay Decl. ¶ 12; Jay Depo. Tr. 84:5-10. Smith states that she and her colleagues received a request for

PAGE 15 – OPINION AND ORDER

reasonable accommodation from Plaintiff and granted it, but did not recall when that was. Smith Depo. Tr. 54:20-25 (ECF 31-2). Coleman states that Cockrum and Mascolo granted the request, but does not provide details on how—or even whether—that outcome was communicated to Plaintiff. *See* Coleman Depo. Tr. 81:18-23.  Coleman further states that although she does not remember what the outcome was, she does remember printing and posting the results back to Plaintiff. Coleman Depo. Tr. 81:13-14. The Moving Defendants, however, fail to provide any evidence of a communication to Plaintiff in which they granted her request. Without this documentation, the question of whether Defendants communicated to Plaintiff that they granted her request comes down to the credibility of each witness, which the Court may not resolve at summary judgment. *See, e.g.*, *Johnson v. Guardian Mgmt.*, 535 F. Supp. 3d 1004, 1016 (D. Or. 2021). Viewing the record in a light most favorable to Plaintiff, as the Court must do at this stage of the lawsuit, there is a genuine dispute of material fact as to whether Defendants granted the accommodation. Thus, the Court denies the Moving Defendants' motion with respect to Plaintiff's first claim.[7]

## B. Plaintiff's Second Claim: Violation of FHA (Sexually Hostile Living Environment)

Plaintiff alleges that Defendants further violated the FHA by ignoring a hostile sexual living environment.

### 1. Applicable Law

The FHA makes unlawful discriminatory practices based on "race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The FHA also forbids interference with a

---

[7] The parties also dispute whether Plaintiff submitted a request for reasonable accommodation *before* the August Eviction Notice. Plaintiff alleges a claim for failure to accommodate under the FHA, and that claim does not require that she request an accommodation *before* Defendants sent the August Eviction Notice. It is undisputed that Plaintiff sent an accommodation request on August 25, 2021.

person's enjoyment of any right granted or protected by § 3604. 42 U.S.C. § 3617. This section prohibits discriminatory harassment that unreasonably interferes with the use and enjoyment of a home, or "by another name, a hostile housing environment." *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 861 (7th Cir. 2018).

The Ninth Circuit has not yet explicitly outlined the scope of landlord liability under an FHA *hostile living environment claim* for failing to address tenant-on-tenant harassment. *See, e.g.*, *Pardo-Pena v. Kaas Props. LLC*, 2024 WL 3298284, at *4 (C.D. Cal. Feb. 9, 2024); *Gibson v. Cmty. Dev. Partners*, 2022 WL 10481324, at *5 (D. Or. Oct. 18, 2022). District courts in this circuit have adapted tests from other circuits to analyze hostile living environment claims. *See, e.g.*, *Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1290 (E.D. Cal. 2013); *Vickerman v. Ramon Mobile Home Park Inc.*, 2015 WL 13918532, at *10 (C.D. Cal. Aug. 14, 2015); *Pardo-Pena*, 2024 WL 3298284, at *5.

These district courts, however, appear to have adopted one of *two* versions of an Eighth Circuit test. Under the first test, which Plaintiff uses, "a plaintiff must establish that she was subjected to (1) unwelcomed (2) sexual harassment that was (3) sufficiently severe or pervasive so as to interfere with or deprive the plaintiff of her right to use or enjoy her home." *Salisbury*, 974 F. Supp. 2d at 1290 (citing *Quigley v. Winter*, 598 F.3d 938, 946-47 (8th Cir. 2010)). Under the second test, which the Moving Defendants use, a plaintiff must show that (1) she is a disabled individual (2) who experienced unwanted harassment (3) based on her class status, (4) the severity of which was sufficient to impact her right to enjoy her living arrangement, and (5) property managers were aware of or should have known about, and failed to promptly remedy the harassment. *See Pardo-Pena*, 2024 WL 3298284, at *5 (adapting this test from *Neudecker v. Boisclair Corp.*, 2005 WL 1607409, at *2 (D. Minn. July 7, 2005)). This second test

makes one significant addition: a plaintiff must show that her landlord was aware—or should have been aware—of the harassment but failed to address it.

Which test a court adopts depends on whether the alleged offender in the case was a member of management (or management's agent) or a co-tenant. *Compare, e.g.*, *Salisbury*, 974 F. Supp. 2d at 1290 (employing three-part test in lawsuit against managers), *and Sharon v. New Directions Inc.*, 2016 WL 158223, at *3 (C.D. Cal. Jan. 12, 2016) (same); *with, e.g.*, *Pardo-Pena*, 2024 WL 3298284, at *5 (employing five-part test in lawsuit against co-tenants). *But see West v. City & County of San Francisco*, 2022 WL 1556415, at *8 (N.D. Cal. May 17, 2022) (employing three-part test in lawsuit against co-tenants). This general pattern is sound; if a plaintiff seeks to hold management accountable for the improper conduct of a co-tenant, it is reasonable to require the plaintiff to show that management was aware, or at least reasonably should have been aware, of that co-tenant's improper conduct. This approach aligns with a Department of Housing and Urban Development regulation issued in 2016, which explains that a person is directly liable for "[f]ailing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the *person knew or should have known of the discriminatory conduct* and had the power to correct it." 24 C.F.R. § 100.7(a)(1)(iii) (emphasis added).

An analogous context in which the Ninth Circuit *has* adopted this type of standard is employment discrimination and hostile work environment claims. Indeed, courts in the Ninth Circuit "apply Title VII discrimination analysis in examining [FHA] discrimination claims." *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997). In this circuit, employers are liable for harassing conduct by non-employees "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have

known of the conduct." *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). "This theory of liability is grounded not in the harassing act itself . . . but rather in the employer's negligence and ratification of the harassment through its failure to take appropriate and reasonable responsive action." *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006) (quotation marks omitted). In other words, an employer may be liable for the conduct of non-employees engaging in harassment only when the employer knows or has reason to know of the conduct—just as the *Neudecker* test holds management and their agents accountable for co-tenant harassment only when management was aware or should have been aware of that harassment. *See Pardo-Pena*, 2024 WL 3298284, at *4 ("District courts in the Ninth Circuit have found it appropriate to use the *Neudecker* test because . . . the *Neudecker* test mirrors the hostile working environment claims under Title VII."). Thus, the Court will apply the five-part test in evaluating Plaintiff's claim.

### 2. Analysis

The Moving Defendants make two relevant arguments regarding this claim.[8] First, they address the second element of the *Neudecker* test by arguing that there is insufficient evidence that McKnight harassed Plaintiff. Specifically, the Moving Defendants observe that Plaintiff never submitted a written complaint regarding any of McKnight's alleged conduct after the July

---

[8] The Moving Defendants made an additional argument in their motion that there is no evidence that John McKnight harassed Plaintiff because of her *disability*. As Plaintiff points out in her response, however, her claim for hostile living environment is based on *sexual* harassment, not harassment based on disability. Moreover, the Moving Defendants did not reply to this argument. Thus, the Moving Defendants abandoned it. *See Palmer v. Cognizant Tech. Sols. Corp.*, 2022 WL 18214014, at *31 (C.D. Cal. Oct. 27, 2022) ("Plaintiffs do not respond to this contention in their Reply, which constitutes a concession of that argument."); *Nguyen v. Nissan N. Am., Inc.*, 487 F. Supp. 3d 845, 857 (N.D. Cal. 2020) (concluding that the party's failure to address counterarguments in reply constituted abandonment of position taken in initial brief). For these two reasons, the Court does not address the merits of this argument.

12, 2021, incident. They further assert that Plaintiff's anecdotal evidence of harassment—such as when McKnight mimed shooting her at her apartment—lack "sufficient details, such as dates, necessary to create a genuine issue of material fact."

At summary judgment, the Court must construe evidence in the light most favorable to the nonmoving party. Accordingly, the Court accepts as true Plaintiff's deposition and declaration testimony that McKnight sexually harassed her on July 12th and continued to harass her verbally and by following her and gesturing at her thereafter. That Plaintiff does not provide specific dates beyond July 12th and July 16th does not mean that her accounts do not create a genuine issue of material fact. The Court is satisfied with Plaintiff's sworn statement in her declaration that from July 12th until he left GMS, McKnight "continued to stalk and harass [Plaintiff] daily." Further, although it is technically true that *Plaintiff* did not submit a formal written complaint to Coleman regarding McKnight's continued harassment, Plaintiff's caretaker submitted to Coleman additional complaints—including a written report—on Plaintiff's behalf.

Plaintiff also documented some of McKnight's harassing conduct in the August 25th letter that she sent to GMS. In that letter and in her filings made in this case, Plaintiff provides details such as the specific types of gestures and comments that McKnight made and where he was when he made them. The Court finds that Plaintiff's allegations go beyond what the Moving Defendants characterize as "a self-serving and internally inconsistent affidavit." A reasonable juror may ultimately agree with the Moving Defendants and find that Plaintiff's assertions are insufficient to support her claim. Similarly, a reasonable juror could find that Plaintiff's contentions sufficiently are detailed and credible. Based on the governing standards, however, the Court declines to grant summary judgment for the Moving Defendants on this ground.

Second, the Moving Defendants address the fourth element of the *Neudecker* test and argue that there is no evidence that any harassment was sufficiently severe or pervasive such that it unreasonably interfered with Plaintiff's use and enjoyment of her residence. "To determine what constitutes severe or pervasive sexual harassment under the FHA, federal courts look to cases interpreting what constitutes severe or pervasive sexual harassment in the context of [Title VII]." *Salisbury*, 974 F. Supp. 2d at 1290. Under Title VII, this inquiry requires considering both objective and subjective factors. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 999 (9th Cir. 2010). Courts "must assess all the circumstances, 'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes [with a housing environment].'" *Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1034 (9th Cir. 2005) (quoting *Clark Cnty Sch. Dist. v. Breeden*, 523 U.S. 268, 270-71 (2001)). No one factor is dispositive. *Harris*, 510 U.S. at 23. Although "isolated and innocuous incidents do not support a finding of sexual harassment," *see Salisbury*, 974 F. Supp. 2d at 1291 (quoting *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996)), "the more severe the harassment, the less need to show a repetitive series of incidents," *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000) (quoting EEOC, Policy Guidance on Sexual Harassment, 8 BNA FEP Manual 405:6681 (Mar. 19, 1990)).

Considering the relevant circumstances viewed in the light most favorable to the nonmoving party, the Court finds that Plaintiff raises an issue of fact as to whether she suffered severe or pervasive harassment. First, the July 12th incident constituted severe sexual harassment. Importantly, the alleged assault occurred in Plaintiff's own home. *See Salisbury*, 974 F. Supp. 2d at 1292 ("Courts have recognized that harassment in one's own home is particularly egregious . . .

." (citing *Quigley*, 598 F.3d at 947)). It was physical; McKnight kicked Plaintiff's feet off her wheelchair footrest, grabbed her hair, and tried to pull her head closer to his genitalia. It was frightening and humiliating; Plaintiff reports that the encounter was nonconsensual, and that afterwards she was so horrified that she vomited in her lap. A reasonable juror also could find that it was threatening; McKnight was armed and stood over Plaintiff, an unarmed elderly woman using a wheelchair. McKnight's conduct on July 12th far exceeded "a mere offensive utterance." It thus also exceeds the conduct at issue in the two cases to which the Moving Defendants analogize this case. *See Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013) (finding no severe or pervasive harassment where employer made "crude and offensive remarks" towards the plaintiff on four occasions about breast sizes, orgasms, tampons, and gender-based stereotypes); *McGee v. Poverello House*, 2021 WL 3602157, *23 (E.D. Cal. Aug. 13, 2021) (finding no severe or pervasive harassment where a roommate made a sexual comment and showed the plaintiff a photo of herself in her underwear).

Given the severity of the July 12th incident, there is less of a need to show repetitive incidents thereafter. As discussed, however, McKnight made a series of comments and threatening gestures towards Plaintiff between July 12 and August 31, 2021, including coming to her bedroom window at night, making frightening noises, making shooting gestures at Plaintiff's apartment, and pantomiming punching her. The Moving Defendants argue that "Plaintiff does not contend that these behaviors occurred hourly, daily, weekly or even monthly" and that "there is no evidence that these behaviors occurred once or even more than once." But the Court disagrees with the Moving Defendants' characterization. Plaintiff specifically asserts that McKnight harassed her "daily." Plaintiff testified at deposition that McKnight's conduct made her go "hysterical" and that she "freaked out" because McKnight's "gun scared the hell out of [her]."

Viewing the record in a light favorable to Plaintiff, the Court finds the conduct in this case to resemble—or perhaps even exceed—the severity and pervasiveness of the conduct in *Ellison v. Brady*, 924 F.2d 872 (9th Cir. 1991). In that case, a male employee of the Internal Revenue Service asked out his female coworker to lunch. *Id.* at 873. Although she initially accepted, he started to "pester her with unnecessary questions," asked her out repeatedly even when she declined, and then began send her love letters that escalated in intensity. *Id.* at 873-74. The female coworker reported feeling "frightened" by the obsessive letters. *Id.* at 874. At no point did the male employee threaten violence or display a weapon. Nor did the male employee have a history of harassing other employees. Nevertheless, the Ninth Circuit held that a "reasonable woman" could consider the male employee's conduct, as alleged by the female coworker, sufficiently severe or pervasive to create a hostile working environment. *Id.* at 880. Indeed, as the Ninth Circuit explained, "in some cases the mere *presence* of a [tenant] who has engaged in particularly severe or pervasive harassment can create a hostile [living] environment." *See id.* at 883 (emphasis added). The Court similarly finds that a reasonable woman—and indeed, a reasonable juror—could find that McKnight's physical conduct on July 12, 2021, coupled with "daily" stalking incidents and threatening gestures thereafter, are sufficiently severe or pervasive to create a hostile living environment. Accordingly, the Court denies summary judgment on Plaintiff's hostile living environment claim.

Finally, in moving for summary judgment on this claim, Moving Defendants do not dispute the fifth factor, awareness. Nor do the Moving Defendants dispute that they had the power to evict McKnight. Plaintiff spends considerable time on this issue in her Response, but because the Moving Defendants do not contest her position in their pending motion, the Court does not address it further with respect to this claim.

**C.  Plaintiff's Third Claim: Violation of FHA (Retaliation)**

Plaintiff alleges that Defendants engaged in discriminatory housing practices by issuing the August Eviction Notice to Plaintiff and thereby "coercing, intimidating, threatening[,] and interfering with Plaintiff." Compl. (ECF 1) ¶ 56. The FHA prohibits retaliating against a person for exercising rights protected by the FHA.[9] *See* 42 U.S.C. § 3617. To successfully bring a retaliation claim under the FHA, a plaintiff must show that (1) she engaged in a protected activity, (2) an adverse housing consequence is causally linked to that activity, and (3) there was resulting damage. *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 477 (9th Cir. 1998). "In the context of a § 3617 claim, that adverse action must be in the form of coercion, intimidation, threats, or interference." *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001) (cleaned up).[10]

First, Plaintiff asserts that she engaged in protected activity by reporting McKnight. To the extent that the Moving Defendants argue that they sent Plaintiff the August Eviction Notice because she was spying on McKnight with binoculars, attempting to "evict" McKnight from

---

[9] "A Section 3617 violation does not require the person who is interfered with to capitulate to the interference, and a violation can involve a situation where no discriminatory housing practice may have occurred at all." *Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, Inc.*, 104 F.4th 1128, 1142 (9th Cir. 2024) (quotation marks omitted). "For instance, if a landlord rents to a white tenant but then threatens to evict him upon learning that he is married to a black woman, the landlord has plainly violated § 3617, whether he actually evicts the tenant or not." *Id.* (quoting *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009)).

[10] Section 3617 does not define "coercion," "intimidation," or "threat." In *Walker*, 272 F.3d at 1129, quoting *Webster's Third New International Dictionary* (14th ed. 1961), the Ninth Circuit adopted the following definitions. "Interference" means "the act of meddling in or hampering an activity or process." "Coercion" means "compel[ling] to an act or choice by force, threat, or other pressure" and includes "the application of sanctions or force . . . accompanied by the suppression of constitutional liberties in order to compel dissenters to conform." Finally, "threat" means "an expression to inflict evil, injury, or other damage on another." Importantly, "§ 3617 does not require a showing of force or violence for coercion, interference, intimidation, or threats to give rise to liability." *Id.* at 1128.

---

community spaces, or because her caretaker was rude, there are genuine disputes of fact as to whether these events occurred at all, or, if they did occur, whether they were the reason for the August Eviction Notice. Plaintiff testified at her deposition and stated in her declaration that she used her binoculars for birdwatching. She further stated that the community room incident never occurred and that her caretaker never behaved aggressively. The Moving Defendants do not dispute that reporting an assault committed by a co-tenant is protected activity under the FHA, and the Court agrees that Plaintiff has shown a genuine issue of material fact regarding this first factor.

As for the second factor, the Moving Defendants argue that sending the August Eviction Notice to Plaintiff after she obtained a restraining order was not interfering, coercive, threatening, or intimidating. Again, this is a question for the jury. Plaintiff engaged in protected conduct by reporting McKnight for harassing her. Defendants took an adverse housing action against Plaintiff when they sent the August Eviction Notice to her, which stated that Plaintiff would be evicted if she did not comply with its terms. Plaintiff is an elderly woman with a disability who has resided in the same apartment complex for more than 25 years. A reasonable juror could conclude that the August Eviction Notice constituted impermissible intimidation, coercion, or a threat.

The Moving Defendants also dispute whether Plaintiff's protected activity is causally linked to that adverse housing action. The Moving Defendants assert that the August Eviction Notice concerned unlawful and improper behavior by Plaintiff, including her watching McKnight with binoculars, Plaintiff trying to "evict" McKnight from community spaces, and Plaintiff's caretaker acting aggressively towards management. As noted, Plaintiff disputes these allegations. If Plaintiff's account is believed by the jury, that would be evidence that Defendants' motives were retaliatory. *Cf. Walker*, 272 F.3d at 1131 (denying summary judgment on coercion issue

because parties disputed the defendant's motives in acting). Based on these disputed issues of fact, the question of causality must go to the jury.

Additionally, the August Eviction Notice stated that Plaintiff's walker was impermissibly located. In May 2021, Plaintiff had been warned about keeping her walker on her porch, and she immediately relocated it to the gravel area. No further action was taken until *three months* later in August 2021, shortly after Plaintiff had begun to report McKnight's conduct. *See San Pedro Hotel Co.*, 159 F.3d at 477-78 (holding that the timing of the allegedly retaliatory investigations may be accepted as circumstantial evidence of invidious purpose); *Walker*, 272 F.3d at 1130 (focusing on how the allegedly coercive and retaliatory conduct occurred only two weeks after defendants received a complaint). This is further evidence that a jury may consider as evidence of Defendants' retaliatory intent. As noted, summary judgment on causality is inappropriate.

The Moving Defendants also argue that the 14/30 notice sent in March 2023 is not evidence of retaliation. They contend that this 14/30 notice simply related to a paperwork issue, which Plaintiff corrected, and resulted in no further action. On this issue, the Court agrees with the Moving Defendants. Plaintiff has offered no evidence to link her complaints against McKnight to the paperwork miscommunication in March 2023, one and a half years later. Even if Elrod had misinformed Plaintiff about the recertification process, nothing in the record indicates that Elrod was involved with or even aware of Plaintiff's reports about McKnight, or that she was asked to misinform Plaintiff by somebody who was. The Court thus grants the Moving Defendants' motion with respect to this 14/30 notice.

**D.  Plaintiff's Fourth Claim: Negligence**

Plaintiff alleges that Defendants were negligent in two alternative ways. First, she alleges that Defendants "negligently violated their duty to recognize their obligations under the law and to refrain from discrimination." Compl. ¶ 61. Second, she alleges that Defendants "negligently

violated their duty to provide a dwelling that was reasonably safe for Ms. Jay." *Id.* ¶ 62. The Moving Defendants move for summary judgment only on the second allegation.

### 1. Applicable Law

Generally, a negligence claim brought under Oregon common law requires a plaintiff to show that a defendant's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987). "'Duty' is not an element of a negligence case unless the claim involves an obligation arising from a special relationship which creates, limits or defines the obligation." *Budd v. Am. Sav. & Loan Ass'n*, 89 Or. App. 609, 612 (1988). When a special relationship between the defendant and the injured party exists, then that relationship *may* create, define, or limit the defendant's duty to the plaintiff. *Or. Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329, 341 (2004). If, however, the special relationship does not prescribe a particular scope of duty, then "[c]ommon law principles of reasonable care and foreseeability of harm are relevant." *Cain v. Rijken*, 300 Or. 706, 717 (1986).

"[T]he relationship between a landlord and tenant [is] the kind of special relationship that, under *Fazzolari*, should be analyzed according to the landlord's duty as opposed to general foreseeability." *McPherson v. State ex rel. Dept. of Corr.*, 210 Or. App. 602, 609 (2007). "[T]he landlord-tenant relationship imposes on a landlord an affirmative duty to take reasonable steps to warn or otherwise protect a tenant from foreseeable unreasonable risks of physical harm posed by another tenant, whether on or off the premises." *Miller v. Tabor W. Inv. Co.*, 223 Or. App. 700, 710 (2008) (quotation marks omitted). Thus, harm may be foreseeable even when inflicted by a third person. *Id.* at 711 (citing *Fazzolari*, 303 Or. at 20). "But mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it." *Buchler v. State By & Through Or.*

*Corr. Div.*, 316 Or. 499, 511 (1993). Indeed, in *Buchler*, the Oregon Supreme Court determined that liability based the defendant's failure to warn plaintiffs that an escaped criminal might be in the area was not viable because the plaintiff failed to provide evidence that the defendant knew or had reason to know of the specific danger presented to the plaintiffs by the prisoner. *See id.* at 516.

"[W]hether a rational juror can find that harm is foreseeable, particularly in the context of criminal activity by third parties, is an *ad hoc* determination depending on the particular circumstances of each case." *McPherson*, 210 Or. App. at 617. Oregon courts have identified certain factors to consider when conducting the foreseeability analysis. For example, "cases following *Buchler* have recognized that the third-party criminal offender's criminal history and propensity for violence—at least insofar as it was or should have been known to the defendant— is an important consideration." *Miller*, 223 Or. App. at 712-13 (collecting cases). The vulnerability of the plaintiff also is a relevant factor. *Id.* at 713.

### 2. Analysis

The parties agree that GMS and Plaintiff had a landlord-tenant relationship between them, which comes with heightened duties of care. The Moving Defendants' argument at summary judgment is that GMS could not reasonably have foreseen that McKnight would pose a danger to Plaintiff. GMS explains that it "is not going to present McKnight as a boy scout, as he certainly was not. However, despite the complaints lodged against McKnight by other tenants, most were 'he said/she said' situations that could not be verified." Thus, the Moving Defendants explain, "nothing about [McKnight's] past behavior gave GMS a reason to believe that McKnight would be sexually indecent with Plaintiff." The Moving Defendants ask that the Court dismiss the negligence claim as alleging only "mere facilitation" on the part of GMS.

The parties have discussed several cases that analyze when conduct may or may not be foreseeable. In *McAlpine v. Multnomah County*, plaintiff-motorists were injured by a parolee during a traffic-related altercation. 166 Or. App. 472, 477 (2000). The plaintiffs alleged that the parole officer knew or had reason to know of the parolee's violent history—including armed robbery, possession of a gas bomb, and assault in the first degree—and that the roadside altercation was therefore foreseeable. *Id.* at 483. The court held that at the motion to dismiss stage, the harm could be reasonably foreseeable, and the court allowed the claim to proceed. *Id.* Similarly, in *Brown v. Washington County*, the Oregon Court of Appeals concluded that a reasonable juror could find that the defendant county knew or should have known that an assailant was likely to cause bodily harm to others because the county was familiar with the assailant's "entire criminal history, which included violent assaultive conduct." 163 Or. App. 362, 372 (1999).

Both *McAlpine* and *Brown* rely on the analysis in *Buchler*, in which the Oregon Supreme Court explored what types of underlying conduct are relevant to a foreseeability inquiry. The *Buchler* court held that the deaths and injuries caused by a felon with nonviolent underlying convictions were not legally foreseeable to the defendant jailer. 316 Or. at 507. The court explained that "the prisoner's criminal record only concerned property crimes, not acts of violence," and thus, that "[i]t is not possible for a reasonable person to find from this record that a custodian would have known that this particular prisoner was 'likely to cause bodily harm.'" *Id.* Finally, in *Miller*, which discussed foreseeability in the context of a landlord-tenant relationship, the court concluded that there was enough of a difference between the assailant's past conduct—a history of mental illness and a single assault several years before—and the conduct that instigated the case—an assault against a co-tenant—to hold as a matter of law that the attack was not

reasonably foreseeable. 223 Or. App. at 704, 716. The court emphasized that there was no evidence that the defendants knew that the assailant had a mental illness (or that his illness triggered violence) or that the defendants knew of the details of the first assault. *Id.* at 714.

Unlike in *Miller*, there is no dispute that the Moving Defendants were aware—both through AppFolio and direct interactions with tenants—of past, *detailed* allegations against McKnight. Furthermore, as in *McAlpine* and *Brown*, and unlike in *Buchler*, there are several common threads between McKnight's alleged past conduct and his alleged conduct towards Plaintiff. At least ten complaints were made against McKnight during the two and a half years preceding the July 12, 2021, incident and its aftermath. Although not all of these complaints involved a sexual assault, many of them included stalking and following women, staring at female tenants through windows, making threatening comments, and discussing his gun or deliberately displaying it. Plaintiff alleges that McKnight did each of those things to her, and on some occasions, multiple times. As for the sexual misconduct on July 12th, the Moving Defendants were aware of at least two explicit allegations of sexual misconduct: a tenant who asserted that McKnight rubbed her arm, and a GMS employee who asserted that McKnight sexually assaulted her and left bite marks on her body. The Moving Defendants thus were aware of at least one incident that potentially *exceeded* the severity of Plaintiff's allegation.

These specific sexual misconduct allegations, in light of McKnight's other disturbing conduct towards women—such as following them around, pounding on their doors, and making them fear for their lives—are sufficient to create an issue of fact as to whether the Moving Defendants knew or should have known that McKnight was a danger to Plaintiff, sexually or

otherwise.[11] A reasonable juror could find that Defendants' conduct constituted more than "mere facilitation" of a third party's intervening intentional criminal act. A reasonable juror thus could find that the alleged assault and subsequent harassment was foreseeable to the Moving Defendants.[12]

The Court also is unpersuaded by the Moving Defendants' argument that Defendants could not have "divined" that McKnight posed a sexual danger when Plaintiff—his close friend and supporter in a dispute against an ex-girlfriend—"herself did not make that inferential leap." This argument mischaracterizes which party had access to the pertinent information. Plaintiff made the calculation to befriend McKnight based on the limited information she had accessible to her. The Moving Defendants, who had access to the numerous past complaints, cannot blame Plaintiff for relying on incomplete information. Nor can they use Plaintiff's friendship with McKnight to evade their duty to keep Plaintiff and other tenants safe from dangers of which they were aware. That McKnight spent considerable time with Plaintiff and that Plaintiff thought the

---

[11] The Court does not find persuasive the Moving Defendants' ancillary argument that they would not have had reason to know that McKnight would assault *Plaintiff*—as opposed to, presumably, another tenant. The Moving Defendants were aware that Plaintiff and McKnight were close, and that McKnight had a history of assaulting women with whom he was close (including a former romantic partner). McKnight also had harassed at least two other women with a disability.

[12] In their opening brief, the Moving Defendants also argued that the Court should dismiss Plaintiff's claims against the individual defendants because Plaintiff failed to establish an applicable standard of care. Citing *Adams v. United States*, 2022 WL 1538649, at *14 (D. Or. May 16, 2022), the Moving Defendants asserted that Plaintiff needed to present expert testimony establishing the standard of care, and because she did not do so, her negligence claim as against the individual defendants cannot move forward. Plaintiff addressed this argument in her Response, explaining both why *Adams* is inapplicable and why dismissal of the claims against the individual Defendants is not warranted. The Moving Defendants do not address these arguments in their Reply and have thus conceded these arguments. *See supra* note 8.

two were friends does not demonstrate that McKnight's conduct was unforeseeable to the Moving Defendants.

### E.  Plaintiff's Request for Punitive Damages

"[I]f a court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages . . . ." 42 U.S.C. § 3613(c)(1). To obtain punitive damages under the FHA, a plaintiff must show that defendants acted at least with reckless indifference. *See Fair Hous. Ctr. of Wash. v. Breier-Scheetz Props., LLC*, 743 Fed. App'x. 116, 118 (9th Cir. 2018) (unpublished) (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002)); *see also Montano v. Bonnie Brae Convalescent Hosp., Inc.*, 79 F. Supp. 3d 1120, 1134 (C.D. Cal. 2015) (awarding punitive damages under FHA where defendants acted "with reckless indifference"); *Sanzaro v. Ardiente Homeowners Ass'n, LLC*, 364 F. Supp. 3d 1158, 1182 (D. Nev. 2019) (same).

The Moving Defendants argue that Plaintiff should not be able to seek punitive damages in this matter because she cannot show that the Moving Defendants "acted with an evil motive or callous indifference towards Plaintiff." Plaintiff responds that Defendants acted with reckless or callous indifference to her federally established rights because Defendants "were aware" of McKnight's concerning behavior—including complaints filed by Plaintiff herself—and chose not to evict him. Instead, Plaintiff argues, the Moving Defendants took adverse action against *her* by issuing the unwarranted August Eviction Notice.

The Court finds that a reasonable juror could find that the Moving Defendants acted with reckless indifference toward Plaintiff's rights. As discussed, Defendants were on notice about McKnight's past behavior—behavior that scared or endangered several female tenants at Evergreen Gardens. The record further reveals that Defendants had discussed evicting McKnight in the past but chose not to, even after Plaintiff reported a sexual assault. Finally, viewed in a light

most favorable to Plaintiff, Defendants never responded to her request for a reasonable accommodation to keep her walker outside. *Cf. Montano*, 79 F. Supp. 3d at 1128, 1134 (finding that defendants acted with reckless indifference in part because they "either refused or failed to respond to plaintiff's reasonable accommodation requests"). Accordingly, the Court declines to dismiss Plaintiff's request for punitive damages at this stage of the litigation.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART the Moving Defendants' motion for summary judgment, ECF 27. The Court grants the motion only against that portion of Plaintiff's Third Claim for Relief (alleging "Interference, Coercion, Intimidation") based on what the parties refer to as the March 2023 "14/30 notice." The Court denies the Moving Defendants' motion in all other respects.

**IT IS SO ORDERED**.

DATED this 20th day of May, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge